# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# BUTTE DIVISION



FILED

DEC 07 2016

Clerk, U.S. District Court
District Of Montana
Helena

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ATLANTIC RICHFIELD COMPANY,<br><br>Defendant. | No. CV-89-39-BU-SEH<br><br>**OPINION AND ORDER** |

## Background

On September 20, 2016, Lee Enterprises, Inc. d/b/a Montana Standard and Silver Bow Creek Headwaters Coalition ("Montana Standard") filed Applicant Intervenors' Motion to Intervene ("Motion").[1] Both the United States and Atlantic Richfield Company ("ARCO") filed response briefs in opposition.[2] Montana

---

[1] Doc. 1130.

[2] Doc. 1139 (ARCO); Doc. 1140 (United States).

-1-

Standard filed a reply.[3] On November 29, 2016, the Court conducted a hearing on the Motion. The matter is fully submitted.

This 27 year-old CERCLA[4] action, which involves the largest CERCLA site in the United States, arose from environmental damage which resulted from a century of mining and smelting operations by the Anaconda Copper Mining Company, to which ARCO is successor. The locations at which much of the environmental damage occurred were located primarily in and around Butte and Anaconda, Montana. However, some of the damage sites extend over one-hundred miles downstream from Butte/Anaconda along the Clark Fork River to the former Milltown Dam site. Numerous discrete sites known as "operable units" were established during the pendency of the litigation to manage the monumental task of remedying the detrimental effects of the extensive and prolonged mining operations.

The parties reached, and the Court approved, a landmark agreement known as the Streamside Tailings Operable Unit Consent Decree ("SSTOU")[5] in 1999, following ten years of discovery and motion practice undertaken and carried out

---

[3] Doc. 1143.

[4] Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9675.

[5] Doc. 934.

by the parties. The SSTOU identified six site-groups requiring environmental remediation. A binding schedule for settling any disputes over the final six site-groups was established. The parties have since reached agreement on, and the Court has entered consent decrees for three of the site-groups and for the Butte Mining Flooding ("Berkeley Pit") Site in a fourth site-group. Three site-groups remain pending. The several consent decrees are the result of years of negotiation carried out among the United States, ARCO, the State of Montana, Butte-Silver Bow County, and numerous other private and government entities.

On May 31, 2002, the United States moved the Court to maintain confidentiality of all settlement negotiations.[6] It sought "to protect the confidentiality, not only of deliberations and documents exchanged between the United States and ARCO, but also the confidentiality of documents exchanged and deliberations between either of the Parties and the Third-Party Participants[7] in settlement negotiations conducted under the SSTOU Framework."[8] The motion asserted that while all settlement negotiations up to the filing of the motion were

---

[6] Doc. 1037.

[7] *Id.* at 3 ("Third-Party Participants" included "the State of Montana, the Confederated Salish and Kootenai Tribes, and, depending on the particular site [subject to] the negotiations, certain other third-parties that the U.S. Environmental Protection Agency has identified as potentially responsible parties under Section 107 of [CERCLA].")

[8] *Id.* at 4.

confidential, assurance that confidentiality would continue throughout the remaining negotiations was sought. The motion was unopposed by ARCO.

On August 28, 2002, the Court issued its Order to Keep Settlement Communications Confidential ("Confidentiality Order").[9] The order was amended on December 29, 2003, to include the language underlined below:

> All settlement discussions among and between the Parties and any [Third-Party Participants] in settlement negotiations conducted pursuant to the [SSTOU], as well as all documents prepared for settlement purposes or exchanged by the participants in such negotiations, shall be kept confidential <u>both during and after the negotiations</u> and not disclosed to third persons.[10]

The State of Montana;[11] Northwestern Energy, LLC;[12] City and County of Butte-Silver Bow ("Butte-Silver Bow");[13] and Anaconda Deer Lodge County[14] all consented to be bound by the Confidentiality Order.

