IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA AND THE STATE OF MONTANA, Plaintiffs,<br><br>v.<br><br>ATLANTIC RICHFIELD COMPANY, Defendant. | Civil Action No. CV89-039-BU-SEH |

**2020 PARTIAL CONSENT DECREE
FOR THE ANACONDA SMELTER NPL SITE**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | BACKGROUND | 1 |
| II. | JURISDICTION | 11 |
| III. | PARTIES BOUND | 12 |
| IV. | DEFINITIONS | 12 |
| V. | GENERAL PROVISIONS | 25 |
| VI. | PERFORMANCE OF THE WORK | 26 |
| VII. | REMEDY REVIEW | 31 |
| VIII. | ACCESS | 31 |
| IX. | FINANCIAL ASSURANCE | 33 |
| X. | PAYMENT OF RESPONSE COSTS | 40 |
| XI. | INDEMNIFICATION AND INSURANCE | 44 |
| XII. | FORCE MAJEURE | 48 |
| XIII. | DISPUTE RESOLUTION | 50 |
| XIV. | STIPULATED PENALTIES | 55 |
| XV. | COVENANTS AND RESERVATIONS BY UNITED STATES AND STATE | 60 |
| XVI. | COVENANTS AND RESERVATIONS BY AR | 69 |
| XVII. | EFFECT OF SETTLEMENT; CONTRIBUTION | 73 |
| XVIII. | ACCESS TO INFORMATION | 76 |
| XIX. | RETENTION OF RECORDS | 78 |
| XX. | NOTICES AND SUBMISSIONS | 79 |
| XXI. | RETENTION OF JURISDICTION | 82 |
| XXII. | APPENDICES | 82 |
| XXIII. | EFFECTIVE DATE | 82 |
| XXIV. | MODIFICATION | 83 |
| XXV. | LODGING AND OPPORTUNITY FOR PUBLIC COMMENT | 83 |
| XXVI. | SIGNATORIES/SERVICE | 84 |
| XXVII. | FINAL JUDGMENT | 85 |

# I.   BACKGROUND

<u>THE UNITED STATES' COMPLAINT</u>

A.      In 1989, the United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint ("Complaint") in this matter (the "Federal Action") pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9607, against the Atlantic Richfield Company ("AR").

B.      In the Complaint and its subsequent amendments dated October 14, 1992, October 31, 1994, August 2, 2003, November 5, 2004, and June 8, 2020, the United States sought the recovery of past response costs and a declaratory judgment of liability for future response costs paid at or in connection with the Silver Bow Creek/Butte Area National Priorities List ("NPL") Site, the Milltown Reservoir Sediments NPL Site (now referred to as the "Milltown Reservoir/Clark Fork River NPL Site"), the Butte Priority Soils Operable Unit, and the Anaconda Smelter NPL Site ("Anaconda Site" or "Site"). This Consent Decree concerns certain response actions performed and to be performed at the Anaconda Site.

C.      In response to the United States' Complaint, AR asserted several defenses and filed counterclaims against the United States, naming several departments and agencies, seeking cost recovery, contribution, contractual indemnity, equitable indemnification, recoupment, and declaratory relief. Among AR's defenses to the United States' claims is AR's assertion that the United States' CERCLA claims are in the nature of contribution under CERCLA § 113 rather than CERCLA § 107, and thus AR's CERCLA liability is several rather than joint and several.

1

This defense is addressed in a Report and Recommendation issued by the Magistrate in the Federal Action.

D.    The State of Montana (the "State"), acting by and through the Montana Department of Environmental Quality ("DEQ"), filed a motion to intervene and a complaint in intervention in the Federal Action on June 8, 2020, which alleged claims under CERCLA and the Montana Comprehensive Environmental Cleanup and Responsibility Act ("CECRA"), §§ 75-10-701, MCA, *et seq.* relating to the Butte Priority Soils Operable Unit. The State's motion to intervene in the Federal Action was granted on June 25, 2020. In connection with the lodging of this Consent Decree, the State is filing an amended complaint that adds claims under CERCLA and CECRA relating to the Anaconda Site.

SETTLEMENT FRAMEWORK

E.    In November of 1998, the United States and AR reached a settlement regarding the claims of the United States at a portion of the Silver Bow Creek/Butte Area NPL Site – the Streamside Tailings Operable Unit ("Streamside Tailings Consent Decree"). The Streamside Tailings Consent Decree, together with a consent decree entered in the case of *Montana v. Atlantic Richfield*, No. CV-83-317-H-SEH, both of which were entered on April 19, 1999, also resolved the majority of the Clark Fork River Basin natural resource damages claims of the United States and the State against AR. The Streamside Tailings Consent Decree also established a framework for resolving the United States' remaining claims throughout the Clark Fork River Basin in Montana. These claims were separable into geographic areas that, under Section VII of the Streamside Tailings Consent Decree, the parties agreed to resolve in six groups of operable units:

2

1.    Rocker Site;

2.    Butte Mine Flooding (Berkeley Pit) Site and the Butte Active Mining Area Site;

3.    Anaconda Smelter Site;

4.    Clark Fork River Operable Unit, Warm Spring Ponds Operable Units and the Milltown Reservoir Operable Units;

5.    Butte Priority Soils (towns of Butte and Walkerville) Site; and

6.    The Westside Soils Site formerly referred to as Non-Priority Soils Operable Unit in Paragraph 31(F) of the Streamside Tailings Consent Decree (rural Butte).

F.    The United States and AR have previously resolved their claims and defenses, subject to certain stated reservations, involving the Rocker, Butte Mine Flooding, Milltown Reservoir, Clark Fork River, and Butte Priority Soils Sites.  The Rocker Site consent decree was entered in November 2000, the Butte Mine Flooding Site consent decree was entered in August 2002, and the Milltown Site consent decree was entered in February 2006.  The Clark Fork River Operable Unit consent decree and a consent decree between the State and AR ("State-AR 2008 CD"), which were entered in August 2008, addressed certain remaining State and federal natural resource damage claims and certain response action and costs claims against AR.  These decrees also obligated the State to implement remedial and restoration actions in certain areas of the Anaconda Site, including areas known as Stucky Ridge / Section 36 and RDU 15 ("State Property Remedial Commitments") and other State-owned lands within the Site ("State Lands Obligations").  The State's performance of the State Property Remedial Commitments and State Lands Obligations is ongoing.  The Butte Priority Soils consent decree was lodged on June 8, 2020.

3

G.     In addition, the United States and AR negotiated two consent decrees for

reimbursement of United States' CERCLA response costs at the Clark Fork Basin sites. The

first, the Consent Decree for Settlement of Remaining Sites Past Response Costs ("Past Costs

Consent Decree"), was entered by this Court on January 24, 2005. It addressed EPA and United

States Department of Justice ("DOJ") costs incurred in connection with the Anaconda Site, the

Butte Priority Soils Operable Unit, the Clark Fork River Operable Unit, and the Warm Springs

Ponds Operable Units. The Past Costs Consent Decree also resolved all counterclaims and most

defenses asserted by AR against the United States in the Federal Action and addressed related

covenants and reservations for the "Remaining Sites" as defined in that consent decree.

Paragraph 20 of the Past Costs Consent Decree reserved certain specific counterclaims and

defenses relating to the Remaining Sites, including the Anaconda Site. The second, the

September 2013 Consent Decree for Settlement of Interim Past Response Costs ("Interim Past

Costs Consent Decree") provided for reimbursement of later EPA and DOJ response costs paid

at the Anaconda Site and the Warm Springs Ponds Operable Units.

H.     Although the Streamside Tailings Consent Decree set out a tentative order for

negotiating consent decrees resolving federal claims over the six groups of Clark Fork Basin

operable units, it also provided the parties with flexibility to change this order. Consistent with

this flexible framework, after addressing other operable units out of turn, the parties commenced

negotiations to address the United States' and the State's claims against AR relating to the

Anaconda Site. This Consent Decree and the Statement of Work ("SOW") attached hereto as

Appendix A, pursuant to which AR is agreeing to perform certain specified remedial actions and

4

operation and maintenance activities at the Anaconda Site, is intended as a partial resolution of these claims against AR, as described in this Consent Decree.

ANACONDA SMELTER NPL SITE

I.      The Anaconda Site is one of several Superfund sites in the Upper Clark Fork River Basin.  The Site covers approximately 300 square miles of agricultural, pasture, rangeland, forest, riparian, and wetland areas in the southern Deer Lodge Valley and surrounding foothills in and around the City of Anaconda and about 25 miles northwest of the City of Butte.  For nearly a century the Anaconda Copper Mining Company ("ACM") and its predecessors conducted mining, milling, and smelting activities at the Site.  Areas of the Site now contain volumes of wastes, slag, tailings, flue dust, and debris, which have contaminated soils, groundwater, and surface water.  Beginning in 1983, EPA, in consultation with DEQ, initiated a series of investigations of Site contamination and instituted various removal and remedial actions at the Site.  EPA placed the Anaconda Site on the Superfund program's National Priorities List ("NPL") on September 8, 1983, *see* 48 Fed. Reg. 40658, pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605.

J.      The Anaconda Site is presently organized into five operable units.  The parties have previously negotiated consent decrees regarding two of these operable units: the Mill Creek Operable Unit and the Flue Dust Operable Unit.  A third operable unit, the Community Soils Operable Unit ("CSOU"), is not addressed under this Consent Decree, although response actions at the CSOU are ongoing and enforceable under one or more administrative orders.  This Consent Decree focuses on certain response actions at the other two operable units at the Site:

the Anaconda Regional Water, Waste & Soils Operable Unit ("ARWW&S OU") and the Old

Works/East Anaconda Development Area Operable Unit ("OW/EADA OU").

K.     The ARWW&S OU is a comprehensive regional operable unit of the Anaconda

Site that addresses soil, surface water, and groundwater contamination at the Site not addressed

by the other Site OUs. The RI/FS for the ARWW&S OU was completed by AR through a

number of separate reports issued in 1996 and 1997. EPA published notice of the proposed plan

for remedial action at the ARWW&S OU on October 21, 1997. EPA provided an opportunity

for written and oral comments from the public on the proposed plan for remedial action. A copy

of the transcript of the public meeting is available to the public as part of the administrative

record upon which the Regional Administrator, EPA Region 8, based the selection of the

response action. The decision by EPA on the remedial action to be implemented at the

ARWW&S OU was embodied in a Record of Decision ("ROD") executed on September 29,

1998, and attached hereto as Appendix B, on which the State gave its concurrence. On

November 8, 2009, EPA published notice of a revised plan for remedial action at the ARWW&S

OU. EPA's decision on the revised plan was embodied in a ROD Amendment, executed on

September 29, 2011, and attached hereto as Appendix C, on which the State concurred. Among

other things, the ARWW&S OU ROD Amendment lowered the human health standard for

arsenic in Site groundwater and surface waters to meet new state and federal standards. Given

the lower standard, the ROD Amendment also expanded the areas in which the standard would

be waived. This waiver was based on the finding that it was technically impracticable from an

engineering perspective to meet the standard in those areas. In September 2019, EPA published

notice of an additional proposed plan for revisions to the remedial action at the ARWW&S OU

6

and provided an opportunity for written and oral comments from the public. The proposed plan set out additional response actions necessary to reduce surface water contamination, and also provided for contingent waivers of certain State of Montana water quality standards, if certain conditions are met and certain remedial actions are performed, based on the likelihood that achieving such standards would be technically impracticable from an engineering perspective. The issuance of these contingent waivers will not require a further ROD Amendment or additional technical impracticability evaluation. EPA's decision on the proposed plan is reflected in a ROD Amendment executed on June 12, 2020, and attached hereto as Appendix D, on which the State concurred.

      L.     Since 2000, AR has performed and continues to perform a number of response actions at the ARWW&S OU identified in the ARWW&S OU ROD pursuant to the following EPA administrative orders:

      1.     Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-8-2001-01 (December 11, 2000) (RDU 4 Anaconda Ponds);

      2.     Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2002-07 (June 11, 2002) (RDU 8 Opportunity Ponds);

      3.     Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08--2002-09 (September 9, 2002) (RDU 3 and 14 Aspen Hills Loop Track);

      4.     Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08--2002-10 (September 9, 2002) (RDU 1 Stucky Ridge);

5.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2003-0017 (September 29, 2003) (RDU 12 Slag);

6.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2003-0018 (September 29, 2003) (RDU 5 Active Railroad West);

7.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-082004-0001 (October 22, 2004) (RDU 11 Cashman Concentrate);

8.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2005-0007 (August 5, 2005) (West Galen Expansion Area);

9.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-082007-0008 (June 7, 2007) (RDU 6 South Opportunity Uplands);

10.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2008-0009 (September 22, 2008) (RDU 7 North Opportunity Uplands);

11.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2010-0004 (September 13, 2010) (RDU 9 Fluvial Tailings);

12.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2010-0005 (September 13, 2010) (RDU 5 Active Railroad East);

13.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2011-0009 (June 2, 2011) (RDU 14 Smelter Hill Facilities);

14.      Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2015-0010 (September 24, 2015) (RDU 10 Warm Springs Creek); and

15. Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2016-0005 (June 22, 2016) (RDU 3 Smelter Hill Uplands).