On June 7, 2016, Montana Standard's counsel sent letters to both the Montana Department of Environmental Quality ("MDEQ") and Butte-Silver

---

[9] Doc. 1042.

[10] Doc. 1052 at 1–2.

[11] Doc. 1038.

[12] Doc. 1041.

[13] Doc. 1064.

[14] Doc. 1141.

Bow,[15] asserting that the Montana Standard had the right, under Montana freedom of information laws,[16] to information related to MDEQ and Butte-Silver Bow's involvement in the settlement negotiations over the Butte Priority Soils Operable Unit ("BPSOU")—one of the three pending, unsettled site-groups established by the SSTOU. Specifically, it demanded:

> Reasonable opportunity to review, inspect and copy all documents and information in MDEQ's[Butte-Silver Bow's] possession, custody, or control related to BPSOU and the above-describe consent decree negotiations; and
>
> That all further meetings related to the BPSOU consent decree negotiations be opened to the public, and the minutes and/or other recordings of past meetings in which MDEQ[Butte-Silver Bow] took part be made available for public review, inspection and copying.[17]

MDEQ and Butte-Silver Bow denied the demand on grounds the Confidentiality Order prohibited the disclosure of such information.[18] Permissive intervention in this action is now sought for the limited purpose of challenging the Confidentiality Order.

---

[15] Doc. 1131-1 at 1–4.

[16] Mont. Const. art. II, §§ 8, 9; Mont. Code Ann. §§ 2-3-201–21; Mont. Code Ann. §§ 2-6-1001–20.

[17] Doc. 1131-1 at 1.

[18] *Id.* at 5, 10–11.

-5-

## Discussion

Permissive intervention is governed by Fed. R. Civ. P. 24(b):

(1) *In General*. On timely motion, the court may permit anyone to intervene who:

> (A) is given a conditional right to intervene by a federal statute; or
>
> (B) has a claim or defense that shares with the main action a common question of law or fact

. . .

(3) *Delay or Prejudice*. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Untimeliness is fatal to a motion to intervene. Upon such a finding, the Court need not address any of the remaining elements of Rule 24(b).[19]

The Court of Appeals for the Ninth Circuit ("Ninth Circuit") set forth three factors for determining timeliness in *League of United Latin American Citizens v. Wilson*: "the stage of the proceedings, the prejudice to existing parties, and the length of and reason for the delay[.]"[20] "In considering these factors, however, we must bear in mind that any substantial lapse of time weighs heavily against

---

[19] *United States. v. State of Wash.*, 86 F.3d 1499, 1503 (9th Cir. 1996).

[20] 131 F.3d 1297, 1308 (9th Cir. 1997).

intervention.'"[21] In *San Jose Mercury News, Inc. v. U.S. District Court, Northern District (San Jose)* the Ninth Circuit established that the timeliness clock starts to run "when the intervenor first became aware that its interests would no longer be adequately protected by the parties."[22]

### I. The Motion is Untimely, was Filed 13 Years after the Confidentiality Order, Will Prejudice the Parties, and Provides no Justification for Delay in Seeking Intervention

The portion of this case relating to the BPSOU has been stayed pending entry of a final consent decree. Since 1999, the parties and several Third-Party Participants have been and continue to be engaged in prolonged, confidential negotiations under the SSTOU framework. Settlement agreements resolving extensive, complex, technical disputes have been reached for several of the six site-groups, while others, including the BPSOU, remain under negotiation.

Both the United States and ARCO argue that prejudice to the parties from disclosure would be significant, asserting: (1) "[a]ll parties involved have exchanged documents setting forth positions and arguments that would otherwise have been saved for trial, and have taken positions, exposed weaknesses and shared ideas in manners which, quite frankly, would not have happened without

---

[21] *Id.* at 1302 (quoting *State of Wash.*, 86 F.3d at 1503).