M. The OW/EADA OU encompasses approximately 1,300 acres of the Site. In September 1993, AR completed an RI/FS for the OW/EADA OU pursuant to 40 C.F.R. § 300.430. Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the RI/FS and of the proposed plan for remedial action at the OW/EADA OU on September 22 and 24, 1993. The decision by EPA on the remedial action to be implemented at the OW/EADA OU was embodied in a final ROD executed on March 8, 1994, and attached hereto as Appendix E, on which the State gave its concurrence. EPA issued Explanations of Significant Differences ("ESD") for the OW/EADA OU ROD on November 6, 1995 (Appendix F), and June 12, 2020 (Appendix G).

N. Since 1994, AR has performed a number of response actions at the OW/EADA OU identified in the OW/EADA OU ROD and pursuant to the Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-VIII-94-08 (April 8, 1994). Response actions at the OW/EADA OU to date have centered on reduction of arsenic concentrations in soils, construction of engineered covers on milling and smelting waste piles, installing sedimentation basins and channels to control stormwater runoff into surface waters and other downgradient receptors, and revegetating hillsides and other natural features. AR's work at the OW/EADA OU to date includes completion of construction of the OWGC Remedial Action, as defined herein. With the submission and approval by EPA, in consultation with DEQ, of a Final Remedial Action Completion Report for the OWGC Remedy, the requirements for Certification of Remedial Action Completion for the OWGC Remedy will be determined to have been

9

satisfied pursuant to Section 4.9 of the SOW and Section 122(f)(3) of CERCLA, 42 U.S.C. §
9622(f)(3).

O.    Based on the information presently available to EPA and the State, EPA and the
State believe that the Work will be properly and promptly conducted by AR if conducted in
accordance with this Consent Decree and its appendices.  Solely for the purposes of Section
113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the RODs and the Work to be
performed by AR pursuant to this Consent Decree shall constitute a response action taken or
ordered by the President for which judicial review shall be limited to the administrative record.

NOTICES

P.    In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C.
§ 9621(f)(1)(F), EPA notified DEQ of negotiations with AR regarding the Anaconda Site.  EPA
also provided DEQ, on behalf of the State, with an opportunity to participate in such negotiations
and to be a party to this Consent Decree.  DEQ has since participated in these negotiations, and
the State is a party to the Federal Action and a signatory to this Consent Decree.

NO ADMISSION OF LIABILITY

Q.    By entering into this Consent Decree, AR, the United States, and the State (the
"Parties") do not admit to any liability arising out of the transactions or occurrences either that
were alleged, or could have been alleged, in the complaints, amended complaints, or
counterclaims filed in the Federal Action.  In addition, AR does not admit or acknowledge that
any alleged release or threatened release of hazardous substances at or from the Anaconda Site
constitutes an imminent or substantial endangerment to the public health or welfare or the
environment.  The United States does not admit any liability arising out of the transactions or

10

occurrences alleged in any counterclaim asserted by AR. The form of this Consent Decree (which is related to the prior consent decrees filed in the Federal Action) and the interpretation of certain legal requirements supporting the Work are unique to the site-specific circumstances occurring at the Anaconda Site and are not precedent for any other consent decree.

### THE PROPOSED SETTLEMENT

R.     The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite specified portions of the cleanup of the Anaconda Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.    JURISDICTION

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367, and 42 U.S.C. §§ 9606, 9607, and 9613(b).  This Court also has personal jurisdiction over the Parties.  Solely for the purposes of this Consent Decree and the underlying complaints, the parties waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District.  The Parties shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.  Each Party hereby agrees not to oppose entry of this Consent Decree by this Court unless the United States or the State has notified the other Parties in writing that it no longer supports entry of this Consent Decree after consideration of public comment, as provided in Section XXV (Lodging and Opportunity for Public Comment) below.

11

### III.  PARTIES BOUND

2.      This Consent Decree is binding upon the United States, the State, and AR and its successors and assigns. Any change in ownership or corporate or other legal status of AR including, but not limited to, any transfer of assets or real or personal property, shall in no way alter AR's responsibilities under this Consent Decree.

3.      AR shall provide a copy of this Consent Decree to each contractor hired to perform the Work (as defined below) or any portion of the Work required by this Consent Decree and to each person representing AR with respect to the Site or the Work.  AR shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree.  AR or its contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work.  AR shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work contemplated herein in accordance with this Consent Decree.  With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with AR within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

### IV.  DEFINITIONS

4.      Unless otherwise expressly provided in this Consent Decree, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Consent Decree or its appendices, the following definitions shall apply solely for purposes of this Consent Decree:

"Anaconda Site" or "Site" means the Anaconda Smelter NPL Site, which is shown on the map attached hereto as Appendix H.

"Anaconda Smelter NPL Site Special Account" means the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"ARAR" means an applicable or relevant and appropriate requirement, criterion, standard, or limitation of federal or state law within the meaning of Section 121(d)(2) of CERCLA, 42 U.S.C. § 9621(d)(2), identified in the RODs.

"AR" means the Defendant, Atlantic Richfield Company, its divisions and subsidiaries, including ARCO Environmental Remediation L.L.C. (AERL), and any predecessors in interest. It shall also mean any successors in interest to the extent that any such successor's liability at the Anaconda Site derives from the liability of the Atlantic Richfield Company, its divisions and subsidiaries, including AERL, and any predecessors in interest.

"ARWW&S OU" means the Anaconda Regional Water, Waste and Soils Operable Unit of the Anaconda Site.

"ARWW&S OU ROD" means the Record of Decision for the Anaconda Regional Water, Waste and Soils Operable Unit of the Anaconda Site, signed on September 29, 1998, by the Assistant Regional Administrator for Ecosystems Protection and Remediation, EPA Region 8, and concurred on by the Director of the Montana Department of Environmental Quality on behalf of the State, all attachments, the ROD Amendments executed on September 29, 2011, and June 12, 2020, and any nonsignificant/minor modifications thereto, when effective. For purposes

13

of this Consent Decree, the ARWW&S OU ROD does not include any other future ROD amendments or ESDs.

"CECRA" means the Montana Comprehensive Environmental Cleanup and Responsibility Act, as amended, §§ 75-10-701 *et seq.*, MCA.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9601-9675.

"Certification of Remedial Action Completion for the OWGC Remedy" means EPA's certification, in consultation with DEQ, pursuant to Section 4.9 of the SOW and Section 122(f)(3) of CERCLA, 42 U.S.C. § 9622(f)(3), that the Remedial Action for the OWGC Remedy and any modifications thereto have been completed in accordance with the requirements of CERCLA, the NCP, and the OW/EADA ROD, including certification that Performance Standards have been attained.

"Certification of Remedial Action Completion for the Slag Pile Remedy" means EPA's certification, in consultation with DEQ, pursuant to Section 4.8 of the SOW and Section 122(f)(3) of CERCLA, 42 U.S.C. § 9622(f)(3), that the Remedial Action for the Slag Pile Remedy and any modifications thereto have been completed in accordance with the requirements of CERCLA, the NCP, and the ARWW&S ROD, including certification that applicable Performance Standards have been attained.

"Clark Fork River Operable Unit Consent Decree" means the consent decree entered in this Federal Action on August 21, 2008, resolving, among other things, the United States' response action, natural resource damages, and certain response cost claims against AR in connection with the Clark Fork Operable Unit.

14

"Contingent Replacement Performance Standards" are the contingent standards identified in the 2020 ARWW&S ROD Amendment and Tables 6-1, 6-2, and 6-3 of the Final Surface Water Management Plan for the Anaconda Site.

"Consent Decree" means this 2020 Partial Consent Decree for the Anaconda Smelter NPL Site, and all appendices attached hereto. In the event of conflict between this Consent Decree and any appendix, this Consent Decree shall control.

"Cost Documentation" means a cost package for EPA's costs which consists of applicable: (1) payroll information, consisting of the Superfund Cost Recovery Package Imaging and On-Line System ("SCORPIO$") report or an equivalent cost summary; (2) indirect cost information, consisting of an overall and an employee-by-employee SCORPIO$ report or equivalent cost summary; (3) travel information, consisting of a SCORPIO$ report or an equivalent cost summary, travel authorizations, and travel vouchers or their equivalent that exist; (4) EPA contractor (including Contract Laboratory Program contracts) information, consisting of site and/or Operable Unit specific vouchers, any existing progress reports, Treasury schedules, tasking documents for contractors not required to provide progress reports, Annual Allocation Reports and the SCORPIO$ report or an equivalent cost summary; (5) EPA Interagency Agreements ("IAGs") information, consisting of SCORPIO$ reports or an equivalent cost summary, IAGs and any amendments thereto, invoices or the equivalent, proof of payment documents, and any existing progress reports or their equivalent; (6) EPA Cooperative Agreements information, consisting of SCORPIO$ reports or an equivalent cost summary, cooperative agreements and any amendments thereto, drawdown documentation, DEQ quarterly progress reports; (7) prejudgment interest information, consisting of an interest cost report

showing methodologies and calculations; and (8) Operable Unit allocated cost information, consisting of a narrative of allocation methodologies and spreadsheets implementing such methodologies. Because DEQ has incurred costs and may continue to incur costs under cooperative agreements with EPA which relate to or are allocated to the Anaconda Site, Cost Documentation, if requested by AR, shall also include: (a) DEQ contractor invoices; (b) any existing contractor progress reports; and (c) State Accounting, Budget, and Human Resources System Report 106 information (if not included in DEQ quarterly progress reports) or its equivalent. EPA may also provide the information described in the foregoing list of "Cost Documentation" in the form of printouts from electronic databases or systems that have been developed or may be developed by EPA in the future. "Cost Documentation" for response costs incurred by DOJ shall consist of a cost summary of: (a) direct labor costs; (b) other direct costs (invoices, travel, etc.); and (c) indirect costs, and upon request by AR, shall also consist of the supporting reports for each of these three types of DOJ costs.

"CSOU" means the Community Soils Operable Unit of the Anaconda Site.
"Day" or "day" means a calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DEQ" means the Montana Department of Environmental Quality and any predecessor or successor departments or agencies of the State.

"DOJ" means the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" means 60 days from the date that this District Court enters the Consent Decree, unless an appeal of the entry and judgment is filed during the 60-day period; if an appeal is taken, the Effective Date means the date on which the District Court's judgment is affirmed.

"EPA" means the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"ESD" means an Explanation of Significant Differences issued pursuant to 40 C.F.R. § 300.435(c) that describes significant changes to a remedy selected in a record of decision under CERCLA (*i.e.*, not minor changes or fundamental changes).

"Federal Action" means *United States v. Atlantic Richfield Company*, No. CV-89-039-SEH (D. Mont.).

"Final Remedial Action Completion Report for the OWGC Remedy" means the report to be submitted by AR that will, upon approval by EPA in consultation with DEQ, result in Certification of Remedial Action Completion for the OWGC Remedy pursuant to Section 4.9 of the SOW and Section 122(f)(3) of CERCLA, 42 U.S.C. § 9622(f)(3).

"Future Response Costs" shall mean all costs incurred pursuant to this Consent Decree after the Effective Date, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this Consent Decree, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Paragraph 11 (Emergencies and Releases), Paragraph 12 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), Paragraph 25 (Access to Financial

17

Assurance), Section VII (Remedy Review), Section VIII (Access) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIII (Dispute Resolution), and all litigation costs.  Although this Consent Decree does not contemplate direct reimbursement of the State's Future Response Costs from AR to the State, Section X of this Decree does require AR to reimburse EPA for all of its Future Response Costs relating to this Consent Decree, including Future Response Costs paid by EPA to the State under a cooperative agreement.

"Hazardous Substance" means a hazardous substance within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), or a hazardous or deleterious substance within the meaning of Section 75-10-701(8), MCA.

"Institutional Controls" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Work; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the Work; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Work.

"Interest" on federal claims means interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at

18

the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"National Contingency Plan" or "NCP" means the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"NPL" means the National Priorities List set forth at 40 C.F.R. Part 300, appendix B.

"Notice of Completion of Surface Water Remedy" means EPA's notice, in consultation with DEQ, pursuant to Section 4.7 of the SOW that all remedial activities comprising the Surface Water Remedy and any modifications thereto have been completed in accordance with the requirements of CERCLA, the NCP, and the ARWW&S ROD.

"Old Works Golf Course" or "OWGC" means the public golf course owned by Anaconda-Deer Lodge County and operated by Old Works Golf Course, Inc., a Montana non-profit corporation, on the property located within the OW/EADA OU, which is more particularly described as Tract A in Certificate of Survey 474-B recorded on December 12, 2019, at reception No. 206448 in the real property records of the Anaconda-Deer Lodge County real property records and depicted in the SOW, Attachment 10 (Old Works Golf Course Figure).