[22] 187 F.3d 1096, 1101 (9th Cir. 1999).

the guaranty of confidentiality;"[23] (2) retroactively removing the veil of confidentiality after over 13 years of good faith negotiations have been carried out is directly counter to the settled expectations of all parties involved; and (3) such settlement negotiations may end entirely should they be thrust into the public eye. Settlement negotiations arguably have already been chilled by the possibility of public disclosure.

The challenge to the Confidentiality Order on its face is essentially without merit. To require the United States and ARCO to expend further time and money defending the order is itself prejudicial. The parties unquestionably would be prejudiced were the Motion to be granted.

The Motion before the Court is itself approximately 13 years late. The original Confidentiality Order was entered on August 28, 2002. The amended Confidentiality Order was entered on December 29, 2003. Both filings since entry have been matters of public record. Moreover, the State of Montana and Butte-Silver Bow publicly filed consents to be bound by the Confidentiality Order back in 2003 and 2004. The public filings of the orders in 2002 and 2003 gave notice to the world, including the Montana Standard, of the orders' existence and content as of the date of the filings. Anyone seeking to challenge the actions of government

---

[23] Doc. 1139 at 20.

has the obligation to be informed of matters of public record. Ignorance of this Court's actions, undertaken as they were in open court and documented by public record, cannot be argued to toll the timeliness clock.

Montana Standard did in fact know of the Confidentiality Order by at least March 22, 2003, when it published an article that commented on the confidential nature of the BPSOU settlement negotiations.[24] However, it simply sat by and did nothing in response to the Confidentiality Order and Butte-Silver Bow's consent to be bound for almost 13 years. It cannot now be heard to complain. The delay of approximately 13 years alone is fatal to the Motion.

Montana Standard did not offer a single justifiable reason for the 13-year delay in either of its briefs, although, at the hearing of November 29, 2016, it did assert that it and the general public were losing confidence in the federal government generally and the EPA specifically and were beginning to doubt the EPA is protecting the interest of the people of Butte in adequately cleaning up the remaining site-groups. However, no proof was presented as to what events, if any, precipitated such claimed doubts. Nothing before the Court supports the conclusion that the United States has betrayed the public's interest in environmental remediation. Montana Standard's nebulous stated reason for delay

---

[24] Doc. 1140, Exhibit A at 3–4.

cannot warrant the starting of a new timeliness clock.

Instead of making legitimate factual arguments supporting its position, Montana Standard cites to circuit case law permitting intervention after some delay, even a delay of years.[25] However, none of the cases cited even comes close to approving a 13-year delay. The longest delay found in any case to be justified was only four years.[26]

The Montana Standard also argues, citing *Pansy v. Borough of Stroudsburg*,[27] "[t]he timeliness requirement is relaxed when challenging a protective order because 'the public and third parties may often have no way of knowing at the time a confidentiality order is granted what relevance the . . . case has to their interests.'"[28] There, the court addressed and decided the issue of whether a third-party could intervene to challenge a confidentiality order over a settlement agreement years after a case was settled and dismissed. In allowing intervention, the court applied a relaxed timeliness standard, reasoning that the parties would experience little prejudice because the underlying suit was long ago

---

[25] Doc. 1131 at 11–12.

[26] *See Mokhiber v. Davis*, 537 A.2d 1100 (D.C. Cir. 1988).

[27] 23 F.3d 772 (3rd Cir. 1994).

[28] Doc. 1131 at 12 (quoting *Pansy*, 23 F.3d at 780).

-10-

resolved on the merits.[29] The same "little prejudice" has no application to the matter before the Court.

Unlike *Pansy*, where intervenors sought access to a settlement agreement in a settled and dismissed case, Montana Standard here is challenging the Confidentiality Order, which concerns ongoing settlement negotiations in a case yet to be tried, settled, or dismissed. As discussed *supra*, and unlike *Pansy*, the parties here would be prejudiced should their settlement negotiations become public. Moreover, the several settlement *agreements* already reached in this case are, in strict adherence with CERCLA, matters of public record. The several resolved SSTOU site-group consent decrees are available for inspection by any member of the public. *Pansy* simply has no application to this case where settlement negotiations are ongoing and a resolution on the merits is pending.