"OWGC Conversion Remedy" means the contingent remedy for converting the existing Old Works Golf Course from a golf course to other recreational uses and open space in the event that the Old Works Golf Course property ceases to be utilized as a golf course in the future, as described in sections 1.3(e) and 5 of the SOW.

"OWGC O&M" means the activities described in the Old Works Golf Course Operations and Maintenance Plan (September 2019), attached to the SOW as Attachment 5, to maintain the effectiveness and protectiveness of the OWGC Remedy.

"OWGC O&M Plan" means the Old Works Golf Course Operations and Maintenance Plan (September 2019), attached to the SOW as Attachment 5.

"OWGC Remedy" means the RA activities, except for Operation and Maintenance, identified in section 1.3(c) of the SOW (Scope of the Remedy/OWGC Remedy).

"Operable Unit" or "OU" means an area, geographic or otherwise, for which there is a response action, whether removal or remedial, that is subject to a separate administrative record and response selection decision.

"Operation and Maintenance" or "O&M" means all activities performed by AR that are required to operate, maintain, and monitor the effectiveness of Remedial Action as specified in the SOW and its attachments.

"OW/EADA OU" means the Old Works/East Anaconda Development Area Operable Unit of the Anaconda Site.

"OW/EADA OU ROD" means the Record of Decision for the Old Works/East Anaconda Development Area Operable Unit of the Anaconda Site, signed on March 8, 1994, by the Assistant Regional Administrator for Ecosystems Protection and Remediation, EPA Region 8, and concurred on by the Director of the Montana Department of Environmental Quality on behalf of the State, including all attachments, the ESDs issued on November 6, 1995 and June 12, 2020, and any nonsignificant/minor modifications thereto, when effective.  For purposes

of this Consent Decree, the OW/EADA OU ROD does not include any other future ROD amendments or ESDs.

"Paragraph" means a portion of this Consent Decree identified by an Arabic numeral.

"Parties" means the United States, the State, and AR.

"Past Costs Consent Decree" means the Consent Decree for Settlement of Remaining Sites Past Response Costs entered in the Federal Action on January 24, 2005, which resolved certain of the United States' past response cost claims against AR relating to the Anaconda Site, the Butte Priority Soils Operable Unit, the Clark Fork River Operable Unit, and the Warm Springs Ponds Operable Units.

"Performance Standards" means the cleanup standards and levels and other measures of achievement of the Remedial Action objectives, including ARARs that are applicable to the Work required under this Consent Decree, contained in: the ARWW&S ROD (including any Contingent Replacement Performance Standards) and the Vegetation Management Plan (June 24, 2013) for the Surface Water Remedy and Slag Pile Remedy; the Final Surface Water Management Plan (August 2020) and ARWW&S OU Supplemental Surface Water Controls Remedial Design/Remedial Action (RD/RA) Report (March 11, 2020) for the Surface Water Remedy; the Slag Management Plan, Remedial Design Unit 12 – Slag Main Granulated Slag (August 2020) and the Slag Management Plan, Remedial Design Unit 12 – Slag, West Stack Slag Site (August 2020) for the Slag Pile Remedy; and the OW/EADA ROD and OWGC O&M Plan for the OWGC Remedy.

"Plaintiffs" means the United States and the State of Montana.

"Proprietary Controls" means easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to Montana common law or statutory law by an instrument that is recorded in the appropriate land records office.

"Remedial Action" or "RA" means those activities, except Operation and Maintenance, that AR has undertaken or will undertake as required under this Consent Decree and the SOW to implement the OWGC Remedy, the Surface Water Remedy, and the Slag Pile Remedy.

"Remedial Action Work Plans" or "RAWPs" means, for purposes of this Consent Decree, the documents described in the SOW or developed pursuant to this Consent Decree that detail the implementation plans for the Remedial Action, and any amendments thereto, as approved by EPA in accordance with this Consent Decree.

"Remedial Design" or "RD" means those activities that AR has undertaken or will undertake to develop the final plans and specifications for the Remedial Action.

"RODs," for purposes of this Consent Decree, means, collectively, the ARWW&S ROD and the OW/EADA OU ROD.

"Section" means a portion of this Consent Decree identified by a Roman numeral.

"Slag Pile Remedy" means the RA activities, except for Operation and Maintenance, identified and described in section 1.3(b) of the SOW (Scope of the Remedy/Slag Pile Remedy).

"Slag Piles" means the Main Granulated Slag Pile and the West Stack Slag Pile at the ARWW&S OU. The Main Granulated Slag Pile is located in Section 1 of Township 4 North, Range 11 West and is depicted in Attachment 11 to the SOW. The West Stack Slag Pile is

22

located in Section 11 of Township 4 North, Range 11 West, and is also depicted in Attachment 11 to the SOW.

"State" means the State of Montana, including all of its departments, agencies, and instrumentalities.

"State Action" means *State of Montana v. Atlantic Richfield Company*, No. CV-83-317-HLN-SEH (D. Mont.).

"State-AR 2008 CD" means the consent decree entered in the State Action on August 21, 2008, resolving the State's and AR's claims for response costs and response actions as to certain State-owned lands within the ARWW&S OU and other claims specified in that consent decree, which has been referred to in past agreements as "State CD II."

"State Lands Obligations" is defined as that term is defined in the State-AR 2008 CD, at section IV, p. 12.

"State Property Remedial Commitments" is defined as that term is defined in the Clark Fork River Operable Unit Consent Decree, at section IV, p. 33.

"Statement of Work" or "SOW" means the document describing the Work AR must perform pursuant to this Consent Decree, which is attached to this Consent Decree as Appendix A, including its attachments and any amendments thereto.

"Streamside Tailings Consent Decree" means the consent decree entered on April 19, 1999, which resolved certain United States natural resource damages claims against AR and established the framework for resolving all remaining Clark Fork River Basin CERCLA claims against AR (as described in Recitals E through H under Section I of this Consent Decree).

23

"Subparagraph" means a portion of a Paragraph identified by an upper or lower case letter or by a lower case Roman numeral.

"Supervising Contractor" means the principal contractor(s) or AR employee(s) retained or utilized by AR, as approved by EPA, in consultation with the DEQ, to supervise and direct the implementation of the Work under this Consent Decree.

"Surface Water Remedy" means the RA activities, except for Operation and Maintenance, identified and described in section 1.3(a) of the SOW (Scope of the Remedy/Surface Water Remedy). Other remedial activities addressing surface water contamination at the Site pursuant to EPA administrative orders are expressly excluded from the definition of "Surface Water Remedy."

"United States" means the United States of America, including all of its departments, agencies, and instrumentalities.

"Waste Material" means: (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33), 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous or deleterious substance" under Section 75-10-701(8), MCA.

"Work" means all activities AR is required to perform under this Consent Decree, including the Remedial Design, Remedial Action, Operation and Maintenance, including OWGC O&M, emergency response actions undertaken pursuant to section 4.4 of the SOW (Emergency Response and Reporting), and, if required pursuant to section 5.0 of the SOW, the OWGC Conversion Remedy; provided however that Work does not include the activities required under Section XIX (Retention of Records).

24

## V.   GENERAL PROVISIONS

5.      **Objectives of the Parties**. The objectives of the Parties in entering into this Consent Decree are to protect public health and welfare and the environment by the design and implementation of the Work by AR, to pay certain United States response costs related to this Consent Decree, and to resolve the claims of the United States and State against AR and the claims of AR against the United States with regard to the Work as provided for in this Consent Decree.

6.      **Commitments by AR**.  AR shall finance and perform the Work in accordance with this Consent Decree and all deliverables developed by AR and approved or modified by EPA, in consultation with DEQ, pursuant to this Consent Decree.  AR shall also pay United States Future Response Costs, as provided in this Consent Decree.

7.      **Compliance with Applicable Law**.  Nothing in this Consent Decree limits AR's obligations to comply with the requirements of all applicable federal and state laws and regulations.  AR must also comply with all applicable ARARs as set forth in the RODs, and in the manner described by the SOW. The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.      **Permits**.

a.      As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (*i.e.*, within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any

25

portion of the Work that is not on-site requires a federal or state permit or approval, AR shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

        b.      AR may seek relief under the provisions of Section XII (Force Majeure) of this Consent Decree for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit required for the Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

        c.      This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.   PERFORMANCE OF THE WORK

9.     **Coordination and Supervision.**

        a.      **Project Coordinator.**

        (1)      AR's Project Coordinator must have sufficient technical expertise to coordinate the Work.  AR's Project Coordinator may not be an attorney representing AR in this matter and may not act as the Supervising Contractor. AR's Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

        (2)      EPA shall designate and notify AR of its Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work.  EPA's Project Coordinator will have the same authority as a remedial project manager and/or an on-scene

coordinator, as described in the NCP.  This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)     DEQ shall designate and notify EPA and AR of its Project Coordinator.  DEQ may designate other representatives, including its employees, contractors and/or consultants to oversee the Work.  For any meetings and inspections in which EPA's Project Coordinator participates, DEQ's Project Coordinator also may participate.  AR shall notify DEQ reasonably in advance of any such meetings or inspections.

(4)     AR's Project Coordinator shall meet with EPA's and DEQ's Project Coordinators at least monthly.

b.     **Supervising Contractor**.  AR may propose one or more Supervising Contractors to supervise different elements of the Work.  AR's proposed Supervising Contractor(s) must have a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.     **Procedures for Disapproval/Notice to Proceed**.

(1)     AR shall designate, and notify EPA, within thirty (30) days after the Effective Date, of the names, contact information, and qualifications of AR's proposed Project Coordinator and Supervising Contractor.

27

(2)     EPA, after a reasonable opportunity for review and comment by DEQ, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, and any subsequently named Project Coordinator and Supervising Contractor, as applicable.  If EPA issues a notice of disapproval, AR shall, within thirty (30) days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each.  EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor.  AR may select any coordinator/contractor covered by an authorization to proceed and shall, within twenty-one (21) days, notify EPA of AR's selection.

(3)     AR may change its Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of Subparagraphs a(1) and a(2).

(4)     AR has proposed, and EPA has authorized AR to proceed, regarding the following Project Coordinator:

Shannon W. Dunlap
317 Anaconda Road
Butte, MT 59701
(406) 593-6645
Shannon.Dunlap@bp.com

10.     **Performance of Work in Accordance with SOW**.  AR shall: (a) develop the Remedial Design; (b) perform the Remedial Action; and (c) operate, maintain, and monitor the effectiveness of the Remedial Action (O&M); all in accordance with the SOW and its

28

attachments and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under this Consent Decree or the SOW shall be subject to approval by EPA, in consultation with DEQ, in accordance with section 7.6 (Approval of Deliverables) of the SOW.

11. **Emergencies and Releases**. AR shall comply with the emergency and release response and reporting requirements under section 4.4 (Emergency Response and Reporting) of the SOW. Subject to Section XV (Covenants and Reservations by United States and State), nothing in this Consent Decree, including section 4.4 of the SOW, limits any authority of Plaintiffs: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to AR's failure to take appropriate response action under section 4.4 of the SOW, EPA takes such action instead, AR shall reimburse EPA under Section X (Payment of Response Costs) for all costs of the response action.

12. **Community Involvement**. If requested by EPA, AR shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, section 2.0 (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator.

13. **Modification of SOW or Related Deliverables**.

    a.    If EPA, in consultation with DEQ, determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the Remedial Action, and such modification is consistent with the Scope of the Remedy set forth in section 1.3 of the SOW, then EPA may notify AR of such modification.  If AR objects to the modification, it may, within thirty (30) days after EPA's notification, seek dispute resolution under Section XIII (Dispute Resolution).

    b.    The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA under Paragraph 13(a); or (2) if AR invokes dispute resolution, in accordance with the final resolution of the dispute.  The modification shall be incorporated into and enforceable under this Consent Decree, and AR shall implement all work required by such modification.  AR shall incorporate the modification into the deliverable required under the SOW, as appropriate.

    c.    Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

14. **No Warranty**.  Nothing in this Consent Decree, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by the United States and the State that compliance with the work requirements set forth in the SOW or related deliverables will achieve the Performance Standards.

## VII. REMEDY REVIEW

15.     **Periodic Review**.  AR shall conduct, in accordance with section 4.10 (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the Remedial Action is protective of human health and the environment.  Nothing in this Consent Decree limits AR's rights under CERCLA to comment on any modified or further response actions proposed or selected by EPA.