Montana Standard has failed to show that any of the timeliness factors weigh in its favor. Without justification, it waited 13 years to challenge the Confidentiality Order. Such a delay weighs heavily against intervention and, in this instance, is fatal to the intervention application. Furthermore, it now seeks, at the expense of prejudicing the parties and Third-Party Participants, to insert itself into ongoing confidential settlement negotiations, which have thus far been

---

[29] *Pansy*, 23 F.3d at 779–80.

effective at resolving highly complicated disputes. The Motion is untimely. The remaining Rule 24(b) elements need not be addressed.

## II. The Challenge Would Fail on the Merits Because the Confidentiality Order was Properly Entered Under This Court's Article III Powers

At its core, the challenge to the Confidentiality Order is grounded in the proposition that the Court failed to articulate "good cause" under Fed. R. Civ. P. 26(c) for entering the order. Rule 26(c)'s plain language, however, makes clear that it governs protective orders over *discovery*. What is now sought is not discovery. The parties are not engaged in discovery. In fact, the BPSOU litigation is stayed pending settlement negotiations.

Montana Standard has not cited to, nor has the Court found, any Ninth Circuit case approving an extension of Rule 26(c)'s good cause requirement beyond the plain language of the rule. The case at bar concerns active, ongoing negotiations, not a finalized settlement agreement as in *Pansy*. This Court finds no basis to extend the reach of Rule 26(c) as urged. Until the Ninth Circuit directs otherwise, no justification exists for expanding Rule 26(c)'s good cause requirement to the Confidentiality Order at issue.

The combined efforts of counsel and the Court have yielded but one case with reasoning directly applicable to the issue before the Court: *United States v.*

*Glens Falls Newspapers, Inc.*[30] There, the court noted "that fostering settlement is an important Article III function of the federal district courts."[31] Indeed, as in *Glen Falls*, this Court has a duty to ensure parties are afforded the opportunity to engage in frank, open discussion "so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial."[32] Moreover, the resolution of this prodigious case will greatly benefit the public by address and remediation of the negative effects of a legacy of mining and smelting. "The trial court must protect the public interest, as well as the interests of the parties, by encouraging the most fair and efficient resolution."[33] This case, in particular, requires that the parties be given a fair opportunity to settle.

The Confidentiality Order was entered under the inherent Article III powers of this Court to facilitate a resolution of this and all cases before it. Ample good cause exists to keep the settlement negotiations confidential. Both parties assert that confidentiality has been and continues to be pivotal in reaching agreements on the six SSTOU site-groups. Both parties doubt the remaining site-groups could be

---

[30] 160 F.3d 853 (2nd Cir. 1998).

[31] *Id.* at 856.

[32] *Id.*

[33] *Id.* at 857.

resolved amicably should their negotiations be thrust into the public eye. It is obvious the public has a strong interest in the efficient resolution of this case. Forcing the parties into further protracted litigation would without doubt delay resolution for years.

CERCLA mandates that the public be afforded an opportunity to participate in and comment upon proposed resolutions before they are entered by the Court.[34] Once resolution is reached, Montana Standard and any other interested person may read, comment on, and attend a public meeting regarding any proposed BPSOU consent decree. It will have ample opportunity to be publicly heard.

The challenge to the Confidentiality Order is without merit. Intervention will not be permitted.

ORDERED:

Montana Standard's Motion[35] is DENIED.

DATED this 7th day of December, 2016.

/s/ Sam E. Haddon

SAM E. HADDON
United States District Judge

---

[34] *See* 42 U.S.C. § 9617.

[35] Doc. 1130.