## VIII.     ACCESS

16.     **Access and Use of AR-Owned Property**.  For real property that AR owns, or has a property interest in that confers the legal ability to control access, within the Anaconda Site, where access and/or land/water use restrictions are needed to implement this Consent Decree, AR shall, with respect to such property:

a.     Provide the United States, the State, and their representatives and contractors, access at all reasonable times to any real property to which access is required for the implementation of this Consent Decree, for the purpose of conducting any activity related to this Consent Decree including, but not limited to, the following activities:

(1)     Monitoring the Work;

(2)     Verifying any data or information submitted to the United States or the State;

(3)     Conducting investigations relating to contamination at or near the Anaconda Site;

(4)     Obtaining samples;

(5)     Assessing the need for, planning, or implementing additional response actions at or near the Anaconda Site;

31

(6)     Assessing implementation of quality assurance and quality control practices as defined in any construction quality assurance quality control plans approved pursuant to the SOW;

(7)     Implementing the Work pursuant to the conditions set forth in Paragraph 56 (Work Takeover) of this Consent Decree;

(8)     Assessing AR's compliance with this Consent Decree;

(9)     Determining whether the Anaconda Site is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted, by or pursuant to this Consent Decree;

(10)    Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions.

Prior to obtaining access to any real property, the United States, the State and AR shall consider any health and safety limitations previously identified for the areas of the Site where Work will be performed under this Consent Decree; and

b.     Commencing on the date of lodging of this Consent Decree, refrain from using any real property in any manner that would interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action to be performed pursuant to this Consent Decree, except as required to implement the SOW or as EPA and DEQ authorize in writing after receipt of a written request from AR to engage in an otherwise restricted activity.

17.     **Access and Use of Third-Party Property**.  If any part of the Anaconda Site where access and/or land/water use restrictions are needed to implement this Consent Decree, is owned or controlled by persons other than AR, AR shall use best efforts to secure from such persons an agreement to provide access thereto for AR, as well as for the United States on behalf of EPA, and the State on behalf of DEQ, as well as their representatives and contractors, for the purpose of conducting any activity related to this Consent Decree including, but not limited to, those activities listed in Subparagraph 16.a of this Consent Decree.  AR shall provide a copy of

such access and use restriction agreement(s) entered into and/or amended after the Effective Date

to EPA and DEQ.  AR shall also use best efforts to enforce land and/or water use restrictions

established in the RODs for the Site to ensure the protectiveness of or non-interference with the

Remedial Action and any modifications thereto.

18.     **Best Efforts**.  For purposes of Paragraph 17 (Access and Use of Third Party

Property) of this Consent Decree, "best efforts" includes the payment of reasonable sums of

money in consideration of access, access agreements, land/water use restrictions, and/or

Proprietary Controls (collectively "Access").  For the Anaconda Site, "reasonable sums" shall be

determined by considering, among other factors, the potentially responsible party status of the

current owners and the degree of general cooperation shown by these parties.  The United States

may, as it deems appropriate, assist AR in obtaining access or land/water use restrictions, either

in the form of contractual agreements or in the form of Proprietary Controls running with the

land.  AR shall reimburse the United States in accordance with the procedures in Section X

(Payment of Response Costs), for all costs incurred by the United States in obtaining such access

or land/water use restrictions.

19.     **Access and Other Authority Reserved**.  Notwithstanding any provision of this

Consent Decree, the United States and the State retain all of their access authorities and rights, as

well as all of their rights to require land/water use restrictions, including enforcement authorities

related thereto, under CERCLA and any other applicable federal and state statute or regulations.

## IX.   FINANCIAL ASSURANCE

20.     **Financial Assurance Requirements**.  In order to ensure completion of the Work,

AR shall secure financial assurance, initially in the amount of $23,730,000.00 ("Estimated Cost

of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents (if any) available from the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. AR may use multiple mechanisms of guaranteeing payment, including surety bonds, letters of credit, trust funds, insurance policies, and/or guarantees as described below.

        a.     A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

        b.     An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

        c.     A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency; or

        d.     A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that is eligible to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency.

        e.     A guarantee to fund or perform the Work executed in favor of EPA by a company: (1) that is a direct or indirect parent company of AR or has a "substantial business

34

relationship" (as defined in 40 C.F.R. §264.141(h)) with AR; and (2) can demonstrate to EPA's satisfaction that it meets the financial test criteria of Paragraph 23 (Financial Assurance Mechanism).

21.     In the event AR seeks to provide financial assurance by means of a guarantee under Subparagraph 20.e AR must at that time:

a.      Demonstrate that:

(1)     the guarantor has:

i.      Two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

ii.     Net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations (including but not limited to obligations under CERCLA, RCRA, and CECRA) financially assured through the use of a financial test or guarantee; and

iii.    Tangible net worth of at least $10 million; and

iv.     Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations (including but not limited to CERCLA, CECRA and RCRA obligations) financially assured through the use of a financial test or guarantee; or

(2)     the guarantor has

i.      A current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

ii.     Tangible net worth at least six times the sum of the
Estimated Cost of the Work and the amounts, if any, of
other federal, state, or tribal environmental obligations
(including but not limited to CERCLA, CECRA and RCRA
obligations) financially assured through the use of a
financial test or guarantee; and

iii.    Tangible net worth of at least $10 million; and

iv.     Assets located in the United States amounting to at least 90
percent of total assets or at least six times the sum of the
Estimated Cost of the Work and the amounts, if any, of
other federal, state, or tribal environmental obligations
(including but not limited to CERCLA, CECRA and RCRA
obligations) financially assured through the use of a
financial test or guarantee; and

b.      Submit to EPA for the guarantor: (1) a copy of an independent certified

public accountant's report of the entity's financial statements for the latest completed fiscal year,

which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its

chief financial officer and a report from an independent certified public accountant substantially

identical to the sample letter and reports available from EPA or under the "Financial Assurance -

Settlements" subject list category on the Cleanup Enforcement Model Language and Sample

Documents Database at https://cfpub.epa.gov/compliance/models/.

22.     If AR provides financial assurance by means of a guarantee under Subparagraph

20.e, it must also:

a.      Annually resubmit the documents described in Subparagraph 21.b within

90 days after the close of the guarantor's fiscal year;

b.      Notify EPA within 30 days after the guarantor determines that it no longer

satisfies the relevant financial test criteria and requirements set forth in this Section; and

36

c.      Provide to EPA, within 30 days of EPA's request, reports of the financial condition of the guarantor in addition to those specified above; EPA may make such a request at any time based on a belief that the affected guarantor may no longer meet the financial test requirements of this Section.

23.      **Financial Assurance Mechanism**.  AR has selected, and EPA has found satisfactory, as an initial financial assurance one or more irrevocable letters of credit and/or surety bonds prepared in accordance with Paragraph 20 (Financial Assurance Requirements).  If not previously secured, within 30 days after the Effective Date, or 30 days after EPA's approval of the form and substance of AR's financial assurance, whichever is later, AR shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the Region 8 financial assurance specialist, to the United States, and to EPA and the State as specified in Section XX (Notices and Submissions).

24.      **Diligent Monitoring of Financial Assurance**.  AR shall diligently monitor the adequacy of the financial assurance.  If AR becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, AR shall notify EPA of such information within 15 days.  If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify AR of such determination.  AR shall, within 60 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section.  EPA may extend this deadline for

such time as is reasonably necessary for AR, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism. AR shall follow the procedures of Paragraph 26 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. AR's inability to secure financial assurance in accordance with this Section shall not excuse performance of any other obligation under this Consent Decree including, without limitation, the obligation of AR to complete the Work in accordance with the terms of this Consent Decree.

25.     **Access to Financial Assurance**.

a.      If EPA issues a notice of implementation of a Work Takeover under Paragraph 56, then, in accordance with any applicable financial assurance mechanism and/or related standby funding commitment, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with Subparagraph 25.d.

b.      If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and AR fails to provide an alternative financial assurance mechanism in accordance with this Section at least 60 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with Subparagraph 25.d.

c.      If, upon issuance of a notice of implementation of a Work Takeover under Paragraph 56 and EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism and/or related standby funding commitment, whether in cash or in kind, to continue and complete the Work, then EPA may

38

demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. AR shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

      d.    Any amounts required to be paid under this Paragraph 25 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the Anaconda Smelter NPL Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Anaconda Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

      e.    All EPA Work Takeover costs not paid under this Paragraph 25 must be reimbursed as Future Response Costs under Section X (Payment of Response Costs).

26.    **Modification of Financial Assurance.**  AR may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with Paragraph 23 (Financial Assurance Mechanism), and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify AR of its decision to accept or reject a requested reduction or change pursuant to this Paragraph. AR may reduce the amount of the financial assurance

39

mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the

agreement, final administrative decision, or final judicial decision resolving such dispute under

Section XIII (Dispute Resolution).  AR may change the form or terms of the financial assurance

mechanism only in accordance with EPA's approval.  Within 30 days after receipt of EPA's

approval of, or the agreement or decision resolving a dispute relating to, the requested

modifications pursuant to this Paragraph, AR shall submit to EPA documentation of the reduced,

revised, or alternative financial assurance mechanism in accordance with Paragraph 23

(Financial Assurance Mechanism).

27.     **Release, Cancellation, or Discontinuation of Financial Assurance**.  AR may

release, cancel, or discontinue any financial assurance provided under this Section only: (a) in

accordance with EPA's approval of such release, cancellation, or discontinuation; or (b) if there

is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in

accordance with the agreement, final administrative decision, or final judicial decision resolving

such dispute under Section XIII (Dispute Resolution).

## X.  PAYMENT OF RESPONSE COSTS

28.     **The Anaconda Smelter NPL Site Special Account**.  EPA has established a

special account within the EPA Hazardous Substances Superfund called the Anaconda Smelter

NPL Site Special Account.  The amounts paid by AR to the United States under Paragraph 29

(Payment of Future Response Costs) shall be deposited in the Anaconda Smelter NPL Site

Special Account within the EPA Hazardous Substance Superfund to be retained and used to

conduct or finance response actions at or in connection with any of the operable units within the

Anaconda Site, or to the Clark Fork River Basin Special Account to be used to conduct or

finance response actions at the Anaconda Site, the Milltown Reservoir/Clark Fork River NPL Site, the Silver Bow Creek/Butte Area NPL Site, or the Montana Pole NPL Site; or to be transferred by EPA to the EPA Hazardous Substance Superfund.

29. **Payment of Future Response Costs.** AR shall reimburse the EPA Hazardous Substance Superfund for all Future Response Costs that are not inconsistent with the National Contingency Plan. The amounts paid by AR under this Paragraph shall be deposited into the Anaconda Smelter NPL Site Special Account as described in Paragraph 28 (The Anaconda Smelter NPL Site Special Account). On a periodic basis, the United States will send to AR a bill, including Cost Documentation, requiring payment of Future Response Costs. Any failure by the United States to provide such periodic billing and/or complete Cost Documentation, however, shall not relieve AR of any obligation under this Consent Decree. AR shall make all payments within sixty (60) days of its receipt of each bill requiring payment, except as otherwise provided in Paragraph 30 (Dispute of Costs Payments). AR shall make all payments required by this Paragraph in the form of a wire transfer made payable to "Anaconda Smelter NPL Site Special Account Hazardous Substance Superfund" and referencing the EPA Region and Site / Spill ID # 08-22, the DOJ case number 90-11-2-430, and the name and address of the Party making payment. AR shall send a notice of such payment to the current EPA Site attorney, and the Cost Recovery Coordinator and the Director of Financial Management Programs both at the following address: US EPA Region 8, 1595 Wynkoop Street, Denver, Colorado 80202. The Fedwire EFT payment shall be sent as follows:

Federal Reserve Bank of New York
ABA = 021030004
Account = 68010727
SWIFT address = FRNYUS33

33 Liberty Street
New York NY 10045
Field Tag 4200 of the Fedwire message should read:
"D 68010727 Environmental Protection Agency"

In addition to the notices above, for each payment made above AR shall send notices, including

references to the CDCS, Site/Spill ID, and DJ numbers, to the United States, EPA, and the EPA

Cincinnati Finance Center, all in accordance with Section XX (Notices and Submissions).

30.     **Dispute of Costs Payments.**  AR may contest payment of any portion of a bill

received under Paragraph 29 solely on the basis that:  (a) the United States has made an

accounting error including attribution of response costs to AR in a manner inconsistent with this

Consent Decree and/or the SOW attached to this Consent Decree as Appendix A; (b) the United

States is seeking reimbursement of costs that otherwise do not fall within the definition of Future

Response Costs; (c) a cost item demanded for reimbursement represents costs that are

inconsistent with the NCP; or (d) EPA has failed to provide complete Cost Documentation as

required by Paragraph 29.  The failure of the United States to provide complete Cost

Documentation shall not relieve AR of any obligation under this Consent Decree, but it may

provide the basis for AR to seek, through the dispute resolution provisions of Section XIII

(Dispute Resolution), a reduction in AR's obligation to reimburse EPA for those costs which AR

claims are not fully supported by Cost Documentation.  Any objection made under this

Paragraph shall be made in writing within sixty (60) days of receipt of the bill and must be sent

to the United States.  Any such objection shall specifically identify the contested response costs

and the basis for objection.  In the event of an objection, AR shall within the 60-day period pay

all uncontested response costs (but not contested costs) to the United States in the manner

described in Paragraph 29 and shall initiate the dispute resolution procedures in Section XIII.

Any such payment made by AR shall be credited by the United States only to the payment of the uncontested costs. If the United States prevails in the dispute, within thirty (30) days of the resolution of the dispute, AR shall pay the sums due (with accrued interest) to the United States, in the manner described in Paragraph 29. If AR prevails concerning any aspect of the contested costs, AR shall pay that portion of the costs (plus associated accrued interest), if any, for which they did not prevail to the United States, in the manner described in Paragraph 29. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIII shall be the exclusive mechanisms for resolving disputes regarding AR's obligation to reimburse the United States for Future Response Costs.

31.   **Interest**.

a.      In the event that the payments required by Paragraph 29 or Section XIV (Stipulated Penalties) are not made within the time period specified in that Paragraph or Section, AR shall pay Interest on the unpaid balance consistent with the obligations described in Paragraph 29 and Section XIV.

b.      The Interest to be paid on the amounts due under Paragraph 29 shall begin to accrue sixty (60) days after the date of receipt by AR of the bill submitted by EPA for such costs. The Interest to be paid on the amounts due under Section XIV (Stipulated Penalties) shall begin to accrue thirty (30) days after receipt of the stipulated penalty demand; provided however, for disputed matters involving performance of the Work only, the accrual of Interest is stayed if AR initiates the dispute resolution procedures in Section XIII (Dispute Resolution), and Interest shall not accrue until EPA issues a decision resolving the dispute as provided in Section XIII (Dispute Resolution).

43

   d.  Interest shall continue to accrue through the date of AR's payment, except as provided above for accrual of Interest on a stipulated penalty demand for matters involving the performance of Work.

   e.  Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of AR's failure to make timely payments under this Section.

   f.  AR shall make all payments required by this Paragraph in the manner described in Paragraph 29.

## XI. INDEMNIFICATION AND INSURANCE

32. **AR's Indemnification of the United States and the State.**

   a.  The United States and the State do not assume any liability by entering into this Consent Decree or by virtue of any designation of AR as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), or state law.  AR shall indemnify, save, and hold harmless the United States and the State, and their officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of AR and its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on AR's behalf or under its control, in carrying out activities pursuant to this Consent Decree, including, but not limited to, any claims arising from any designation of AR as EPA's authorized representatives under Section 104(e) of CERCLA or state law.  Further, AR agrees to pay the United States and the State all costs they incur including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made

against the United States and the State based on negligent or other wrongful acts or omissions of AR, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Consent Decree. Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of AR in carrying out activities pursuant to this Consent Decree.  Neither AR nor any such contractor shall be considered an agent of the United States or the State.

        b.      The United States and the State, respectively, shall give AR notice of any third-party claim for which the United States or the State plans to seek indemnification pursuant to this Paragraph 32 (AR's Indemnification of the United States and the State), and shall consult with AR prior to settling such claim.

33.     AR waives all claims against the United States and the State for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State arising from or on account of any contract, agreement, or arrangement between AR and any person for AR's performance of the Work under this Consent Decree, including, but not limited to, claims on account of construction delays.  In addition, AR shall indemnify, save and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between AR and any person (other than the United States or the State) for AR's performance of the Work under this Consent Decree, including, but not limited to, claims on account of construction delays.  AR does not waive under this Consent Decree any claims or rights it reserved under the State-AR 2008 CD.

34.     **Comprehensive General Liability and Automobile Insurance**.

a.      Prior to lodging of this Consent Decree, AR provided the United States and the State with information that satisfied the United States and the State as to its financial resources and ability to provide the equivalent of comprehensive general liability insurance and automobile insurance with limits of two million dollars, combined single limit, which it shall maintain for the duration of the Work.

b.      If, prior to the first anniversary of EPA's Certification of Remedial Action Completion for the Slag Pile Remedy pursuant to section 4.8 of the SOW or Notice of Completion of Surface Water Remedy pursuant to section 4.7 of the SOW, whichever occurs later, any material change occurs in the financial resources of AR such that it may no longer be able to assure its ability to provide the equivalent of comprehensive general liability insurance and automobile insurance with limits of two million dollars, combined single limit, AR shall promptly notify the United States and the State in accordance with Section XX (Notices and Submissions).  Upon receipt of such notice, EPA may, in its sole and unreviewable discretion, after reasonable opportunity for review by the State, require that AR obtain that insurance.

c.      If, prior to the first anniversary of EPA's Certification of Remedial Action Completion for the Slag Pile Remedy pursuant to section 4.8 of the SOW or Notice of Completion of Surface Water Remedy pursuant to section 4.7 of the SOW, whichever occurs later, the United States or the State obtains information regarding any material change in the financial resources of AR that leads the United States, in consultation with the State, to believe that AR may no longer have the financial ability to provide the equivalent of comprehensive general liability insurance and automobile insurance with limits of two million dollars, combined

46

single limit, the United States shall so notify AR in accordance with Section XX (Notices and Submissions). AR shall have sixty (60) days after receiving any such written notice to respond and provide corrected or supplemental information or otherwise assure the United States and the State that it has the ability to provide the equivalent of comprehensive general liability insurance and automobile insurance with limits of two million dollars, combined single limit.

        d.      If AR does not satisfactorily resolve the concerns of the United States, in consultation with the State, that a material change has occurred in its financial resources such that AR may no longer have the financial ability to provide the equivalent of comprehensive general liability and automobile insurance with limits of two million dollars, combined single limit, EPA, in consultation with the State and in its discretion, may require that AR obtain such insurance which names EPA and DEQ as additional beneficiaries and/or additional insureds.

        e.      In addition, for the duration of the Consent Decree, AR shall also satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of workers' compensation insurance for all persons performing activities required of AR by this Consent Decree. Until EPA issues its Certification of Remedial Action Completion for the Slag Pile Remedy pursuant to section 4.8 of the SOW or Notice of Completion of Surface Water Remedy pursuant to section 4.7 of the SOW, whichever occurs later, AR shall provide to EPA and DEQ certificates of such insurance. AR shall resubmit such certificates each year on or before January 30th. If AR demonstrates by evidence satisfactory to EPA and DEQ that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect

47

to that contractor or subcontractor, AR need provide only that portion of the insurance described above which is not maintained by the contractor or subcontractor.

## XII. FORCE MAJEURE

35.     **Definition**.  "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of AR, of any entity controlled by AR, or of AR's contractors, which delays or prevents the performance of any obligation under this Consent Decree despite AR's best efforts to fulfill the obligation.  The requirement that AR exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure event, such that the delay is minimized to the greatest extent possible.  "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.  A Force Majeure event may, however, include a labor strike or work stoppage directly related to remedial construction activities.

36.     **Notification**.  If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, AR shall notify orally EPA's Project Coordinator or, in his or her absence, the Director, Superfund and Emergency Management Division, EPA Region 8, and shall also notify orally DEQ's Project Coordinator, within seven (7) days of when AR first knew that the event might cause a delay. Within twelve (12) days thereafter, AR shall provide in writing to EPA and DEQ an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; AR's rationale for

48

attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of AR, such event may cause or contribute to an endangerment to public health, welfare or the environment. AR shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. AR shall be deemed to know of any circumstance of which AR, any entity controlled by AR, or AR's contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude AR from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure event under Paragraph 35 (Definition) and whether AR has exercised its best efforts under Paragraph 35, EPA, in consultation with DEQ, may excuse in writing AR's failure to submit timely or complete notices under this Paragraph.

    37. **EPA Response**. If EPA, after a reasonable opportunity for review and comment by DEQ, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by DEQ, for such time as is necessary to complete those obligations. If EPA, after a reasonable opportunity to review and comment by DEQ, agrees that the delay or anticipated delay is attributable to a force majeure event, EPA will notify AR in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. If EPA, after a reasonable

opportunity for review and comment by DEQ, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify AR in writing of its decision.

38.     **Dispute.**  If AR elects to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding EPA's decision, it shall do so no later than 15 days after receipt of EPA's notice.  In any such proceeding, AR shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts to fulfill the obligation were exercised to avoid and mitigate the effects of the delay, and that AR complied with the requirements of Paragraphs 35 (Definition) and 36 (Notification), above.  If AR carries this burden, the delay at issue shall be deemed not to be a violation by AR of the affected obligation of this Consent Decree identified to EPA and the Court.

39.     **EPA Timely Completion.**  The failure by EPA to timely complete any obligation under the Consent Decree or under the SOW is not a violation of the Consent Decree, provided, however, that if such failure prevents AR from meeting one or more deadlines in the SOW, AR may seek relief under this Section.

## XIII.     DISPUTE RESOLUTION

40.     **Exclusivity.**  Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes under this Consent Decree.  The procedures set forth in this Section shall not apply to actions by the United States or DEQ to enforce obligations of AR that have not been disputed in

50

accordance with this Section.  EPA's decisions under these procedures, except for EPA's final administrative decision under Paragraph 44 (Other Review), will be made in consultation with DEQ.

41.  **Informal Dispute Resolution**.  Any dispute which arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between EPA, in consultation with DEQ, and AR.  The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of EPA and AR.  The dispute shall be considered to have arisen when one party to the dispute sends the other party to the dispute a written Notice of Dispute.

42.  **Statements of Positions**.

a.  In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within thirty (30) days after the conclusion of the informal negotiation period, AR invokes the formal dispute resolution procedures of this Section by serving on EPA and DEQ a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by AR.  The Statement of Position shall specify AR's position as to whether formal dispute resolution should proceed under Paragraph 43 (Record Review) or Paragraph 44 (Other Review).

b.  Within thirty (30) days after receipt of AR's Statement of Position, EPA, after consulting with DEQ, will serve on AR its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting

51

documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under Paragraph 43 (Record Review) or Paragraph 44 (Other Review). Not more than thirty (30) days after receipt of EPA's Statement of Position, AR may submit a further statement of position in reply.

       c.     If there is disagreement between EPA and AR as to whether dispute resolution should proceed under Paragraph 43 (Record Review) or Paragraph 44 (Other Review), the parties shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if AR ultimately appeals to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in Paragraph 43 (Record Review) or Paragraph 44 (Other Review).

      43.    **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, (1) the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this Consent Decree; and (2) the adequacy of the performance of response actions taken pursuant to this Consent Decree. Nothing in this Consent Decree shall be construed to allow any dispute by AR regarding the validity of the provisions of the RODs that AR is obligated to implement under this Consent Decree.

       a.     An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant

to this Section.  Where appropriate, EPA may allow submission of supplemental statements of position by the parties.

b.       The Director of the Superfund and Emergency Management Division, EPA Region 8, will issue a final administrative decision resolving the dispute based on the administrative record described in Subparagraph 43.a.  This decision shall be binding upon AR, subject only to the right to seek judicial review pursuant to Subparagraphs 43.c and 43.d.

c.       Any administrative decision made by EPA pursuant to Subparagraph 43.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by AR with the Court and served on all Parties within thirty (30) days of receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree.  The United States may file a response to AR's motion within 30 days of receipt of that motion.

d.       In proceedings on any dispute governed by this Paragraph, AR shall have the burden of demonstrating that the decision of the Director of the Superfund and Emergency Management Division, EPA Region 8, is arbitrary and capricious or otherwise not in accordance with law.  Judicial review of EPA's decision shall be on the administrative record compiled pursuant to Subparagraph 43.a.

44.      **Other Review**.  Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

53

a.      Following receipt of AR's Statement of Position submitted pursuant to Paragraph 42 (Statements of Positions), the Director of the Superfund and Emergency Management Division, EPA Region 8, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under Paragraph 42. The Director's decision shall be binding on AR unless, within thirty (30) days of receipt of the decision, AR files with the Court and serves on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree. The United States may file a response to AR's motion within 30 days of receipt of the motion.

b.      Notwithstanding Section I (Background) of this Consent Decree, judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

45.     **No Postponement**. The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of AR under this Consent Decree, not directly in dispute, unless EPA agrees or the Court orders otherwise or unless specifically provided in this Consent Decree. Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute as provided in Paragraph 51 (Penalty Accrual). Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree. In the event that AR does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).

Stipulated penalties shall not be assessed by the United States nor paid by AR to the extent that AR prevails on the disputed issue.

## XIV.   STIPULATED PENALTIES

46.   **Stipulated Penalties**.  AR shall be liable for stipulated penalties in the amounts set forth in Paragraph 47 (Amounts and Triggering Events) to the United States for failure to comply with the requirements of this Consent Decree specified below, unless excused under Section XII (Force Majeure).  "Compliance" by AR shall mean completion, within the specified time schedules established by this Consent Decree, of the activities and obligations, including payments, required under this Consent Decree or any work plan or other deliverable approved under this Consent Decree, in accordance with all applicable requirements of law, this Consent Decree, the SOW, and any plans or other documents approved by EPA under this Consent Decree.

47.   **Amounts and Triggering Events**.

a.   The following stipulated penalties shall accrue per violation per day for any noncompliance identified in Subparagraph b:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $5,000 | 1st through 14th day |
| $6,500 | 15th through 30th day |
| $8,500 | 31st day and beyond |

b.   Failure to comply with any of the requirements in Section VI (Performance of the Work), including sections 3.0 and 4.0 (RD and RA except emergency response, section 4.4) of the SOW, Section VII (Remedy Review), Section IX (Financial Assurance), and Section X (Payment of Response Costs).  Stipulated penalties shall not be

assessed under this Consent Decree for (i) an exceedance or other noncompliance with in-stream surface water Performance Standards, as set forth in the SOW, Attachment 1 (Surface Water Management Plan); or (ii) failure to comply with the requirements of this Consent Decree attributable to the State's performance of or failure to perform the State Property Remedial Commitments and/or State Lands Obligations.

      c.      The following stipulated penalties shall accrue per violation per day for any noncompliance identified in Subparagraph 47.d:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $3,000 | 1st through 14th day |
| $4,500 | 15th through 30th day |
| $6,000 | 31st day and beyond |

      d.      Failure to comply with any of the requirements in Sections XI (Indemnification and Insurance), XVIII (Access to Information), XIX (Retention of Records), and XX (Notices and Submissions) of this Consent Decree, and sections 4.4 (Emergency Response and Reporting), 6.0 (Reporting), and 7.0 (Deliverables, except sections 7.8 and 7.9) of the SOW.

      e.      In the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 56 (Work Takeover) of Section XV (Covenants and Reservations by United States and the State), AR shall be liable for a stipulated penalty in the amount of $1,000,000; provided, however, that this stipulated penalty shall not exceed 30% of the present value of the Work to be taken over, based on EPA's cost estimates and a discount rate of 5%. Stipulated penalties under this Paragraph are in addition to the remedies available under Paragraph 25 (Access to Financial Assurance) and 56 (Work Takeover).

     f.     All stipulated penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity; provided, however, that stipulated penalties shall not accrue: (1) with respect to a deficient submission under section 7.0 of the SOW (Deliverables), during the period, if any, beginning on the twenty-first (21st) day after EPA's receipt of such submission until five days after the date that EPA notifies AR of any deficiency; (2) with respect to a decision by the Director of the Superfund and Emergency Management Division, EPA Region 8, under Subparagraph 43.b or 44.a of Section XIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that AR's reply to EPA's Statement of Position is received until five days after the date that the Director issues a final decision regarding such dispute; or (3) with respect to judicial review by this Court or the Court of Appeals of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until five days after the date that this Court or the Court of Appeals issues a final decision regarding such dispute. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

     48.    **Notice**. Following EPA's determination, in consultation with DEQ, that AR has failed to comply with a requirement of this Consent Decree, EPA shall give AR written notification of the same and describe the noncompliance. If EPA determines that stipulated penalties are applicable to a noncompliance event, EPA may send AR a written demand for payment of the penalties. However, stipulated penalties shall accrue as provided in Paragraph 45

(No Postponement) and Paragraph 47 (Amounts and Triggering Events) regardless of whether EPA has provided a written demand to AR for payment of stipulated penalties.

49.     **Payment**.  All penalties accruing under this Section shall be due and payable to the United States within thirty (30) days of AR's receipt from EPA of a demand for payment of the stipulated penalties, unless AR invokes the Dispute Resolution procedures under Section XIII (Dispute Resolution).  All payments to the United States under this Section shall be made in accordance with Paragraph 29 (Payment of Future Response Costs).

50.     **Obligation to Perform Work**.  The payment of stipulated penalties shall not alter in any way AR's obligation to complete the performance of the Work required under this Consent Decree.

51.     **Penalty Accrual**.  Penalties shall continue to accrue as provided in Paragraph 48 (Notice) during any dispute resolution period, but need not be paid until the following:

a.     If the dispute is resolved by agreement or by a decision of EPA that is not appealed to this Court, AR shall pay accrued stipulated penalties determined to be owing to EPA, and Interest, within fifteen (15) days after the agreement or the receipt of EPA's decision or order;

b.     If the dispute is appealed to this Court and the United States, as appropriate, prevails in whole or in part, AR shall pay all accrued stipulated penalties determined by the Court to be owed to EPA and Interest within 60 days of receipt of the Court's decision or order, except as provided in subparagraph 51.c below; and

c.     If the District Court's decision is appealed by any Party, Interest shall accrue on the stipulated penalties determined by the District Court to be owing to the United

States. Within fifteen (15) days of receipt of the final appellate court decision, AR shall pay all accrued stipulated penalties and Interest determined to be owed by AR to the United States.

52.     **United States' Collection of Stipulated Penalties**.

a.     If AR fails to pay stipulated penalties when due, the United States may institute proceedings to collect the penalties, as well as Interest and the cost of enforcing the requirements of this Consent Decree, including attorney's fees. AR shall pay Interest on the unpaid balance of any stipulated penalty.

b.     Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of AR's violation of this Consent Decree or, except as provided in Section XV (Covenants and Reservations by United States and State), the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(l) of CERCLA, 42 U.S.C. § 9622(l); provided, however, that the United States shall not seek civil penalties pursuant to Section 122(l) of CERCLA for (i) any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of this Consent Decree; or (ii) any violation excluded from stipulated penalties under Paragraph 47.b(i)-(ii).

53.     **Stipulated Penalty Waiver**. Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Consent Decree.

59

## XV. COVENANTS AND RESERVATIONS BY UNITED STATES AND STATE

54.     **Covenants to AR.**

a.      **United States' Covenants to AR.**  In consideration of the actions that will

be performed and the payments that will be made by AR under the terms of this Consent Decree,

and except as specifically provided in Paragraph 55 (General Reservations of Rights), the United

States covenants not to sue or to take administrative action against AR, any of AR's parent or

affiliate corporations providing the financial assurances required under Section IX (Financial

Assurance) of this Consent Decree, the subsidiaries of such parent or affiliate corporations, their

respective officers, directors and employees, to the extent that the liability of such parent or

affiliate companies, subsidiaries, officers, directors, and employees arises solely from their status

as parent or affiliate companies, subsidiaries, officers, directors, and employees, pursuant to

Sections 106, 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections

3004(u) and (v), 3008 and 7003 of RCRA, 42 U.S.C. §§ 6924(u) and (v), 6928 and 6973; and

Sections 309(b), 311 and 504 of the Clean Water Act, 33 U.S.C. §§ 1319(b), 1321 and 1364 for

the Work and Future Response Costs.  These covenants shall take effect upon the Effective Date.

These covenants are conditioned upon the satisfactory performance by AR of its obligations

under this Consent Decree.  These covenants extend only to AR, AR's parent or affiliate

corporations providing the financial assurances required under Section IX (Financial Assurance)

of this Consent Decree, the subsidiaries of such parent or affiliate corporations, and their

respective officers, directors, and employees, and does not extend to any other person.

b.      **State's Covenants to AR.**  In consideration of the actions that will be

performed and the payments that will be made by AR under the terms of this Consent Decree,

and except as specifically provided in Paragraph 55 (General Reservations of Rights), the State covenants not to sue or to take administrative action against AR, AR's parent or affiliate corporations providing the financial assurances required under Section IX (Financial Assurance) of this Consent Decree, the subsidiaries of such parent or affiliate corporations, their respective officers, directors and employees, to the extent that the liability of such parent or affiliate companies, subsidiaries, officers, directors, and employees arises solely from their status as parent or affiliate companies, subsidiaries, officers, directors, and employees, pursuant to Sections 106, 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections 3004(u) and (v), 3008 and 7002 of RCRA, 42 U.S.C. §§ 6924(u) and (v), 6928 and 6972; Sections 309(a), 311, 504 and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(a), 1321, 1364 and 1365; Sections 601, 602, 611, 613, 614 (except with respect to enforcement of an emergency order under 75-5-621), 615, 617, 631 and 635 of the Montana Water Quality Act, MCA §§ 75-5-601, 602, 611, 613, 614 (except with respect to enforcement of an emergency order under MCA § 75-5-621), 615, 617, 631 and 635; Section 415 of the Montana Hazardous Waste Act, MCA § 75-10-415; and Sections 711, 715, 722 and 726 of CECRA, MCA §§ 75-10-711, 712, 722 and 726 for the Work. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by AR of its obligations under this Consent Decree. These covenants extend only to AR, AR's parent or affiliate corporations providing the financial assurances required under Section IX (Financial Assurance) of this Consent Decree, the subsidiaries of such parent or affiliate corporations, their respective officers, directors, and employees, and does not extend to any other person.

61

55.     **General Reservations of Rights**.

a.      **United States' General Reservations of Rights**.  The covenants set forth in Paragraph 54 (Covenants to AR) do not pertain to any matters other than those expressly specified in that Paragraph.  With respect to all other matters, including but not limited to Paragraph 63 (Contribution Protection), the United States reserves, and this Consent Decree is without prejudice to, all rights against AR to take action in certain circumstances, including, but not limited to, the following:

(1)     Claims or actions to enforce this Consent Decree based on a failure by AR to meet a requirement of this Consent Decree;

(2)     Liability for response costs and injunctive relief under CERCLA Sections 106, 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections 3004(u) and (v), 3008 and 7003 of RCRA, 42 U.S.C. §§ 6924(u) and (v), 6928 and 6973; and Sections 309(b), 311 and 504 of the Clean Water Act, 33 U.S.C. §§ 1319(b), 1321 and 1364 arising from the past, present, or future disposal, release, or threat of release of Waste Materials outside of the Anaconda Site, other than as provided by the provisions of the RODs that AR is obligated to implement under this Consent Decree or the Work.  For purposes of this Reservation, the downstream movement of hazardous substances from the areas where AR is performing the Surface Water Remedy is not a disposal or "a release of Waste Materials outside of the Anaconda Site" as long as AR is in compliance with its obligations under this Consent Decree and any other lawful cleanup requirements under administrative orders associated with the Site;

62

(3)     Liability for response costs and injunctive relief under CERCLA Sections 106, 107(a), and 113(f) of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections 3004(u) and (v), 3008 and 7003 of RCRA, 42 U.S.C. §§ 6924(u) and (v), 6928 and 6973; and Sections 309(b), 311 and 504 of the Clean Water Act, 33 U.S.C. §§ 1319(b), 1321 and 1364 for future acts of disposal of Waste Materials at the Anaconda Site by AR, other than as provided by the provisions of the RODs that AR is obligated to implement under this Consent Decree, the Work, or otherwise ordered by EPA;

(4)     Criminal liability;

(5)     Liability for violations of federal or state law by AR which occur during or after implementation of the Work;

(6)     Liability, prior to Certification of Remedial Action Completion for the Slag Pile Remedy, for additional response actions that EPA determines are necessary to achieve and maintain Slag Pile Remedy Performance Standards, or to carry out and maintain the effectiveness of the Slag Pile Remedy, but that cannot be required pursuant to Paragraph 13 (Modification of SOW or Related Deliverables) because they are outside the Scope of the Remedy selected in the ARWW&S ROD as defined in section 1.3(b) of the SOW.  The rights reserved under this Subparagraph 55.a(6) shall be exercised only in a separate judicial proceeding in the Federal Action (but not under this Consent Decree) or a new action or under a new and/or existing administrative order;

63

(7)     Liability, prior to Notice of Completion of Surface Water Remedy, for additional response actions that EPA determines are necessary to achieve and maintain Surface Water Remedy Performance Standards, or to carry out and maintain the effectiveness of the Surface Water Remedy, but that cannot be required pursuant to Paragraph 13 (Modification of SOW or Related Deliverables) because they are outside the Scope of the Remedy selected in the ARWW&S ROD as defined in section 1.3(a) of the SOW.  The rights reserved under this Subparagraph 55.a(7) shall be exercised only in a separate judicial proceeding in the Federal Action (but not under this Consent Decree) or a new action or under a new and/or existing administrative order;

(8)     Liability for damages for injury to, destruction of, or loss of, natural resources and for the costs of assessing and litigating any claims for natural resource damages relating to the Anaconda Site against AR, but only to the extent such claims are reserved in Paragraph 114 of the Clark Fork River Operable Unit Consent Decree or Paragraph 77 of the Streamside Tailings Consent Decree;

(9)     Liability for response actions at the Anaconda Site other than the Work;

(10)     Liability for response costs that the United States has incurred or will incur regarding the Anaconda Site but that are not within the definition of Future Response Costs; and

64

(11)   Liability for costs incurred or to be incurred by the U.S. Department of Agriculture regarding the Site.

b.   **State's General Reservation of Rights**. The covenants set forth in Paragraph 54 (Covenants to AR) do not pertain to any matters other than those expressly specified in that Paragraph. With respect to all other matters, including but not limited to Paragraph 63 (Contribution Protection), the State reserves, and this Consent Decree is without prejudice to all rights against AR, including but not limited to the following:

(1)   Claims or actions to enforce this Consent Decree based on a failure by AR to meet a requirement of this Consent Decree;

(2)   Liability for response costs and injunctive relief under CERCLA Sections 106, 107, and 9613(f), 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections 3004(u) and (v), 3008 and 7002 of RCRA, 42 U.S.C. §§ 6924(u) and (v), 6928 and 6972; Sections 309(a), 311, 504 and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(a), 1321, 1364 and 1365; Sections 601, 602, 611, 613, 614, 615, 617, 631 and 635 of the Montana Water Quality Act, MCA §§ 75-5-601, 602, 611, 613, 614, 615, 617, 631 and 635; Section 415 of the Montana Hazardous Waste Act, MCA § 75-10-415; and Sections 711, 715, 722 and 726 of CECRA, MCA §§ 75-10-711, 715, 722 and 726 arising from the past, present, or future disposal, release, or threat of release of Waste Materials outside of the Anaconda Site, other than as provided by the provisions of the RODs that AR is obligated to implement under this Consent Decree or the Work. For purposes of this Reservation, the downstream movement of hazardous substances from the areas where AR is

performing the Surface Water Remedy is not disposal or "a release of Waste Materials outside of the Anaconda Site" as long as AR is in compliance with its obligations under this Consent Decree and any other lawful cleanup requirements under administrative orders associated with the Site;

(3)     Liability for response costs and injunctive relief under CERCLA Sections 106, 107, and 9613(f), 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections 3004(u) and (v), 3008 and 7002 of RCRA, 42 U.S.C. §§ 6924(u) and (v), 6928 and 6972; Sections 309(a), 311, 504 and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(a), 1321, 1364 and 1365; Sections 601, 602, 611, 613, 614, 615, 617, 631 and 635 of the Montana Water Quality Act, MCA §§ 75-5-601, 602, 611, 613, 614, 615, 617, 631 and 635; Section 415 of the Montana Hazardous Waste Act, MCA § 75-10-415; and Sections 711, 715, 722 and 726 of CECRA, MCA §§ 75-10-711, 715, 722 and 726 for future acts of disposal of Waste Material at the Anaconda Site by AR, other than as provided by the provisions of the RODs that AR is obligated to implement under this Consent Decree, the Work, or otherwise ordered by EPA;

(4)     Criminal liability;

(5)     Liability for violations of federal or state law by AR which occur during or after implementation of the Work;

(6)     Liability, prior to Certification of Remedial Action Completion for the Slag Pile Remedy, for additional response actions that the State determines are necessary to achieve and maintain Slag Pile Remedy Performance Standards, or to

66

carry out and maintain the effectiveness of the Slag Pile Remedy, but that cannot be required pursuant to Paragraph 13 (Modification of SOW and Related Deliverables) because they are outside the Scope of the Remedy selected in the ARWW&S ROD as defined in section 1.3(b) of the SOW. The rights reserved under this Subparagraph 55.b(6) shall be exercised only in a separate judicial proceeding in the Federal Action (but not under this Consent Decree) or a new action or under a new and/or existing administrative order;

(7) Liability, prior to Notice of Completion of Surface Water Remedy, for additional response actions that the State determines are necessary to achieve and maintain Surface Water Remedy Performance Standards, or to carry out and maintain the effectiveness of the Surface Water Remedy, but that cannot be required pursuant to Paragraph 13 (Modification of SOW or Related Deliverables) because they are outside the Scope of the Remedy selected in the ARWW&S ROD as defined in section 1.3(a) of the SOW. The rights reserved under this Subparagraph 55.b(7)55.a(6) shall be exercised only in a separate judicial proceeding in the Federal Action (but not under this Consent Decree) or a new action or under a new and/or existing administrative order;

(8) Liability for damages for injury to, destruction of, or loss of, natural resources and for the costs of assessing and litigating any claims for natural resource damages and other liability relating to the Anaconda Site against AR, but only to the extent such claims are reserved in consent decrees previously entered in the State Action; and

67

(9)     Liability for response actions at the Anaconda Site other than the
Work.

56.     **Work Takeover**.

a.      In the event EPA, in consultation with DEQ, determines that AR has (i)
ceased implementation of any portion of the Work, (ii) is seriously or repeatedly deficient or late
in its performance of the Work, or (iii) is implementing the Work in a manner which may cause
an endangerment to human health or the environment, EPA may issue a "Work Takeover
Notice" to AR.  Any Work Takeover Notice issued by EPA will specify the grounds upon which
such notice was issued and will provide AR a period of thirty (30) days within which to remedy
the circumstances giving rise to EPA's issuance of such notice.

b.      If, after expiration of the 30-day notice period specified in Subparagraph
56.a, AR has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance
of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance
of all or any portion of the Work as EPA deems necessary ("Work Takeover").  EPA shall notify
AR in writing (which writing may be electronic) if EPA determines that implementation of a
Work Takeover is warranted under this Subparagraph 56.b.

c.      AR may invoke the procedures set forth in Paragraph 43 (Record Review)
of Section XIII (Dispute Resolution), to dispute EPA's implementation of a Work Takeover
under Subparagraph 56.b.  However, notwithstanding AR's invocation of such dispute resolution
procedures, and during the pendency of any such dispute, EPA, in consultation with DEQ, may
in its sole discretion commence and continue a Work Takeover under Subparagraph 56.b until
the earlier of (i) the date that AR remedies, to EPA's satisfaction, the circumstances giving rise

to EPA's issuance of the relevant Work Takeover Notice, or (ii) the date that a final decision is rendered in accordance with Section XIII (Dispute Resolution), Paragraph 43 (Record Review) requiring EPA to terminate such Work Takeover.

        d.      After commencement and for the duration of any Work Takeover, EPA shall have immediate access to and benefit of any financial assurance mechanism provided pursuant to Section IX (Financial Assurance), pursuant to the terms of said form of performance guarantee and pursuant to Paragraph 25 (Access to Financial Assurance) of that Section. Any unreimbursed costs incurred by EPA in performing Work under the Work Takeover shall be considered Future Response Costs that AR shall pay pursuant to Section X (Payment of Response Costs).

       57.     **Reservation of Response Authority.**  Notwithstanding any other provision of this Consent Decree, the United States and the State retain all authority and reserve all rights to take any and all response actions authorized by law.

## XVI.    COVENANTS AND RESERVATIONS BY AR

      58.     **AR's Covenants not to Sue the United States and the State.**  Subject to the reservations in Paragraph 59 (AR's Reservation of Rights), AR hereby covenants not to sue and agrees not to assert any claims or causes of action against the United States or the State, and their agencies, instrumentalities, officials, employees, agents, and contractors with respect to the Work, Future Response Costs, and this Consent Decree, including, but not limited to:

        a.      Any direct or indirect claim for reimbursement from the Hazardous Substance Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C.§ 9507) through CERCLA Sections 106(b)(2), 107, 111, 112, 113; any direct or indirect claim for

69

reimbursement or funding under State law, including any direct or indirect claim for reimbursement from the Environmental Quality Protection Fund (established pursuant to MCA 75-10-704), the Orphan Share Account (established pursuant to MCA 75-10-743); or any other provision of law;

        b.      Any claims under CERCLA Sections 107 or 113, 42 U.S.C. §§ 9607 and 9613; under Sections 3004(u) and (v), 3008, and 7002 of RCRA, 42 U.S.C. §§ 6924(u) and (v), 6928, and 6972; under Sections 309(a) and (b), 311, 504 and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(a) and (b), 1321, 1364 and 1365; or under CECRA, including Sections 711, 715, 719, 722, 724 and 726, MCA §§ 75-10-711, 75-10-715, 75-10-719, 75-10-722, 75-10-724, 75-10-726 regarding the Work and Future Response Costs; or

        c.      Any claims arising out of the Work and brought under the United States Constitution, the State of Montana Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

        59.    **AR's Reservation of Rights**.  AR reserves, and this Consent Decree (including but not limited to Paragraph 63 (Contribution Protection)) is without prejudice to:

        a.      Claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and claims against the State under Chapter 9 of Title 2 of Montana Code Annotated for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States or the State while acting within the scope of his office or employment under circumstances where the United States or the State, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  However, any such

70

claim shall not include a claim for any damages caused, in whole or in part, by the act or omission of any person, including any contractor, who is not a federal employee as that term is defined in 28 U.S.C. § 2671, or an employee, as that term is defined in 2-9-101, MCA; nor shall any such claim include a claim based on EPA's selection of response actions that may be required under this Consent Decree or the oversight or approval of AR's plans or activities. The foregoing applies only to claims that are brought pursuant to any Federal or State statute other than CERCLA or CECRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or CECRA;

        b.     In the event the United States or the State initiates a new claim, new action, or administrative order seeking to compel AR to perform and/or pay for further response actions pursuant to the reservations of the United States and the State under any reservation pursuant to Paragraph 55 (United States' General Reservations of Rights), other than in Subparagraphs 55.a(1) and 55.b(1) (claims for failure to meet a requirement of the Consent Decree), 55.a(4) and 55.b(4) (criminal liability), and 55.a(5) and 55.b(5) (violations of federal/state law during or after implementation of the Work), then AR reserves the defenses, contribution claims, counterclaims, and other claims that AR reserved in and did not settle under paragraph 20 of the Past Costs Consent Decree (including, but not limited to, contribution claims against any person or entity not a party to the Past Costs Consent Decree), but only for defenses, contribution claims, counterclaims, and other claims arising from the same matters, transactions, or occurrences that are raised in or directly related to the United States' or the State's claims against AR;

71

        c.      Any claim, defense, or counterclaim by AR against the State which is expressly reserved in a consent decree previously entered in the State Action; and

        d.      Any defenses to any claim by the United States or the State for civil penalties under Section 109 or 122(l) of CERCLA, 42 U.S.C. §§ 9609, 9622(l), but only for defenses arising from the same matters, transactions, or occurrences that are raised in or directly related to the United States' claims or the State's claims against AR in such an action.

      60.    **Preauthorization.**  Nothing in this Consent Decree shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

      61.    **Waiver of Claims**.  AR agrees not to assert any claims and to waive all CERCLA, CECRA, and RCRA claims or causes of action that it may have for all matters relating to the Work, including for contribution, against any person where the person's liability to AR with respect to the Work is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment hazardous substances at the Site, if the disposal, treatment, or transport occurred before April 1, 2001 and the total amount of material contributed by such person to the Site containing hazardous substances did not exceed 110 gallons of liquid materials or 200 pounds of solid materials.  This waiver shall not apply to any claim or cause of action against any person meeting the above criteria if: (i) EPA has determined that the materials contributed to the Site by such person contributed or could contribute significantly to the costs of response at the Site, (ii) EPA has named such parties as potentially responsible parties for the Site pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607, (iii) such person has failed to

comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or (iv) such person has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the OWGC or Slag Piles.  This waiver shall also be void to the extent that the United States or the State institutes new claims in the Federal Action (but not under this Consent Decree) or a new action, or issues a new administrative order to AR, pursuant to Paragraphs 55.a(6), 55.a(7), 55.b(6) and 55.b(7) (General Reservations of Rights) of this Consent Decree.  In addition, this waiver and agreement not to assert claims also shall not apply with respect to any defense, claim, or cause of action that AR may have against any person if such person asserts a claim or cause of action relating to the Work against AR, or if legal action to enforce any Remedial Action requirement, including Institutional Controls, is filed in this action.

## XVII.    EFFECT OF SETTLEMENT; CONTRIBUTION

62.    **Effect on Nonparties.**  Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.  The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this Consent Decree may have under applicable law.  Each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the matters addressed in this Consent Decree against any person not a Party hereto.  Nothing in this Consent Decree diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA,

73

42 U.S.C. § 9613(f)(2) and (3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

63.    **Contribution Protection.**  The Parties agree, and by entering this Consent Decree this Court finds that this Consent Decree constitutes a judicially-approved settlement pursuant to which AR has, as of the Effective Date, resolved liability to the United States and the State within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this Consent Decree.  The Parties also agree, and by entering this Consent Decree this Court finds, that AR is entitled, as of the Effective Date, to protection from contribution actions or claims by third parties as provided by CECRA Section 719(1), 75-10-719(1), MCA, for matters addressed in this Consent Decree.  The "matters addressed" in this Consent Decree are the Work and Future Response Costs.  The contribution protection set forth in this Paragraph is intended to provide the broadest protection afforded by CERCLA and CECRA for matters addressed in this Consent Decree.

64.    The Parties further agree, and by entering this Consent Decree this Court finds, that the complaints filed by the United States and the State in this action are a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to which AR has, as of the Effective Date, resolved liability to the United States and the State within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

74

65.     **Notification**.  AR agrees that with respect to any suit or claim for contribution brought by it for matters related to this Consent Decree, it will notify the United States and the State in writing no later than sixty (60) days prior to the initiation of such suit or claim. AR agrees that with respect to any suit or claim brought against it for matters related to this Consent Decree, it will notify the United States and the State in writing within ten (10) days after service of the complaint on it.  In addition, AR shall notify the United States and the State within ten (10) days of service or receipt of any motion for summary judgment and within ten (10) days of receipt of any order from a court setting a case for trial.

66.     **Waiver of Claim-Splitting Defenses**.

a.     In any subsequent administrative or judicial proceeding initiated by (1) the United States or the State for injunctive relief, recovery of response costs, or other appropriate relief relating to the Anaconda Site that are not addressed by or under a consent decree or other judicial order, or (2) the United States or the State for other claims reserved in Paragraph 55 (General Reservation of Rights), AR shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised in the subsequent proceeding by the United States or the State were or should have been brought in the Federal Action or in the State Action; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XV (Covenants and Reservations by United States and State).

b.     In any subsequent administrative or judicial proceeding initiated by the United States or the State, for injunctive relief, recovery of response costs, or other appropriate

75

relief relating to the Anaconda Site, neither the United States nor the State shall use any provision of this Consent Decree to assert and maintain any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by AR in the subsequent proceeding were or should have been brought in the Federal Action or in the State Action; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XVI (Covenants by AR).

## XVIII.   ACCESS TO INFORMATION

67.   **Obligation to Provide Documents**. Subject to the assertion of privilege claims in accordance with Paragraph 68 (Claims of Privilege), AR shall provide to EPA and DEQ, upon request, copies of all documents and information within its possession or control or that of its contractors or agents relating to the implementation of this Consent Decree, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, and correspondence. In response to reasonable requests by EPA, in consultation with DEQ, AR shall cooperate in making available to EPA and DEQ, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work, subject to their right to counsel or any other right under State and Federal law.

68.   **Claims of Privilege**.

a.   AR may assert business confidentiality claims covering part or all of the documents or information submitted to the United States, EPA, or the State under this Consent Decree to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA,

42 U.S.C.§ 9604(e)(7), and 40 C.F.R.§ 2.203(b).  Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B.  If no claim of confidentiality accompanies documents or information when they are submitted to the United States, EPA, or the State, and if EPA has notified AR that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA, the public may be given access to such documents or information without further notice to AR.

      b.   AR may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by state or federal law.  If AR asserts such a privilege in lieu of providing documents over which it asserts a privilege, and if AR has not previously provided a privilege log to the United States for the documents subject to the request, AR shall provide the United States and/or EPA, and the State, with the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the contents of the document, record, or information: and (6) the privilege asserted by AR.  However, no final documents, reports or other information that AR is required to create or generate by this Consent Decree shall be withheld on the grounds that they are privileged.

    69.   **Previously Provided Documents**.  Nothing in this Section shall require AR to produce any documents, records, or other information that it has previously produced to the United States or the State, although AR shall cooperate with the United States to identify the approximate date(s) of such previous production or other information to assist the United States in locating previously produced documents.

70.    **Admissibility**.  If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this Consent Decree.

71.    **No Data Claim**.  No claim of confidentiality shall be made by any Party with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other non-privileged documents or information evidencing conditions relating to the Site.

72.    **Plaintiffs' Retention of Rights**.  Notwithstanding any provision of this Consent Decree, the United States and the State retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIX.    RETENTION OF RECORDS

73.    **Preservation of Records**.  AR shall preserve and retain all records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate to the Work or liability of any person for the Work, regardless of any corporate retention policy to the contrary, until 5 years after such Work is complete, or some other date agreed to by the Parties.  AR shall also instruct its contractors and agents to preserve all documents and records relating to the performance of the Work at the Site.

74.    **Notification**.  At the conclusion of this document retention period, AR shall notify EPA and DEQ at least ninety (90) days prior to the destruction of any such records or

documents.  AR may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by state or federal law.  If AR asserts such a privilege, it shall provide EPA and DEQ with the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by AR.  However, no final documents, reports or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on the grounds that they are privileged.

75.    **Certification**.  The Anaconda Smelter Hill Complex was demolished between 1980 and 1987.  With the exception of records, documents, and other information that may have been impacted by such demolition, AR hereby certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information relating to its potential liability regarding the Anaconda Site since the notification of potential liability by the United State or the State, and that it has fully complied with any and all EPA requests for information pursuant to Section 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XX. NOTICES AND SUBMISSIONS

76.    **Individuals and Addresses**.  All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this Consent Decree must be in writing unless otherwise specified.  Whenever, under this Consent Decree,

notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the Consent Decree regarding such Party.

    As to the United States:

    EES Case Management Unit, U.S. Department of Justice
    Environment and Natural Resources Division
    U.S. Department of Justice
    P.O. Box 7611
    Washington, D.C. 20044-7611
    Re: DJ #90-11-2-430

    As to EPA:

    Charlie Coleman
    EPA Project Coordinator
    U.S. Environmental Protection Agency
    Region 8 Montana Office
    10 West 15th Street, Suite 3200
    Helena, Montana 59624
    coleman.charles@epa.gov

    Andrew Lensink
    Senior Assistant Regional Counsel
    U.S. Environmental Protection Agency
    Region 8
    1595 Wynkoop Street
    Denver, CO 80209
    lensink.andy@epa.gov

    As to the Regional Financial Management Officer:

Ben Bielenberg
U.S. Environmental Protection Agency
Region 8
1595 Wynkoop Street
Denver, CO 80202-1129
bielenberg.ben@epa.gov

As to EPA Cincinnati Finance Center:

EPA Cincinnati Finance Center
26 W. Martin Luther King Drive
Cincinnati, Ohio 45268
cinwd_acctsreceivable@epa.gov

As to the State or DEQ:

Joel Chavez
State Project Officer
Anaconda CERCLA Site
Department of Environmental Quality
Remediation Division
P.O. Box 200901
Helena, Montana  59620-0901
jchavez@mt.gov

Jonathan Morgan
DEQ Legal Counsel
Montana Department of Environmental Quality
P.O. Box 200901
Helena, Montana  59620-0901
jmorgan3@mt.gov

As to AR:

Shannon Dunlap
Project Coordinator
Atlantic Richfield Company
317 Anaconda Road
Butte, Montana  59701
Shannon.Dunlap@bp.com

Jean A. Martin, Senior Counsel
Atlantic Richfield Company
501 Westlake Park Boulevard

81

Low Rise Room 3.664A
Houston, Texas  77079
jean.martin@bp.com

## XXI.     RETENTION OF JURISDICTION

77.     This Court retains jurisdiction over both the subject matter of this Consent Decree

and AR for the duration of the performance of the terms and provisions of this Consent Decree

for the purpose of enabling any of the Parties to apply to the Court at any time for such further

order, direction, and relief as may be necessary or appropriate for the construction or

modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to

resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXII.     APPENDICES

78.     The following appendices are attached to and incorporated into this Consent

Decree:

> Appendix A – Statement of Work
>
> Appendix B – ARWW&S OU ROD (September 29, 1998)
>
> Appendix C – ARWW&S OU ROD Amendment (September 29, 2011)
>
> Appendix D – ARWW&S OU ROD Amendment (June 12, 2020)
>
> Appendix E – OW/EADA OU ROD (March 8, 1994)
>
> Appendix F – OW/EADA OU ESD (November 6, 1995)
>
> Appendix G – OW/EADA OU ESD (June 12, 2020)
>
> Appendix H – Map of Anaconda Site

## XXIII.     EFFECTIVE DATE

79.     The Effective Date of this Consent Decree shall be 60 days from the date that this

District Court enters the Consent Decree, unless an appeal of the entry and judgment is filed

during the 60-day period; if an appeal is taken, the Effective Date means the date on which the District Court's judgment is affirmed.

## XXIV.   MODIFICATION

80.    Except as provided in Paragraph 13 (Modification of SOW or Related Deliverables), material modifications to this Consent Decree, including the SOW, shall be in writing, signed by the Parties, and shall be effective upon approval by the Court. Except as provided in Paragraph 13, non-material modifications to this Consent Decree, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and AR. A modification to the SOW shall be considered material if it changes or further waives an ARAR; modifies Section 1.3 of the SOW (Scope of the Remedy); or implements a ROD amendment or an ESD that alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(i), except as provided in Paragraph 13. Before providing its approval to any modification to the SOW, the United States will provide DEQ with a reasonable opportunity to review and comment on the proposed modification.

81.    Nothing in this Consent Decree shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this Consent Decree.

## XXV.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

82.    This Consent Decree shall be lodged with the Court for at least thirty (30) days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States and the State reserve the right to withdraw or withhold their consent if the comments regarding the Consent Decree disclose facts

or considerations that indicate that the Consent Decree is inappropriate, improper, or inadequate. AR consents to the entry of this Consent Decree without further notice.

83.     If for any reason the Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

84.     On the Effective Date, the applicable portions of the following orders will be terminated: Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-08-2003-0017 (Sept. 29, 2003), with respect to all requirements related to the Slag Piles portions of the ARWW&S OU; and Administrative Order for Remedial Design/Remedial Action, Docket No. CERCLA-VIII-94-08 (Apr. 8, 1994), with respect to all requirements related to the OWGC portion of the OW/EADA OU.

85.     **Certification of Remedial Action Completion for the OWGC Remedy.** Upon approval of the Final Remedial Action Completion Report for the OWGC Remedy by EPA, in consultation with DEQ, in accordance with Section 4.9 of the SOW, the requirements for Certification of Remedial Action Completion for the OWGC Remedy will be deemed satisfied by AR, and EPA will issue a Certification of Remedial Action Completion for the OWGC Remedy, pursuant to Section 122(f)(3) of CERCLA, 42 U.S.C. § 9622(f)(3).

## XXVI.     SIGNATORIES/SERVICE

86.     The undersigned representatives of Atlantic Richfield Company, the Environment and Natural Resources Division of the United States Department of Justice, the United States Environmental Protection Agency, and the Montana Department of Environmental Quality each

certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

87.     Each Party agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States or the State has notified AR in writing that it no longer supports entry of the Consent Decree.

88.     AR shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on its behalf with respect to all matters arising under or relating to this Consent Decree.  AR agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons.  AR need not file any response to the State's Amended Complaint filed in this action unless and until 30 days after the Court expressly declines to enter this Consent Decree as a final judgement.

## XXVII.     FINAL JUDGMENT

89.     This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the Consent Decree.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

85

90. Upon the Court's approval of this Consent Decree, the Decree shall be entered as a final judgment under Fed. R. Civ. P. 54 and 58.  The Court expressly determines that there is no just reason for delay in entering this judgment.

SO ORDERED THIS **28**th DAY OF *January* , 2021.

Sam E. Haddon
United States District Judge

86

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, et al. v. Atlantic Richfield Company, et al., Civil No. CV-89-39-BU-SEH, subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

FOR THE UNITED STATES OF AMERICA:·

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
Washington, D.C.  20530


_John Sither_                                Date: _10/8/20_
JOHN SITHER
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044


_(signature)_                                Date: _10-8-20_
KURT G. ALME
United States Attorney
District of Montana
316 N 26th St #5018
Billings, MT 59101


_(signature)_                                Date: _10-8-2c_
VICTORIA FRANCIS
Assistant United States Attorney
District of Montana
316 N 26th St #5018
Billings, MT 59101

87

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, et al. v. Atlantic Richfield Company, et al., Civil No. CV-89-39-BU-SEH, subject to the public notice and comment requirements of 28 C.F.R. § 50.7 and § 75-10-713, MCA.

Date: September 28, 2020

KENNETH C. SCHEFSKI
Regional Counsel
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado 80202

Date: September 28, 2020

BETSY SMIDINGER
Director
Superfund and Emergency Management Division
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado 80202

Date: September 28, 2020

ANDREW LENSINK
Senior Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency
Region 8
1595 Wynkoop Street
Denver, CO 80209

88

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, et al. v. Atlantic Richfield Company, et al., Civil No. CV-89-39-BU-SEH, subject to the public notice and comment requirements of 28 C.F.R. § 50.7 and § 75-10-713, MCA.

FOR THE STATE OF MONTANA:


Date: 10/19/20

STEVE BULLOCK
Governor of the State of Montana


Date: 16 October 2020

TIM FOX
Montana Attorney General


Date: 10/16/2020

GEORGE MATHIEUS
Deputy Director
Montana Department of Environmental Quality


Date: 10/16/2020

JONATHAN MORGAN
Special Assistant Attorney General
DEQ Legal Counsel
Montana Department of Environmental Quality
1100 North Last Chance Gulch
P.O. Box 200901
Helena, Montana 59620-0901

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States, *et al.* v. Atlantic Richfield Company, *et al.*, Civil No. CV-89-39-BU-SEH.

FOR THE ATLANTIC RICHFIELD COMPANY:


Date: 24 SEPTEMBER 2020

PATRICIA GALLERY
Vice President


Date: 9/24/2020

ADAM S. COHEN
(authorized to accept service of process by mail on behalf of AR as noted in Paragraph 88)
Davis Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver, Colorado  80202


Date: 24 September 2020

JEAN A. MARTIN
Senior Counsel
Atlantic Richfield Company
501 Westlake Park Blvd., Low Rise Room 3.664A
Houston, Texas 77079

90