IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA AND THE STATE OF MONTANA, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. CV89-039-BU-SEH |
| ATLANTIC RICHFIELD COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

**CONSENT DECREE
FOR THE ANACONDA SMELTER NPL SITE**

# TABLE OF CONTENTS

I.       BACKGROUND ....................................................................................................... 1
II.      JURISDICTION .................................................................................................... 13
III.     PARTIES BOUND ................................................................................................ 14
IV.      DEFINITIONS ...................................................................................................... 14
V.       GENERAL PROVISIONS .................................................................................... 31
VI.      PERFORMANCE OF THE WORK ..................................................................... 33
VII.     REMEDY REVIEW .............................................................................................. 38
VIII.    PROPERTY REQUIREMENTS .......................................................................... 40
IX.      FINANCIAL ASSURANCE ................................................................................. 45
X.       PAYMENT OF RESPONSE COSTS ................................................................... 52
XI.      INDEMNIFICATION AND INSURANCE .......................................................... 58
XII.     FORCE MAJEURE .............................................................................................. 62
XIII.    DISPUTE RESOLUTION .................................................................................... 65
XIV.     STIPULATED PENALTIES ................................................................................ 69
XV.      COVENANTS AND RESERVATIONS BY UNITED STATES AND STATE ..................... 74
XVI.     COVENANTS AND RESERVATIONS BY AR AND SETTLING FEDERAL AGENCIES 89
XVII.    EFFECT OF SETTLEMENT; CONTRIBUTION .................................................. 95
XVIII.   ACCESS TO INFORMATION ............................................................................. 98
XIX.     RETENTION OF RECORDS .............................................................................. 100
XX.      NOTICES AND SUBMISSIONS ....................................................................... 102
XXI.     RETENTION OF JURISDICTION ..................................................................... 104
XXII.    APPENDICES ..................................................................................................... 104
XXIII.   EFFECTIVE DATE ............................................................................................. 105
XXIV.    MODIFICATION ................................................................................................ 105
XXV.     LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ........................... 106
XXVI.    MISCELLANEOUS PROVISIONS ................................................................... 106
XXVII.   SIGNATORIES/SERVICE ................................................................................. 107
XXVIII.  FINAL JUDGMENT ........................................................................................... 107

# I.  BACKGROUND

THE UNITED STATES' COMPLAINT

A.      In 1989, the United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint ("Complaint") in this matter (the "Federal Action") pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9607, against the Atlantic Richfield Company ("AR").

B.      In the Complaint and its subsequent amendments dated October 14, 1992, October 31, 1994, August 2, 2003, November 5, 2004, and June 8, 2020, the United States sought the recovery of past response costs and a declaratory judgment of liability for future response costs paid at or in connection with the Original Portion of the Silver Bow Creek/Butte Area National Priorities List ("NPL") Site, the Milltown Reservoir Sediments NPL Site (now referred to as the "Milltown Reservoir/Clark Fork River NPL Site"), the Butte Priority Soils Operable Unit, and the Anaconda Smelter NPL Site (the "Anaconda Site" or "Site").  The Anaconda Site is the focus of this Consent Decree.

C.      In response to the United States' Complaint and subsequent amendments, AR asserted several defenses and filed counterclaims against the United States, naming several Settling Federal Agencies, seeking cost recovery, contribution, contractual indemnity, equitable indemnification, recoupment, and declaratory relief.  Among AR's defenses to the United States' claims is AR's assertion that the United States' CERCLA claims are in the nature of contribution under CERCLA Section 113 rather than CERCLA Section 107, and thus AR's CERCLA liability is several rather than joint and several.  This defense is addressed in a Report and Recommendation issued by the Magistrate in the Federal Action.

D.      The State of Montana (the "State"), acting by and through the Montana Department of Environmental Quality ("DEQ"), filed a motion to intervene and a complaint in intervention in the Federal Action on June 8, 2020.  The State's complaint alleged claims under CERCLA and the Montana Comprehensive Environmental Cleanup and Responsibility Act ("CECRA"), §§ 75-10-701, MCA, *et seq*. relating to the Butte Priority Soils Operable Unit.  The State's motion to intervene in the Federal Action was granted on June 25, 2020.  On October 23, 2020, in connection with the lodging of the 2020 Partial Consent Decree for the Anaconda Smelter Site ("Partial Consent Decree"), the State filed an amended complaint that added claims under CERCLA and CECRA relating to the Anaconda Site.  The new State claims in its amended complaint are expressly limited to the Anaconda Site and the matters addressed in the Partial Consent Decree and this Consent Decree.

SETTLEMENT FRAMEWORK

E.      In November of 1998, the United States and AR reached a settlement regarding the claims of the United States at a portion of the Silver Bow Creek/Butte Area NPL Site – the Streamside Tailings Operable Unit ("Streamside Tailings Consent Decree").  The Streamside Tailings Consent Decree, together with a consent decree entered in the case of *Montana v. Atlantic Richfield*, No. CV-83-317-H-SEH, both of which were entered on April 19, 1999, also resolved the majority of the Clark Fork River Basin natural resource damages claims of the United States and the State against AR.  The Streamside Tailings Consent Decree established a framework for resolving the United States' remaining claims throughout the Clark Fork River Basin in Montana.  These claims were separable into geographic areas that, under Section VII of

2

the Streamside Tailings Consent Decree, the parties agreed to resolve in six groups of operable units:

1.  Rocker Timber Framing and Treating Plant Operable Unit;

2.  Butte Mine Flooding Operable Unit (Berkeley Pit) and the Butte Active Mining Area Operable Unit;

3.  Anaconda Smelter Site;

4.  Clark Fork River Operable Unit, Warm Spring Ponds Operable Units, and the Milltown Reservoir Operable Unit;

5.  Butte Priority Soils Operable Unit (towns of Butte and Walkerville); and

6.  The Westside Soils Operable Unit formerly referred to as the Non Priority Soils Operable Unit in Paragraph 31(F) of the Streamside Tailings Consent Decree.

F.      The United States and AR have previously resolved their claims and defenses, subject to certain stated reservations, involving the Rocker, Butte Mine Flooding, Milltown Reservoir, Clark Fork River, and Butte Priority Soils Operable Units.  The Rocker Site consent decree was entered in November 2000, the Butte Mine Flooding Site consent decree was entered in August 2002, and the Milltown Site consent decree was entered in February 2006.  The Clark Fork River Operable Unit consent decree and a consent decree between the State and AR ("State-AR 2008 CD"), which were entered in August 2008, addressed certain remaining State and federal natural resource damages claims and certain response action and costs claims against AR.  These consent decrees also obligated the State to implement remedial and restoration actions in certain areas of the Anaconda Site, including areas known as Stucky Ridge / Section 36 and Remedial Design Unit 15 ("State Property Remedial Commitments") and other State-owned lands within the Site ("State Lands Obligations").  The State's performance of the State Property Remedial Commitments and State Lands Obligations is ongoing.  The Butte Priority

Soils Operable Unit consent decree was lodged on June 8, 2020, and entered by the Court on

September 18, 2020.

      G.     In addition, the United States and AR negotiated two consent decrees for

reimbursement of the United States' CERCLA response costs at the Clark Fork River Basin

sites.  The first, the Consent Decree for Settlement of Remaining Sites Past Response Costs

("Past Costs Consent Decree"), was entered by this Court on January 24, 2005.  It addressed

EPA and United States Department of Justice ("DOJ") response costs incurred pursuant to

Section 107 of CERCLA, 42 U.S.C. § 9607, in connection with the Anaconda Site, the Butte

Priority Soils Operable Unit, the Clark Fork River Operable Unit, and the Warm Springs Ponds

Operable Units.  The Past Costs Consent Decree also resolved certain counterclaims and most

defenses asserted by AR against the United States in the Federal Action and addressed related

covenants and reservations for the "Remaining Sites," as defined in that consent decree.

Paragraph 20 of the Past Costs Consent Decree reserved certain counterclaims, defenses, and

other claims relating to the Remaining Sites, including the Anaconda Site.  The second response

costs reimbursement consent decree, the September 2013 Consent Decree for Settlement of

Interim Past Response Costs ("Interim Past Costs Consent Decree"), provided for reimbursement

of later EPA and DOJ response costs paid at the Anaconda Site and the Warm Springs Ponds

Operable Units, and DOJ costs.

      H.     The Past Costs Consent Decree and the Interim Past Costs Consent Decree, along

with the Clark Fork River consent decree and the Butte Priority Soils Operable Unit consent

decree, resolved EPA costs claims related to the Anaconda Site that had been paid through

December 31, 2010, and DOJ costs incurred in resolving the Federal Action through September 30, 2016.

      I.      Although the Streamside Tailings Consent Decree set out a tentative order for negotiating consent decrees resolving federal claims over the six groups of Clark Fork Basin operable units, it also provided the parties with flexibility to change this order.  Consistent with this flexible framework, after addressing other operable units out of turn, the parties commenced negotiations to address the United States' and the State's claims against AR relating to the Anaconda Site.  The Partial Consent Decree was intended to resolve AR's liability for certain response actions at the Anaconda Site related to surface water remediation, the cleanup of two smelter slag piles at the Site, and remediation of property on which the Old Works Golf Course ("OWGC") is now located.  The Parties intend for this Consent Decree to supersede the Partial Consent Decree in its entirety, and for this Consent Decree to resolve AR's liability for all response actions, response costs, and operation and maintenance activities at the Anaconda Site.

ANACONDA SMELTER NPL SITE

      J.      The Anaconda Site is one of several Superfund sites in the Upper Clark Fork River Basin in southwestern Montana.  The Site covers approximately 300 square miles of agricultural, pasture, residential, rangeland, forest, riparian, and wetland areas in the southern Deer Lodge Valley and surrounding foothills, in and around the city of Anaconda, where the Anaconda Copper Mining Company ("ACM") conducted milling and smelting activities beginning in the late 1800s.  ACM changed its name to The Anaconda Company ("TAC") in 1955.  TAC was merged with a wholly owned subsidiary of AR in 1977.  That subsidiary was merged into AR in 1981.

K.     Smelter operations ended in 1980, and thereafter most of the facilities at the Site were dismantled.  Areas of the Site now contain large volumes of wastes, slag, tailings, flue dust, and debris, which have contaminated soils, groundwater, and surface water.  In response to the releases and threatened releases of hazardous substances from the Anaconda Smelter facilities, EPA placed the Anaconda Site on the Superfund program's National Priorities List on September 8, 1983, *see* 48 Fed. Reg. 40658, pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605.

L.     Copper ore concentrating and smelting operations began at the Site in 1884 in an area located north of Warm Springs Creek and next to the town of Anaconda known as the Old Works.  The Old Works operated until about 1901, when it was replaced by new ore processing and smelting operations at the Washoe Reduction Works (also called the Anaconda Smelter) on Smelter Hill, south of the Old Works and east of Anaconda.  Smelter wastes were disposed over approximately 6,000 acres of the Site.  Approximately 30,000 acres of upland terrestrial soils are contaminated by aerial deposition of smelter emissions; 13,000 acres of alluvial groundwater contain elevated concentrations of arsenic, cadmium, and copper; and 67,000 acres of bedrock groundwater exceed the State of Montana arsenic standard.

M.     Beginning in 1983, EPA, in consultation with DEQ, initiated a series of investigations of Site contamination and instituted various removal and remedial actions at the Site.  AR has performed many of these response actions and has performed nearly all necessary remedial design activities at the Site pursuant to administrative orders and prior consent decrees.  AR's obligations under the Administrative Orders, listed in section 4 of the Statement of Work

("SOW") attached hereto as Appendix A, will be terminated and superseded by the requirements of this Consent Decree as of the Effective Date.

      N.      The Anaconda Site is presently organized into five operable units.  EPA and AR have previously negotiated consent decrees that resolved AR's liability regarding two of these operable units: the Mill Creek Operable Unit ("Mill Creek OU") and the Flue Dust Operable Unit ("Flue Dust OU").  The Mill Creek OU was formed after severely elevated levels of arsenic were found in soils in the small community of Mill Creek, located two miles east of Anaconda downwind from the smelter stack.  AR performed an expedited Remedial Investigation / Feasibility Study ("RI/FS"), and EPA issued a record of decision ("Mill Creek ROD") in 1987, which selected a remedy of permanent relocation of all Mill Creek area residents and the demolition of structures.  AR implemented the Mill Creek remedy pursuant to a consent decree entered by this Court in September 1988, and EPA certified the Mill Creek OU remedial action as complete on July 15, 2022.  The Flue Dust OU covers the remediation of flue dust waste generated by the smelter.  Pursuant to the Flue Dust OU consent decree, entered in December 1992, AR treated approximately 500,000 tons of flue dust and placed it in an on-site repository. EPA certified the Flue Dust OU remedial action as complete on October 15, 1996.  EPA issued a Notice of Intent to Delete the Flue Dust OU, the Beryllium OU, and the Arbiter OU from the NPL on August 10, 2020, 85 Fed. Reg. 48132, which partial deletions of all three OUs became final on September 30, 2020.  AR's remaining obligations with respect to the Mill Creek OU and Flue Dust OU, which concern operation and maintenance of the remedies, will be superseded by the O&M requirements of this Consent Decree and the SOW.

O.       This Consent Decree and the SOW focus on response actions performed and to be performed at the three remaining operable units at the Site:

      1.       Old Works/East Anaconda Development Area Operable Unit ("OW/EADA OU")

      2.       Community Soils Operable Unit ("Community Soils OU" or "CSOU") and

      3.       Anaconda Regional Water, Waste & Soils Operable Unit ("ARWW&S OU")

P.       Response actions at the OW/EADA OU, which encompasses approximately 1,300 acres of the Anaconda Site, have centered on reduction of arsenic concentrations in soils, construction of engineered covers on milling and smelting waste piles, installing sedimentation basins and channels to control stormwater runoff into surface waters and other downgradient receptors, and revegetating hillsides and other natural features.  In September 1993, AR completed an RI/FS for the OW/EADA OU pursuant to 40 C.F.R. § 300.430.  Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the RI/FS and of the proposed plan for remedial action at the OW/EADA OU on September 22 and 24, 1993.  EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action.  The decision by EPA on the remedial action for the OW/EADA OU was embodied in a final ROD executed on March 8, 1994, on which DEQ gave its concurrence.  The OW/EADA ROD includes a responsiveness summary to the public comments.  EPA issued Explanations of Significant Differences ("ESDs") for the OW/EADA OU ROD on November 6, 1995 and June 12, 2020.  AR's work at the OW/EADA OU to date includes completion of construction of the OWGC Remedy.  On July 15, 2022, EPA, in consultation with DEQ, confirmed that the requirements for certification of Remedial Action

8

completion for the OWGC Remedy have been satisfied pursuant to section 5.1(e) of the SOW and Section 122(f)(3) of CERCLA, 42 U.S.C. § 9622(f)(3).  If the OWGC property ceases to be utilized as a golf course in the future, the selected remedy is the OWGC Conversion Remedy.

Q.     Response actions at the Community Soils OU primarily address residential yards and attics contaminated with arsenic and lead in Anaconda, Opportunity, and other small communities near the former smelters at the Site.  AR conducted various Remedial Investigations and a Feasibility Study for the CSOU, which were completed before EPA published notice of the proposed plan for remedial action at the CSOU on July 8, 1996.  EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action.  The decision by EPA on the remedial action for the CSOU was embodied in a final ROD executed on September 25, 1996, on which DEQ gave its concurrence.  The CSOU ROD includes a responsiveness summary to the public comments. On September 28, 2012, EPA published notice of a revised plan for remedial action at the CSOU and provided an opportunity for written and oral comments from the public.  EPA's final decision on the revised remedial action for the CSOU was embodied in a ROD Amendment, executed on September 30, 2013, on which DEQ gave its concurrence.  EPA issued ESDs for the CSOU ROD on June 19, 2017, and June 12, 2020.

R.     The ARWW&S OU is a comprehensive regional operable unit of the Anaconda Site that addresses a variety of soil, surface water, and groundwater contamination at the Site not addressed by the other Site OUs.  Due to its size and diverse areas of concern, the ARWW&S OU has been separated into fifteen Remedial Design Units and two expansion areas based upon factors such as location, source, and type of contamination.  The RI/FS for the ARWW&S OU

9

was completed by AR through a number of separate reports issued in 1996 and 1997.  EPA

published notice of the proposed plan for remedial action at the ARWW&S OU on October 21,

1997.  EPA provided an opportunity for written and oral comments from the public on the

proposed plan for remedial action.  A copy of the transcript of the public meeting is available to

the public as part of the administrative record upon which the Regional Administrator, EPA

Region 8, based the selection of the response action.  The decision by EPA on the remedial

action for the ARWW&S OU was embodied in a ROD executed on September 29, 1998, on

which DEQ gave its concurrence.  The ARWW&S OU ROD includes a responsiveness summary

to the public comments.  On November 8, 2009, EPA published notice of a revised plan for

remedial action at the ARWW&S OU and provided an opportunity for written and oral

comments from the public.  EPA's decision on the revised remedial actions for the ARWW&S

OU was embodied in a ROD Amendment, executed on September 29, 2011, on which DEQ gave

its concurrence.  EPA published notice of an additional revised plan for remedial action at the

ARWW&S OU in September 2019, and provided an opportunity for written and oral comments

from the public.  EPA's decision on this revised plan for remedial action is reflected in a ROD

Amendment executed on June 12, 2020, on which DEQ concurred.  The 2020 Partial Consent

Decree addressed certain AR cleanup obligations at the ARWW&S OU of the Anaconda Site

related to the OWGC, surface water and slag pile remediation.

        S.      Anaconda-Deer Lodge County ("ADLC") is performing the ADLC Obligations,

consisting of various activities related to cleanup and protection of Superfund remedies at the

Site.  These activities include, among other things, recording and enforcing instruments that

establish restrictive covenants governing the use of certain properties within the Site,

administering the Development Permit System that provides restrictions on the use and development of land within the County, performing certain operation and maintenance at the OWGC, and implementation of the Community Protective Measures Program, each as described in the ICIAP.  ADLC has been performing these activities pursuant to a 1994 Agreement and Covenant Not to Sue that it entered into with EPA and DEQ.  In 2022, this 1994 agreement was updated by an Amendment of Agreement and Covenant Not to Sue, under which ADLC assumed additional obligations, including the implementation of a residential attic abatement program and an interior/exterior dust reduction program in residences in the town of Anaconda. The Old Works Golf Course, Inc. (the "Authority"), which operates the OWGC, is also a party to these agreements between ADLC, EPA, and DEQ.  Long-term funding of the ADLC Obligations has been assured through two additional agreements that ADLC and the Authority have entered into with AR: the Old Works Golf Course Agreement (December 13, 2019), and the Remedy Coordination, Funding, and Settlement Agreement (June 12, 2020).

T.      As described in the SOW, EPA, in consultation with DEQ, oversees all operation and maintenance activities being conducted at the Site through its management of the ARWW&S OU.  This includes operation and maintenance related to the completed response actions at the Mill Creek OU and the Flue Dust OU, and to past and future remedial actions at the OW/EADA OU and CSOU.

U.      Based on information presently available, EPA and DEQ believe that the Work will be properly and promptly conducted by AR if conducted in accordance with this Consent Decree and its appendices.  Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedial actions set forth in the RODs, the response actions required to date of

AR, and the Work to be performed by AR shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

NOTICES

V.     In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified DEQ of negotiations with AR regarding the Anaconda Site.  EPA also provided DEQ, on behalf of the State, with an opportunity to participate in such negotiations and to be a party to this Consent Decree.  DEQ has since participated in these negotiations, and the State is a party to the action and a signatory to this Consent Decree.

W.     In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the Department of the Interior, the State, and the Confederated Salish and Kootenai Tribes (the "Tribes") of negotiations with a potentially responsible party regarding the release of Hazardous Substances relating to the Anaconda Site that may have resulted in injury to natural resources under federal, State, and/or the Tribes' trusteeship.  DOI, the Tribes, and the State as Trustee did not participate in these negotiations and are not signatories to this Consent Decree, as they had previously resolved their natural resource damages claims at the Anaconda Site against AR, subject to certain reservations.  The State, on behalf of DEQ, did participate in these negotiations and is a signatory to this Consent Decree.

NO ADMISSION OF LIABILITY

X.     By entering into this Consent Decree, AR, the United States, and the State (the "Parties") do not admit to any liability arising out of the transactions or occurrences either that were alleged, or could have been alleged, in the complaints, amended complaints, or counterclaims filed in the Federal Action.  In addition, AR does not admit or acknowledge that

any alleged release or threatened release of Hazardous Substances at or from the Anaconda Site

constitutes an imminent or substantial endangerment to the public health or welfare or the

environment.  The Settling Federal Agencies do not admit any liability arising out of the

transactions or occurrences alleged in any counterclaim asserted by AR. The form of this

Consent Decree (which is related to the prior consent decrees filed in the Federal Action) and the

interpretation of certain legal requirements supporting the Work are unique to the site-specific

circumstances occurring at the Anaconda Site and are not precedent for any other consent decree.

THE PROPOSED SETTLEMENT

Y.      The Parties recognize, and the Court by entering this Consent Decree finds, that

this Consent Decree has been negotiated by the Parties in good faith and implementation of this

Consent Decree will expedite the cleanup of the Anaconda Site and will avoid prolonged and

complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and

in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.  JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §§ 1331, 1345, and 1367, and 42 U.S.C. §§ 9606, 9607, and 9613(b).  This Court also

has personal jurisdiction over the Parties.  Solely for the purposes of this Consent Decree and the

underlying complaints, the Parties waive all objections and defenses that they may have to

jurisdiction of the Court or to venue in this District.  The Parties shall not challenge the terms of

this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.  Each

Party hereby agrees not to oppose entry of this Consent Decree by this Court unless the United

States or the State has notified the other Parties in writing that it no longer supports entry of this

13

Consent Decree after consideration of public comment, as provided in Section XXV (Lodging and Opportunity for Public Comment) below.

## III.       PARTIES BOUND

2.       This Consent Decree is binding upon the United States, the State, and AR and its successors and assigns.  Any change in ownership or corporate or other legal status of AR including, but not limited to, any transfer of assets or real or personal property, shall in no way alter AR's responsibilities under this Consent Decree.

3.       AR shall provide a copy of this Consent Decree to each contractor hired to perform the Work (as defined below) or any portion of the Work required by this Consent Decree and to each person representing AR with respect to the Site or the Work.  AR shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree.  AR or its contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work.  AR shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work contemplated herein in accordance with this Consent Decree.  With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with AR within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.  DEFINITIONS

4.       Unless otherwise expressly provided in this Consent Decree, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations.  Whenever terms

listed below are used in this Consent Decree or its appendices, the following definitions shall apply solely for purposes of this Consent Decree:

"ADLC Obligations" means the activities, work, and obligations that ADLC and the Authority have agreed to implement and perform pursuant to the Amended ADLC PPA, as specified in Section V thereof (Consideration).

"ADLC PPA" means the Agreement and Covenant Not to Sue entered into between EPA, the State, ADLC, and the Authority as of April 29, 1994, EPA Docket No. CERCLA 94-12.

"Administrative Orders" means all administrative orders issued by EPA to AR pursuant to Section 106 of CERCLA, 42 U.S.C. § 9606, requiring performance of response actions at the Site, which remained in effect prior to the Effective Date and which are listed in section 4 of the SOW.

"Amended ADLC PPA" means the Amendment of Agreement and Covenant not to Sue entered into between EPA, the State, ADLC, and the Authority in 2022, EPA Docket No. CERCLA 94-12.

"Anaconda-Deer Lodge County" or "ADLC" means Anaconda-Deer Lodge County, a consolidated governmental entity organized under the Constitution and laws of Montana, including its officials and representatives.

"Anaconda Site" or "Site" means the Anaconda Smelter NPL Site, which is shown on the map attached hereto as Appendix B.

"Anaconda Site Future Response Costs" means, collectively, Federal Anaconda Site Future Response Costs and State Anaconda Site Future Response Costs, as those terms are defined below.

"Anaconda Site Interim Response Costs" means all costs of response, including direct and indirect costs, as well as costs allocated from the Clark Fork General account, that are: (a) paid by the United States at or in connection with the Anaconda Site from February 1, 2022 through the Effective Date, including costs incurred by the State paid through funding from the United States pursuant to cooperative agreements; or (b) incurred at or in connection with the Anaconda Site prior to the Effective Date, but paid by the United States after that date, and any claim for Interest accrued on such costs.

"Anaconda Site Past Response Costs" means all response costs, including direct and indirect costs, as well as costs allocated from the Clark Fork General account, that are: (a) paid by the United States (other than DOJ) at or in connection with the Anaconda Site from January 1, 2011 through January 31, 2022, including, without limitation, oversight costs, allocable Clark Fork General account costs, and Interest on all such costs which accrued pursuant to 42 U.S.C. § 9607(a) through such date; (b) incurred by the State and paid through funding from the United States pursuant to cooperative agreements through January 31, 2022; and (c) incurred or paid by DOJ relating to the Federal Action from October 1, 2016 through September 30, 2021, and any claim for Interest accrued on such costs.

"Anaconda Site Response Costs" means, collectively, Anaconda Site Past Response Costs, Anaconda Site Interim Response Costs, and Oversight Costs for the Anaconda Site.

"Anaconda Smelter NPL Site Special Account" means the special account within the EPA Hazardous Substance Superfund established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"ARAR" means an applicable or relevant and appropriate requirement, criterion, standard, or limitation of federal or state law within the meaning of Section 121(d)(2) of CERCLA, 42 U.S.C. § 9621(d)(2), identified in the RODs.

"AR" means the Defendant, Atlantic Richfield Company, its divisions and subsidiaries, including ARCO Environmental Remediation L.L.C. (AERL), and any predecessors in interest. It shall also mean any successors in interest to the extent that any such successor's liability at the Anaconda Site derives from the liability of the Atlantic Richfield Company, its divisions and subsidiaries, including AERL, and any predecessors in interest.

"ARWW&S OU" means the Anaconda Water, Waste and Soils Operable Unit of the Anaconda Site.

"ARWW&S OU ROD" means the Record of Decision for the Anaconda Water, Waste and Soils Operable Unit of the Anaconda Site, signed on September 29, 1998 by the Assistant Regional Administrator for Ecosystems Protection and Remediation, EPA Region 8, and concurred on by the Director of the Montana Department of Environmental Quality on behalf of the State, all attachments, the ROD Amendments executed on September 29, 2011 and June 12, 2020, and any future ESDs that AR is required to perform pursuant to this Consent Decree, when effective.  The ARWW&S OU ROD is attached to this Consent Decree as Appendix C.

"Authority" means Old Works Golf Course, Inc., a nonprofit corporation organized under the Constitution and laws of Montana to operate the Old Works Golf Course in the town of Anaconda.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9601-9675.

17

"Certification of Remedial Action Completion for the ARWW&S OU" means EPA's certification, in consultation with the State, pursuant to Section 122(f)(3) of CERCLA, 42 U.S.C. § 9622(f)(3), and the process set forth in section 5.1(e) of the SOW, that the Remedial Action for the ARWW&S OU and any modifications thereto have been completed and all applicable Performance Standards have been achieved at the ARWW&S OU in accordance with the requirements of CERCLA, the NCP, and the ARWW&S OU ROD.

"Certification of Remedial Action Completion for the CSOU" means EPA's certification, in consultation with the State, pursuant to Section 122(f)(3) of CERCLA, 42 U.S.C. § 9622(f)(3), and the process set forth in section 5.1(e) of the SOW, that the Remedial Action for the CSOU and any modifications thereto have been completed and all applicable Performance Standards have been achieved at the CSOU in accordance with the requirements of CERCLA, the NCP, and the CSOU ROD.

"Certification of Remedial Action Completion for the OW/EADA OU" means EPA's certification, in consultation with the State, pursuant to Section 122(f)(3) of CERCLA, 42 U.S.C. § 9622(f)(3), and the process set forth in section 5.1(e) of the SOW, that the Remedial Action for the OW/EADA OU and any modifications thereto have been completed and all applicable Performance Standards have been achieved at the OW/EADA OU in accordance with the requirements of CERCLA, the NCP, and the OW/EADA OU ROD.

"Certification of Site-Wide Remedial Action Completion" means EPA's certification, in consultation with the State, pursuant to Section 122(f)(3) of CERCLA, 42 U.S.C. § 9622(f)(3), and the process set forth in section 5.1(h) of the SOW, that the Remedial Action has been completed and all Performance Standards have been achieved at the OW/EADA OU, the CSOU,

the ARWW&S OU, the Mill Creek OU, and the Flue Dust OU in accordance with the requirements of CERCLA, the NCP, and the RODs, and any modifications thereto.

"Clark Fork NPL Sites" means the following sites located within the Clark Fork River Basin: the Anaconda Smelter NPL Site, the Silver Bow Creek/Butte Area NPL Site, the Milltown Reservoir/Clark Fork River NPL Site, and the Montana Pole and Treating Plant NPL Site.

"Community Soils OU" or "CSOU" means the Community Soils Operable Unit of the Anaconda Site.

"Contingent Replacement Performance Standards" are the contingent standards identified in the 2020 ARWW&S ROD Amendment and Tables 6-1, 6-2, 6-3, and 6-4 of the Final Surface Water Management Plan for the Anaconda Site.

"CSOU ROD" means the Record of Decision for the Community Soils Operable Unit of the Anaconda Site, signed on July 8, 1996 by the Assistant Regional Administrator for Ecosystems Protection and Remediation, EPA Region 8, and concurred on by the Director of the Montana Department of Environmental Quality on behalf of the State, all attachments, the ROD Amendment executed on September 30, 2013, the ESDs issued on June 19, 2017 and June 12, 2020, and any future ESDs that AR is required to perform pursuant to this Consent Decree, when effective. The CSOU ROD is attached to this Consent Decree as Appendix D.

"Consent Decree" means this consent decree and all appendices attached hereto. In the event of conflict between this Consent Decree and any appendix, this Consent Decree shall control.

"Cost Documentation" means a cost package for EPA's costs which consists of applicable: (1) payroll information, consisting of the Superfund Cost Recovery Package Imaging and On-Line System ("SCORPIO$") report or an equivalent cost summary, and any time sheets that exist, if requested by AR; (2) indirect cost information, consisting of an overall and an employee-by-employee SCORPIO$ report or equivalent cost summary; (3) travel information, consisting of a SCORPIO$ report or an equivalent cost summary, travel authorizations, and travel vouchers or their equivalent that exist; (4) EPA contractor (including Contract Laboratory Program contracts) information, consisting of site and/or Operable Unit specific vouchers, any existing progress reports, Treasury schedules, tasking documents for contractors not required to provide progress reports, Annual Allocation Reports and the SCORPIO$ report or an equivalent cost summary; (5) EPA Interagency Agreements ("IAGs") information, consisting of SCORPIO$ reports or an equivalent cost summary, IAGs and any amendments thereto, invoices or the equivalent, proof of payment documents, and any existing progress reports or their equivalent; (6) EPA Cooperative Agreements information, consisting of SCORPIO$ reports or an equivalent cost summary, cooperative agreements and any amendments thereto, drawdown documentation, DEQ quarterly progress reports; (7) prejudgment interest information, consisting of an interest cost report showing methodologies and calculations; and (8) Operable Unit allocated cost information, consisting of a narrative of allocation methodologies and spreadsheets implementing such methodologies.  Because DEQ has incurred costs and may continue to incur costs under cooperative agreements with EPA which relate to or are allocated to the Anaconda Site, Cost Documentation, if requested by AR, shall also include: (a) DEQ contractor invoices; (b) any existing contractor progress reports; and (c) State Accounting, Budgeting and Human

20

Resource System (SABHRS) Report 106 information (if not included in the DEQ quarterly progress reports) or its equivalent.  EPA may also provide the information described in the foregoing list of "Cost Documentation" in the form of printouts from electronic databases or systems that have been developed or may be developed by EPA in the future.  "Cost Documentation" for response costs incurred by DOJ shall consist of a cost summary of: (a) direct labor costs; (b) other direct costs (invoices, travel, etc.); and (c) indirect costs, and upon request by AR, shall also consist of the supporting reports for each of these three types of DOJ costs.

"Day" or "day" means a calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DEQ" means the Montana Department of Environmental Quality and any predecessor or successor departments or agencies of the State.

"Development Permit System" or "DPS" means Articles II, XXX, XXXI, and XXXIV of Chapter 24 of the Anaconda-Deer Lodge County Code, as it may from time to time be properly amended by the ADLC Board of Commissioners.

"DOJ" means the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" means 60 days from the date that this District Court enters the Consent Decree, unless an appeal of the entry and judgment is filed during the 60-day period; if an appeal is taken, the Effective Date means the date on which the District Court's judgment is affirmed.

"EPA" means the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" means the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"EPA Site Record" means the files maintained by EPA for the Anaconda Site, whether in its Montana Office records center or in some other location (including electronic records), that are neither privileged nor confidential and that are not contained within the administrative record for the CSOU, the OW/EADA OU, and the ARWW&S OU.

"ESD" means an Explanation of Significant Differences issued pursuant to 40 C.F.R. § 300.435(c) that describes significant changes to a remedy selected in a record of decision under CERCLA (i.e., not fundamental changes or minor changes).

"Federal Action" means *United States v. Atlantic Richfield Company*, No. CV-89-039-SEH (D. Mont.).

"Federal Anaconda Site Future Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs), but excluding Oversight Costs for the Anaconda Site and USFS Response Costs, that the United States pays after the Effective Date, and the State pays after the Effective Date through funding from the United States pursuant to a cooperative agreement: (i) in assisting or taking action to obtain access or use restrictions under Section VIII (Property Requirements); (ii) in securing, implementing, monitoring, maintaining, or enforcing Institutional Controls, including compensation paid; (iii) in taking action under Paragraph 31 (Access to Financial Assurance); (iv) in taking response actions described in Paragraph 11 (Emergencies and Releases) because of AR's failure to take action under section 5.1(b) of the SOW (Emergency Response and Reporting); (v) in implementing a work takeover under Section XV (Covenants and Reservations by United States and State); and (vi) in

22

enforcing this Consent Decree, including all costs paid under Section XIII (Dispute Resolution) and all litigation costs. Federal Anaconda Site Future Response Costs also includes allocable Clark Fork General account costs, as well as all Interest accrued after the Effective Date on EPA's unreimbursed costs under Section 107(a) of CERCLA.

"Flue Dust OU" means the Flue Dust Operable Unit (OU11), including the nine flue dust site locations, the soils adjacent to the flue dust site locations that contained visually distinct flue dust in concentrations greater than concentrations of surrounding soils, and the repository, all of which are identified in the Record of Decision for the Flue Dust OU of the Anaconda Site, signed on September 23, 1991 by the Regional Administrator, EPA Region 8. EPA issued a Notice of Intent to Delete the Flue Dust OU from the NPL on August 10, 2020, 85 Fed. Reg. 48132, which partial deletion became final on September 30, 2020.

"Hazardous Substance" means a hazardous substance within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), or a hazardous or deleterious substance within the meaning of Section 75-10-701(8), MCA.

"Institutional Controls" or "ICs" means the Governmental Controls, Proprietary Controls, and Informational Devices and other Program Services described in the ICIAP.

"Institutional Controls Implementation and Assurance Plan" or "ICIAP" means the Anaconda Site Institutional Controls Implementation and Assurance Plan approved by EPA, in consultation with DEQ, on June 12, 2020.

"Interest" on federal claims means interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at

the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

Rates are available online at http://www.epa.gov/ocfopage/finstatement/superfund/int_rate.htm.

"Interest" on State claims means interest specified in Section 75-10-722, MCA as amended.

"Mill Creek OU" means the Mill Creek Operable Unit (OU15), including the unincorporated community of Mill Creek located immediately to the east of Smelter Hill, one and a half miles east of Anaconda, Montana, and 160 acres in size, as identified in the Record of Decision for the Mill Creek OU of the Anaconda Site, signed on January 6, 1988, by the Regional Administrator, EPA Region 8.  All homes and structures in the Mill Creek community were removed as provided for under the Mill Creek ROD.

"National Contingency Plan" or "NCP" means the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"NPL" means the National Priorities List set forth at 40 C.F.R. Part 300, Appendix B.

"Old Works Golf Course" or "OWGC" means the public golf course owned by Anaconda-Deer Lodge County and operated by Old Works Golf Course, Inc., a Montana non-profit corporation, on the property located within the OW/EADA OU, which is more particularly described as Tract A in Certificate of Survey 474-B recorded on December 12, 2019, at reception No. 206448 of the Anaconda-Deer Lodge County real property records.

"OWGC Conversion Remedy" means the contingent remedy for converting the existing Old Works Golf Course from a golf course to other recreational uses and open space in the event that the Old Works Golf Course property ceases to be utilized as a golf course in the future, as described in section 6.1 of the SOW.

"OWGC Remedy" means the RA activities, except for Operation and Maintenance, identified in section 3.1(b)(1) of the SOW (Scope of the Remedy/OWGC Remedy).

"Operable Unit" or "OU" means an area, geographic or otherwise, for which there is a response action, whether removal or remedial, that is subject to a separate administrative record and response selection decision.

"Operation and Maintenance" or "O&M" means all activities that are required to operate, maintain, and monitor the effectiveness of Remedial Action as specified in the SOW and/or any EPA-approved O&M plan.

"Oversight Costs for the Anaconda Site" means, for purposes of this Consent Decree only, those response costs incurred after the Effective Date by EPA, any federal agency that provides support to EPA (except the United States Forest Service), or the State in monitoring and/or overseeing the development and implementation of the Work pursuant to the requirements of this Consent Decree, including costs incurred by EPA in consulting with DEQ and costs paid by EPA to DEQ under cooperative agreements, in reviewing, developing, or approving plans, reports, deliverables, and other documents submitted by AR pursuant to this Consent Decree; allocable Clark Fork General account oversight costs and Anaconda Site-wide costs; costs incurred in conducting the reviews of the remedy and any modifications thereto in accordance with Section VII (Remedy Review) and Section 121(c) of CERCLA; and costs incurred in implementing community involvement activities, including the cost of any technical assistance grant provided under Section 117(e) of CERCLA.  Oversight Costs for the Anaconda Site also shall include costs incurred by EPA, any federal agency that provides support to EPA (except the United States Forest Service), or the State after the Effective Date: (a) in determining the need

for or monitoring and/or overseeing additional response actions at the Anaconda Site that may be required pursuant to the five-year reviews of the Work; (b) in determining the need for or monitoring and/or overseeing any additional response actions to be undertaken at the Anaconda Site pursuant to Paragraph 13 (Modification of SOW or Related Deliverables); and (c) in paying for costs incurred after the Effective Date by the U.S. Geological Survey in performing the surface water monitoring tasks described in section 5.0 and Appendix A to the Final Surface Water Management Plan.

"OW/EADA OU" means the Old Works/East Anaconda Development Area Operable Unit of the Anaconda Site.

"OW/EADA OU ROD" means the Record of Decision for the Old Works/East Anaconda Development Area Operable Unit of the Anaconda Site, signed on March 8, 1994 by the Assistant Regional Administrator for Ecosystems Protection and Remediation, EPA Region 8, and concurred on by the Director of the Montana Department of Environmental Quality on behalf of the State, all attachments, the ESDs issued on November 6, 1995 and June 12, 2020, and any future ESDs that AR is required to perform pursuant to this Consent Decree, when effective.  The OW/EADA OU ROD is attached to this Consent Decree as Appendix E.

"Paragraph" means a portion of this Consent Decree identified by an Arabic numeral.

"Partial Consent Decree" means the 2020 Partial Consent Decree for the Anaconda Smelter NPL Site" entered by the Court in the Federal Action on January 28, 2021.

 "Parties" means the United States, the State, and AR.

"Past Costs Consent Decree" means the Consent Decree for Settlement of Remaining Sites Past Response Costs entered in the Federal Action on January 24, 2005, which resolved

certain of the United States' past response cost claims against AR relating to the Anaconda Site, the Butte Priority Soils Operable Unit, the Clark Fork River Operable Unit, and the Warm Springs Ponds Operable Units.

"Performance Standards" means the cleanup standards, levels and other measures of achievement of the Remedial Action objectives, including ARARs and any Contingent Replacement Performance Standards, that are applicable to the Work required under this Consent Decree and the SOW.

"Plaintiffs" means the United States and the State of Montana.

"Proprietary Controls" means the controls on land use summarized in Section 6.0 and Appendices B and C of the ICIAP.

"RCRA" means the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Remedial Action" or "RA" means those activities, except for Operation and Maintenance, that AR has undertaken or will undertake under this Consent Decree and the SOW to implement the response actions selected in the RODs.

"Remedial Design" means those activities undertaken or to be undertaken to develop the final plans and specifications for the Remedial Action.

"Remedial Design Unit 5" or "RDU 5" means the Active Railroad / Blue Lagoon RDU of the ARWW&S OU.

"RDU 5 Conversion Remedy" means the contingent remedy for converting the active railroad portion of RDU 5 from a dedicated rail line to an alternate dedicated development in the

event that RDU 5 ceases to be utilized as a dedicated rail line in the future, as described in section 6.2 of the SOW.

"RODs" means, collectively, the ARWW&S OU ROD, the CSOU ROD, and the OW/EADA OU ROD.  For purposes of this Consent Decree, the RODs do not include any ROD amendments after the Effective Date.

"Section" means a portion of this Consent Decree identified by a Roman numeral.

"Settling Federal Agencies" means the United States Department of Justice, the United States Department of the Interior, the United States Department of Treasury, the United States Department of Commerce, the United States Department of Agriculture, the United States Department of Agriculture Forest Service, the General Service Administration, the National Aeronautics and Space Administration, the United States Department of Defense, the United States Environmental Protection Agency, the United States Department of Health and Human Services, the United States Public Health Service, the Atomic Energy Commission, the Defense Minerals Exploration Administration, the Defense Minerals Administration, the Office of Minerals Exploration, and the Defense Minerals Procurement Agencies, any agencies, bureaus, or services of such entities, and any predecessor and successor departments, agencies, bureaus, or services of such entities.

"State" means the State of Montana, including all of its departments, agencies, and instrumentalities.

"State Action" means *State of Montana v. Atlantic Richfield Company*, No. CV-83-317-HLN-SEH (D. Mont.).

"State Anaconda Site Future Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs), excluding Oversight Costs for the Anaconda Site, that the State pays after the Effective Date: (i) in assisting or taking action to obtain access or use restrictions under Section VIII (Property Requirements); (ii) in securing, implementing, monitoring, maintaining, or enforcing Institutional Controls, including compensation paid; (iii) in taking response actions described in Paragraph 11 (Emergencies and Releases) because of AR's failure to take action under section 5.1(b) of the SOW (Emergency Response and Reporting); and (iv) in enforcing this Consent Decree, including all costs paid under Section XIII (Dispute Resolution) and all litigation costs.   Such costs are State Anaconda Site Future Response Costs if they are not reimbursed by EPA via cooperative agreement expenditures.

"State-AR 2008 CD" means the consent decree entered in the State Action on August 21, 2008, resolving the State's and AR's claims for response costs and response actions as to certain State-owned lands within the ARWW&S OU and other claims specified in that consent decree, which has been referred to in past consent decrees as "State CD II."

"State Lands Obligations" is defined as that term is defined in the State-AR 2008 CD, at section IV, p. 12.

"State Property Remedial Commitments" is defined as that term is defined in the Clark Fork River Operable Unit Consent Decree, at section III, p. 33.

"State Site Record" means the files for or related to the Anaconda Site that are maintained in the records center of DEQ, the Montana Bureau of Mines and Geology, the Montana Department of Transportation, or the Department of Natural Resources and Conservation and that are neither privileged nor confidential.

"Statement of Work" or "SOW" means the document describing the activities AR must perform to implement the Remedial Design, the Remedial Action, and Operation & Maintenance regarding the Site, which is attached to this Consent Decree as Appendix A, including its attachments and any amendments thereto.  The SOW also includes reference to all final designs and work plans approved prior to lodging of this Consent Decree for the Work.

"Streamside Tailings Consent Decree" means the consent decree entered on April 19, 1999, which resolved certain United States natural resource damages claims against AR and established the framework for resolving all remaining Clark Fork River Basin CERCLA claims against AR.

"Subparagraph" means a portion of a Paragraph identified by an upper or lower case letter or by a lower case Roman numeral.

"Supervising Contractor" means the principal contractors(s) or AR employee(s) retained or utilized by AR, as approved by EPA, in consultation with DEQ, to supervise and direct the implementation of the Work under this Consent Decree.

"United States" means the United States of America and each department, agency, and instrumentality of the United States.

"USFS" or "Forest Service" means the United States Department of Agriculture Forest Service and any successor departments, agencies, or instrumentalities.

"USFS Response Costs" means the costs incurred by the Forest Service before and after the Effective Date in monitoring and/or overseeing AR's development and implementation of the Work pursuant to the requirements of this Consent Decree, including in reviewing plans, reports, and other documents submitted by AR.

"USFS Anaconda Site Special Account" means the special account established by the Forest Service pursuant to 16 U.S.C. § 579c to fund response actions at or in connection with the Site.

"Warm Springs Ponds Operable Units" means the active area, inactive area, and Mill-Willow Bypass areas addressed in EPA Records of Decision dated September 27, 1990, and June 30, 1992, and associated ESDs.

"Waste Material" means: (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33), 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous or deleterious substance" under Section 75-10-701(8), MCA.

"Work" means all activities AR is required to perform under this Consent Decree, including, without limitation, the Remedial Design, Remedial Action, Operation and Maintenance, and emergency response actions undertaken pursuant to section 5.1(b) of the SOW (Emergency Response and Reporting), and, if required pursuant to sections 6.1 and 6.2 of the SOW, the OWGC Conversion Remedy and the RDU 5 Conversion Remedy; provided, however, that Work does not include the activities required under Section XIX (Retention of Records).

## V. GENERAL PROVISIONS

5.     **Objectives of the Parties**. The objectives of the Parties in entering into this Consent Decree are:

a.     To protect public health and welfare and the environment at the Anaconda Site through the implementation of response actions selected in the RODs, as provided for in this Consent Decree;

31

b.   To reimburse the United States and the State for their response costs at the Anaconda Site, as provided for in this Consent Decree;

c.   To resolve the response cost claims of the United States and the State against AR with regard to the Site, as provided in this Consent Decree; and

d.   To resolve the remaining claims and defenses of AR that have been or could have been asserted against the United States and the State with regard to the Site, as provided in this Consent Decree.

6.  **Commitments by AR**.  In accordance with the terms of this Consent Decree, AR shall:

a.   Reimburse the United States for Anaconda Site Response Costs, Federal Anaconda Site Future Response Costs, and USFS Response Costs, and reimburse the State for State Anaconda Site Future Response Costs, as provided in this Consent Decree; and

b.   Finance and perform the Work in accordance with this Consent Decree and all deliverables developed by AR and approved or modified by EPA, in consultation with DEQ, pursuant to this Consent Decree.

7.  **Compliance with Applicable Law**. Nothing in this Consent Decree limits AR's obligations to comply with the requirements of all applicable federal and state laws and regulations.  AR must also comply with all ARARs as set forth in the RODs and in the manner described by the SOW.  The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.       **Permits**.

        a.       As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and

Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work

conducted entirely on-site (*i.e.*, within or in close proximity to the Clark Fork NPL Sites).

Where any portion of the Work that is not on-site requires a federal or state permit or approval,

AR shall submit timely and complete applications and take all other actions necessary to obtain

all such permits or approvals.

        b.       AR may seek relief under the provisions of Section XII (Force Majeure) of

this Consent Decree for any delay in the performance of the Work resulting from a failure to

obtain, or a delay in obtaining, any permit required for the Work, provided that it has submitted

timely and complete applications and taken all other actions necessary to obtain all such permits

or approvals.

        c.       This Consent Decree is not, and shall not be construed to be, a permit

issued pursuant to any federal or state statute or regulation.

## VI.  PERFORMANCE OF THE WORK

9.       **Coordination and Supervision**.

        a.       **Project Coordinators**.

        (1)       AR shall designate and notify EPA and DEQ of its Project

Coordinator(s).  AR's Project Coordinator(s) must have sufficient technical expertise to

coordinate the Work.  AR's Project Coordinator(s) may not be an attorney representing

AR in this matter and may not act as the Supervising Contractor, unless approved by

EPA.  AR's Project Coordinator(s) may assign other representatives, including other contractors, to assist in coordinating the Work.

(2)     EPA shall designate and notify AR of its Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work.  EPA's Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP.  This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)     DEQ shall designate and notify EPA and AR of its Project Coordinator.  DEQ may designate other representatives, including its employees, contractors and/or consultants to oversee the Work.  For any meetings and inspections in which EPA's Project Coordinator participates, DEQ's Project Coordinator also may participate.  AR shall notify DEQ reasonably in advance of any such meetings or inspections.

(4)     AR's Project Coordinator(s) shall meet with EPA's and DEQ's Project Coordinators at least monthly during RA construction, as defined in the SOW, and quarterly (or less frequently if approved by EPA in consultation with DEQ) thereafter until Certification of Site-Wide Remedial Action Completion.

b.     **Supervising Contractor**.  AR may propose one or more Supervising Contractors to supervise different elements of the Work.  AR's proposed Supervising

34

Contractor(s) must have a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

      c.      **Procedures for Disapproval/Notice to Proceed**.

      (1)      AR shall designate, and notify EPA, within thirty (30) days after the Effective Date, of the names, contact information, and qualifications of AR's proposed Project Coordinator(s) and Supervising Contractor(s).

      (2)      EPA, after a reasonable opportunity for review and comment by DEQ, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator(s) and Supervising Contractor(s), and any subsequently named Project Coordinator(s) and Supervising Contractor(s), as applicable.  If EPA issues a notice of disapproval, AR shall, within thirty (30) days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each.  EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor.  AR may select any coordinator/contractor covered by an authorization to proceed and shall, within twenty-one (21) days, notify EPA of AR's selection.

      (3)      AR may change its Project Coordinator(s) and/or Supervising Contractor(s), as applicable, by following the procedures of Subparagraphs a(1) and a(2).

      (4)      AR has proposed, and EPA has authorized AR to proceed, regarding the following Project Coordinators:

Shannon W. Dunlap
317 Anaconda Road
Butte, MT 59701
(406) 593-6645
Shannon.Dunlap@bp.com

Luke Pokorny
317 Anaconda Road
Butte, MT 59701
(406) 723-1832
Luke.Pokorny@bp.com

10. **Performance of Work in Accordance with SOW**.  AR shall: (a) develop the

Remedial Design; (b) perform the Remedial Action; and (c) operate, maintain, and monitor the

effectiveness of the Remedial Action; all in accordance with the SOW and its attachments and all

EPA-approved, conditionally-approved, or modified deliverables as required by the SOW.  All

deliverables required to be submitted for approval under the Consent Decree or the SOW shall be

subject to approval by EPA, in consultation with DEQ, in accordance with section 8.7 (Approval

of Deliverables) of the SOW.

11. **Emergencies and Releases**.  AR shall comply with the emergency and release

response and reporting requirements under section 5.1(b) (Emergency Response and Reporting)

of the SOW.  Subject to Section XV (Covenants and Reservations by United States and State),

nothing in this Consent Decree, including section 5.1(b) of the SOW, limits any authority of

Plaintiffs: (a) to take all appropriate action to protect human health and the environment or to

prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at,

or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect

human health and the environment or to prevent, abate, respond to, or minimize an actual or

threatened release of Waste Material on, at, or from the Site.  If, due to AR's failure to take

appropriate response action under section 5.1(b) of the SOW, EPA or, as appropriate, the State

takes such action instead, AR shall reimburse EPA and/or the State under Paragraph 38 (Payment of Anaconda Site Future Response Costs) for all costs of the response action.

12.     **Community Involvement**.  If requested by EPA, AR shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, section 2 (Community Involvement) of the SOW.  Such activities may include, but are not limited to, designation of a Community Involvement Coordinator.

13.     **Modification of SOW or Related Deliverables**.

a.      If EPA, in consultation with DEQ, determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the Remedial Action, and such modification is consistent with the Scope of the Remedy set forth in section 3 of the SOW, then EPA may notify AR of such modification.  If AR objects to the modification, it may, within thirty (30) days after EPA's notification, seek dispute resolution under Section XIII (Dispute Resolution).

b.      The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA under Subparagraph 13.a; or (2) if AR invokes dispute resolution, in accordance with the final resolution of the dispute.  The modification shall be incorporated into and enforceable under this Consent Decree, and AR shall implement all work required by such modification.  AR shall incorporate the modification into the deliverable required under the SOW, as appropriate.

c.      Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

37

14.     **No Warranty**.  Nothing in this Consent Decree, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by the United States and the State that compliance with the Work requirements set forth in the SOW or related deliverables will achieve the Performance Standards.

## VII.     REMEDY REVIEW

15.     **Periodic Review**.  AR shall conduct, in accordance with section 5.1(i) (Periodic Review Support) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the Remedial Action is protective of human health and the environment.

16.     **EPA Selection of Further Response Actions**.  If EPA, in consultation with DEQ, determines at any time that the Remedial Action is not protective of human health and the environment, EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

17.     **Opportunity to Comment**.  AR and, if required by Sections 113(k)(2) or 117 of CERCLA, 42 U.S.C. §§ 9613(k)(2) or 9617, the public, will be provided with an opportunity to comment on any further response actions proposed by EPA, in consultation with DEQ, as a result of the review conducted pursuant to Section 121(c) of CERCLA, and to submit written comments for the record during the comment period.

18.     **AR's Obligation to Perform Further Response Actions Pursuant to this Consent Decree**.

        a.      In addition to the requirements for further or additional response actions contained in this Consent Decree, if EPA, in consultation with DEQ, selects a further response

38

action for the Anaconda Site pursuant to an ESD which is not consistent with the Scope of the Remedy set forth in section 3 of the SOW, AR shall undertake such further response action if: (i) it may be required under this Consent Decree because it may be lawfully required under an ESD, and (ii) the reopener conditions in Paragraphs 65 and 66 (Pre-Certification and Post-Certification Reservations) are satisfied.

b.      AR may invoke the procedures set forth in Section XIII (Dispute Resolution) to dispute: (1) EPA's determination that a further action may be required under this Consent Decree pursuant to an ESD and/or determination that the reopener conditions of Paragraphs 65 and 66 (Pre-Certification and Post-Certification Reservations) are satisfied; (2) EPA's determination that the Remedial Action is not protective of human health and the environment; or (3) EPA's selection of a further response action, including whether the response action may only be selected through amendment of the ROD(s) or whether EPA's selection of the response action is not consistent with the NCP or this Consent Decree.  Disputes pertaining to EPA's determination that the Remedial Action is not protective or to EPA's selection of a further response action shall be resolved pursuant to Paragraph 52 (Record Review).

c.      Nothing in this Paragraph affects or alters the United States' or the State's reservations under Paragraphs 65 (Pre-Certification Reservations), 66 (Post-Certification Reservations); or 68 (General Reservations of Rights), including but not limited to the United States' and the State's authority to assert new claims in the Federal Action (but not under this Consent Decree) or bring a new action or issue an administrative order for a further response action in accordance with Paragraphs 65 and 66, or with the United States' reservations under Paragraph 68.

19.     **Submission of Plans**.  If AR is required to perform further response actions pursuant to Paragraph 18 (AR's Obligation to Perform Further Response Actions Pursuant to this Consent Decree), it shall submit a schedule and plan for such response actions to EPA for approval, in consultation with DEQ, in accordance with the procedures of Section VI (Performance of the Work).  After approval of the schedule and plan by EPA, following a reasonable opportunity for comment by DEQ, AR shall implement the plan in accordance with this Consent Decree.

## VIII.      PROPERTY REQUIREMENTS

20.     **Access and Use of AR-Owned Property**.

a.      For real property that AR owns or has a property interest in that confers the legal ability to control access within the Anaconda Site, where access is needed to implement this Consent Decree, AR shall, with respect to such property, provide the United States, the State, and their representatives and contractors, access at all reasonable times to any real property to which access is required for the implementation of this Consent Decree, for the purpose of conducting any activity related to this Consent Decree including, but not limited to, the following activities:

(1)      Monitoring the Work;

(2)      Verifying any data or information submitted to the United States or the State;

(3)      Conducting investigations relating to contamination at or near the Anaconda Site;

(4)      Obtaining samples;

(5)      Assessing the need for, planning, or implementing additional response actions at or near the Anaconda Site;

(6)      Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(7)      Implementing the Work pursuant to the conditions set forth in Paragraph 69 (Work Takeover) of this Consent Decree;

(8)      Assessing AR's compliance with this Consent Decree;

(9)      Determining whether the Anaconda Site is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted, by or pursuant to this Consent Decree; and

(10)     Implementing, monitoring, maintaining, reporting on, and enforcing any Institutional Controls.

b.      Prior to obtaining access to any real property, the United States, the State, and AR shall consider any health and safety limitations previously identified for the Anaconda Site.

c.      Commencing on the date of lodging of this Consent Decree, AR shall refrain from using any real property in any manner that would interfere with or adversely affect the implementation, integrity, or protectiveness of the remedial measures to be performed pursuant to this Consent Decree, except as required to implement the SOW or as EPA and DEQ authorize in writing after receipt of a written request from AR to engage in an otherwise restricted activity.

d.      Prior to lodging of this Consent Decree, EPA and DEQ have reviewed the existing Proprietary Controls provided by AR, as summarized in Appendix B of the ICIAP, and approved them as meeting the requirements of this Consent Decree.  Where AR seeks to modify use restrictions or access rights identified in the ICIAP, AR shall secure the approval of EPA and DEQ for the modifications, record the instrument containing such modification in the Recorder's

41

Office of Anaconda-Deer Lodge County, and provide EPA with a copy of the original recorded instrument.

21.      **Access and Use of Third Party Property**.  If any part of the Anaconda Site where access and/or temporary use restrictions are needed to implement this Consent Decree is owned or controlled by persons other than AR, AR shall use best efforts to secure from such persons an agreement to provide access thereto for AR, as well as for the United States on behalf of EPA, and the State on behalf of DEQ, as well as their representatives and contractors, for the purpose of conducting any activity related to this Consent Decree including, but not limited to, those activities listed in Subparagraph 20.a of this Consent Decree.  AR shall also use best efforts to secure such temporary use restrictions that are needed to implement the Consent Decree.  AR shall provide copies of such access and use restriction agreements entered into and/or amended after the Effective Date to EPA and DEQ.  AR shall also use best efforts to enforce such use restriction agreements, to ensure the protectiveness of or non-interference with the Remedial Action.

22.      **Best Efforts**.  For purposes of Paragraph 21 (Access and Use of Third Party Property) of this Consent Decree, "best efforts" includes the payment of reasonable sums of money in consideration for obtaining access and use restriction agreements.  For the Anaconda Site, "reasonable sums" shall be determined by considering, among other factors, the potentially responsible party status of the current owners and the degree of general cooperation shown by these parties.  The United States may, as it deems appropriate, assist AR in obtaining access and use restriction agreements.  AR shall reimburse the United States in accordance with the

procedures in Section X (Payment of Response Costs), for all costs incurred by the United States in obtaining such access and use restriction agreements.

23.     **Institutional Controls**.  Implementation of Institutional Controls is required as described in section 6.0 of the ICIAP.  ADLC generally is responsible for the implementation, monitoring, and enforcement of the primary Institutional Controls described in the RODs and the ICIAP, with funding and support from AR.  If ADLC fails or ceases to perform its responsibilities with respect to some or all of the primary Institutional Controls, EPA, in consultation with DEQ and in accordance with section 12.0 of the ICIAP, will allow one or more governmental or non-governmental entities (including AR) to implement the Institutional Controls contingencies described in section 12.0 of the ICIAP.  EPA will provide those entities with a reasonable period of time sufficient to implement the Institutional Controls contingencies and demonstrate that they will effectively protect the remedy.  No other Institutional Controls will be required under this Consent Decree unless: (i) reasonable time and efforts to implement the Institutional Control contingencies have been employed, and (ii) the Institutional Control contingencies have been determined by EPA, in consultation with DEQ and in accordance with section 12.0 of the ICIAP, to not be effective or protective.  If EPA, in consultation with DEQ, determines that additional Institutional Controls are needed to implement the remedies selected in the RODs, ensure the integrity and protectiveness thereof, or ensure non-interference therewith, AR shall cooperate with EPA's and DEQ's efforts to secure such Institutional Controls, subject to the requirements of Paragraph 13 (Modification of SOW or Related Deliverables).

24.     **Access and Other Authority Reserved**.  Notwithstanding any provision of this Consent Decree, the United States and the State retain all of their access authorities and rights, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable federal and state statute or regulations.

25.     **Notice to Successors in Title**.

a.      Prior to the conveyance by AR of its interest in any real property located within the Anaconda Site, including but not limited to fee interests, leasehold interests, and mortgage interests, AR shall give the grantee written notice of: (i) this Consent Decree, (ii) any instrument specific to said real property by which an interest in real property has been conveyed that confers a right of access to the Site (hereinafter referred to as "access agreements") pursuant to Section VIII (Property Requirements) or pursuant to any other conveyance, and/or (iii) any instrument specific to said property by which an interest in real property has been conveyed that confers a right to enforce restrictions on the use of such property through Proprietary Controls or pursuant to any other conveyance.  At least annually, AR shall also give written notice to EPA and DEQ of any conveyances granted in the prior calendar year, including the name and address of the grantee, and the date on which notice of this Consent Decree and of any access easements and/or Proprietary Controls were given to the grantee.  Nothing in this Consent Decree shall be construed to require the approval of EPA or DEQ before AR conveys any real property interest.

b.      In the event of such conveyance, AR shall continue to meet its obligations under this Consent Decree, including but not limited to the obligation to implement and abide by Institutional Controls, pursuant to Section VIII (Property Requirements) and applicable appendices to this Consent Decree.  In no event shall the conveyance release or otherwise affect

44

the liability of AR to comply with all provisions of this Consent Decree, absent the prior written consent of EPA in consultation with DEQ.  If the United States, in consultation with DEQ, approves, the grantee may perform some or all of the Work under this Consent Decree.  If the conveyance instrument to the grantee provides for access by EPA and DEQ, AR's obligation to provide access to such property is no longer required.

## IX.  FINANCIAL ASSURANCE

26.     **Financial Assurance Requirements**.  In order to ensure completion of the Work, AR shall secure financial assurance, initially in the amount of $83,109,000.00 ("Estimated Cost of the Work"), for the benefit of EPA.  The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents, if any, available from the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to EPA.  AR may use multiple mechanisms for guaranteeing payment, including surety bonds, letters of credit, trust funds, insurance policies, and/or guarantees, as described below.

a.     A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.     An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

      c.      A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

      d.      A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that is eligible to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency; or

      e.      A guarantee to fund or perform the Work executed in favor of EPA by a company: (1) that is a direct or indirect parent company of AR or has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with AR; and (2) can demonstrate to EPA's satisfaction that it meets the financial test criteria of Paragraph 27.

27.     In the event AR seeks to provide financial assurance by means of a guarantee under Subparagraph 26.e, AR must at that time:

      a.   Demonstrate that:

        (1)   the guarantor has:

          (i)     Two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

          (ii)    Net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations (including but not limited to obligations under CERCLA, RCRA, and CECRA)

financially assured through the use of a financial test or guarantee; and

(iii) Tangible net worth of at least $10 million; and

(iv) Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations (including but not limited to CERCLA, CECRA and RCRA obligations) financially assured through the use of a financial test or guarantee; or

(2) the guarantor has

(v) A current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

(vi) Tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations (including but not limited to CERCLA, CECRA and RCRA obligations) financially assured through the use of a financial test or guarantee; and

(vii) Tangible net worth of at least $10 million; and

(viii) Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations (including but not limited to CERCLA, CECRA and RCRA obligations) financially assured through the use of a financial test or guarantee; and

b. Submit to EPA for the guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA or under the "Financial Assurance -

47

Settlements" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/.

28.      If AR provides financial assurance by means of a guarantee under Paragraph 26.e, it must also:

        a.      Annually resubmit the documents described in Paragraph 27.b within 90 days after the close of the guarantor's fiscal year;

        b.      Notify EPA within 30 days after the guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section; and

        c.      Provide to EPA, within 30 days of EPA's request, reports of the financial condition of the guarantor in addition to those specified above; EPA may make such a request at any time based on a belief that the affected guarantor may no longer meet the financial test requirements of this Section.

29.      **Financial Assurance Mechanism**.  AR has selected, and EPA has found satisfactory, as an initial financial assurance one or more irrevocable letters of credit and/or surety bonds prepared in accordance with Paragraph 26.a and 26.b (Financial Assurance Requirements).  If not previously secured, within 30 days after the Effective Date, or 30 days after EPA's approval of the form and substance of AR's financial assurance, whichever is later, AR shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the Region 8 financial assurance specialist, to the United States, and to EPA and the State as specified in Section XX (Notices and Submissions).

30.     **Diligent Monitoring of Financial Assurance**.  AR shall diligently monitor the adequacy of the financial assurance.  If AR becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, AR shall notify EPA of such information within 15 days.  If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify AR of such determination.  AR shall, within 60 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section.   EPA may extend this deadline for such time as is reasonably necessary for AR, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism.  AR shall follow the procedures of Paragraph 32 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism.  AR's inability to secure financial assurance in accordance with this Section shall not excuse performance of any other obligation under this Consent Decree including, without limitation, the obligation of AR to complete the Work in accordance with the terms of this Consent Decree.

31.     **Access to Financial Assurance**.

a.      If EPA issues a notice of implementation of a Work Takeover under Paragraph 69, then, in accordance with any applicable financial assurance mechanism and/or related standby funding commitment, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with Subparagraph 31.d.

b.      If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and AR fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with Subparagraph 31.d.

c.      If, upon issuance of a notice of implementation of a Work Takeover under Paragraph 69 and EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism and/or related standby funding commitment, whether in cash or in kind, to continue and complete the Work, then EPA may demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed.  AR shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

d.      Any amounts required to be paid under this Paragraph 31 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person.  If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the Anaconda Smelter NPL Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Anaconda Site, or to be transferred by EPA to the Clark Fork River Basin Special Account or the EPA Hazardous Substance Superfund.

e.      All EPA Work Takeover costs not paid under this Paragraph 31 must be reimbursed as Anaconda Site Future Response Costs under Section X (Payment of Response Costs).

32.      **Modification of Financial Assurance**.  AR may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism.  Any such request must be submitted to EPA in accordance with Paragraph 29 (Financial Assurance Mechanism), and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify AR of its decision to accept or reject a requested reduction or change pursuant to this Paragraph.  AR may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution).  AR may change the form or terms of the financial assurance mechanism only in accordance with EPA's approval.  Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, AR shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with Paragraph 29 (Financial Assurance Mechanism).

33.      **Release, Cancellation, or Discontinuation of Financial Assurance**.  AR may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under section 5.1(j) (Certification of Work

Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution).

## X.   PAYMENT OF RESPONSE COSTS

34.     **Anaconda Site Special Accounts**.

a.     EPA has established a special account with the EPA Hazardous Substances Superfund called the Anaconda Smelter NPL Site Special Account.  The amounts paid by AR to the United States under Paragraph 35 (Payment of Anaconda Site Response Costs) and Paragraph 38 (Payment of Anaconda Site Future Response Costs) shall be deposited in the Anaconda Smelter NPL Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with any of the operable units within the Anaconda Site, or to the Clark Fork River Basin Special Account to be used to conduct or finance response actions at the Anaconda Site, the Milltown Reservoir/Clark Fork River NPL Site, the Silver Bow Creek/Butte Area NPL Site, or the Montana Pole NPL Site; or to be transferred by EPA to the EPA Hazardous Substance Superfund.

b.     The Forest Service has established the USFS Anaconda Site Special Account.  The amount paid by AR to the United States under Paragraph 36 (Payment of USFS Response Costs) shall be deposited in the USFS Anaconda Site Special Account to be retained and used to conduct or finance USFS response actions at or in connection with the Anaconda Site.

35.     **Payment of Anaconda Site Response Costs.**  Within thirty (30) days of the Effective Date, AR shall pay $48,000,000.00 in full satisfaction and settlement of its obligation to pay Anaconda Site Response Costs.  The amount paid by AR under this Paragraph shall be deposited into the Anaconda Smelter NPL Site Special Account described in Paragraph 34.a.

36.     **Payment of USFS Response Costs.**  Within thirty (30) days of the Effective Date, AR shall pay $185,752.00 in full satisfaction and settlement of its obligation to pay USFS Response Costs.  The amount paid by AR under this Paragraph shall be deposited into the USFS Anaconda Site Special Account described in Paragraph 34.b.

37.     **Payment Instructions**.  The Financial Litigation Unit (FLU) of the United States Attorney's Office for the District of Montana shall provide AR, in accordance with Section XX (Notices and Submissions), with instructions regarding making payments to DOJ on behalf of EPA and USFS.  The instructions must include a Consolidated Debt Collection System (CDCS) number to identify payments made under this Consent Decree.  AR shall make such payments by either Fedwire Electronic Funds Transfer (EFT) or at https://www.pay.gov to the U.S. DOJ account, in accordance with the instructions provided under this Paragraph and include the following information:

   a.     For payment of Anaconda Site Response Costs made under Paragraph 35,**Error! Reference source not found.** AR shall include references to the CDCS Number, Site/Spill ID Number 08-22, and DJ Number 90-11-2-430, and shall send notices, including references to the CDCS, Site/Spill ID, and DJ numbers, to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with Section XX (Notices and Submissions).

53

b.      For payment of USFS Response Costs made under Paragraph 36, AR shall include references to DJ Number 90-11-2-430 and shall send notices to the United States in accordance with Section XX (Notices and Submissions).

38.    **Payment of Anaconda Site Future Response Costs**.

a.    **Federal Anaconda Site Future Response Costs**.  AR shall reimburse the EPA Hazardous Substance Superfund for all Federal Anaconda Site Future Response Costs that are not inconsistent with the NCP.  The amount paid by AR under this Paragraph shall be deposited into the Anaconda Smelter NPL Site Special Account as described in Paragraph 34.a.  For years when Federal Anaconda Site Future Response Costs are paid, the United States will send to AR a bill, including Cost Documentation, requiring payment of Federal Anaconda Site Future Response Costs.  Any failure by the United States to provide a bill and/or complete Cost Documentation, however, shall not relieve AR of any obligation under this Consent Decree.  AR shall make all payments within sixty (60) days of its receipt of each bill requiring payment, except as otherwise provided in Paragraph 39 (Dispute of Anaconda Site Future Response Costs).  AR shall make all payments required by this Paragraph in the form of a wire transfer made payable to "Anaconda Smelter NPL Site Special Account Hazardous Substance Superfund" and referencing the EPA Region and Site/Spill ID # 08-22, and the DOJ case number 90-11-2-430.  AR shall send a notice of such payment to the current EPA Site attorney, and the Cost Recovery Coordinator and the Director of Financial Management Programs both at the following address: US EPA Region 8, 1595 Wynkoop Street, Denver, Colorado 80202.  The Fedwire EFT payment shall be sent as follows:

Federal Reserve Bank of New York
ABA = 021030004
Account = 68010727
SWIFT address = FRNYUS33
33 Liberty Street
New York NY 10045
Field Tag 4200 of the Fedwire message should read
"D 68010727 Environmental Protection Agency"

In addition to the notices above, for each payment made above AR shall send notices, including references to the CDCS, Site/Spill ID # 08-22, and DOJ case number 90-11-2-430, to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with Section XX (Notices and Submissions).

b. **State Anaconda Site Future Response Costs**.  AR shall reimburse the State for all independently incurred State Anaconda Site Future Response Costs that are not inconsistent with the NCP.  In the year following the Effective Date and in other years where State Anaconda Site Future Response Costs are paid, the State will exercise best efforts to send AR as appropriate an annual bill, including Cost Documentation, requiring payment of the State's Anaconda Site Future Response Costs.  Any failure by the State to provide such annual billing and/or complete Cost Documentation, however, shall not relieve AR of any obligation under this Consent Decree.  AR shall make all payments within sixty (60) days of its receipt of each bill requiring payment, except as otherwise provided in Paragraph 39 (Dispute of Anaconda Site Future Response Costs).  All payments to the State under this Section shall be paid by electronic funds transfer in accordance with the instructions provided by the State with the bill. AR shall contact the DEQ Project Officer at least 48 hours prior to initiating the transfer to provide notice of the date and time of the expected transfer and to confirm the wiring instructions and account and bank routing numbers.  If the DEQ Project Officer is unavailable, AR shall

55

contact DEQ Legal Counsel identified in Section XX (Notices and Submissions).  Written

confirmation of the payment shall be sent to the State as provided in Section XX (Notices and

Submissions).

     39.    **Dispute of Anaconda Site Future Response Costs**.  AR may contest payment of

any portion of Anaconda Site Future Response Costs under Paragraph 38 (Payment of Anaconda

Site Future Response Costs) solely on the basis that:  (a) the United States or the State has made

an accounting error including attribution of Anaconda Site Future Response Costs to AR in a

manner inconsistent with this Consent Decree and/or the SOW; (b) the United States or the State

is seeking reimbursement of Oversight Costs for the Anaconda Site; (c) the United States or the

State is seeking reimbursement of costs that otherwise do not fall within the definition of

Anaconda Site Future Response Costs; (d) a cost item demanded for reimbursement represents

costs that are inconsistent with the NCP; or (e) the United States or the State has failed to provide

complete Cost Documentation as required by Paragraph 38.  The failure of the United States or

the State to provide complete Cost Documentation shall not relieve AR of any obligation under

this Consent Decree, but it may provide the basis for AR to seek, through the dispute resolution

provisions of Section XIII (Dispute Resolution), a reduction in AR's obligation to reimburse

EPA or the State for those costs which AR claims are not fully supported by Cost

Documentation.  Any objection made under this Paragraph shall be made in writing within sixty

(60) days of receipt of the bill and must be sent to the United States or the State.  Any such

objection shall specifically identify the contested Federal or State Anaconda Site Future

Response Costs and the basis for objection.  In the event of an objection, AR shall within the

60-day period pay all uncontested Federal and State Anaconda Site Future Response Costs (but

not contested costs) to the United States or the State in the manner described in Paragraph 38 and shall initiate the dispute resolution procedures in Section XIII.  Any such payment made by AR shall be credited by the United States or the State only to the payment of the uncontested costs. If the United States or the State prevails in the dispute, within thirty (30) days of the resolution of the dispute, AR shall pay the sums due (with accrued Interest) to the United States or the State, in the manner described in Paragraph 38.  If AR prevails concerning any aspect of the contested costs, AR shall pay that portion of the costs (plus associated accrued Interest), if any, for which it did not prevail to the United States or the State, in the manner described in Paragraph 38.  The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIII shall be the exclusive mechanisms for resolving disputes regarding AR's obligation to reimburse the United States and/or the State for their respective Anaconda Site Future Response Costs.

40.     **Interest**.

a.      In the event that the payments required by (1) Paragraph 35 (Payment of Anaconda Site Response Costs); (2) Paragraph 36 (Payment of USFS Response Costs); (3) Paragraph 38 (Payment of Anaconda Site Future Response Costs); or (4) Section XIV (Stipulated Penalties) are not made within the time period specified in these Paragraphs or Sections, AR shall pay Interest on the unpaid balance consistent with the obligations described in Paragraphs 35, 36, 38, and Section XIV.

b.      The Interest to be paid on the amounts due under Paragraphs 35 **Error! Reference source not found.**and 36 shall begin to accrue thirty (30) days after the Effective Date.

      c.      Interest to be paid on the amounts due under Paragraph 38 (Payment of Anaconda Site Future Response Costs) shall begin to accrue sixty (60) days after the date of receipt by AR of the bill submitted by EPA or the State for such costs.  Interest to be paid on the amounts due under Section XIV (Stipulated Penalties) shall begin to accrue thirty (30) days after receipt of the stipulated penalty demand; provided, however, for disputed matters involving performance of the Work only, the accrual of Interest is stayed if AR initiates the dispute resolution procedures in Section XIII (Dispute Resolution), and Interest shall not accrue until EPA issues a decision resolving the dispute as provided in Section XIII (Dispute Resolution).

      d.      Interest shall continue to accrue through the date of AR's payment, except as provided above for accrual of Interest on a stipulated penalty demand for matters involving the performance of Work.

      e.      Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States or the State by virtue of AR's failure to make timely payments under this Section.

      f.      AR shall make all payments required by this Paragraph in the manner described in Paragraph 38 (Payment of Anaconda Site Future Response Costs).

## XI.  INDEMNIFICATION AND INSURANCE

41.    **AR's Indemnification of the United States and the State**.

      a.      The United States and the State do not assume any liability by entering into this Consent Decree or by virtue of any designation of AR as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), or state law.  AR shall indemnify, save, and hold harmless the United States and the State, and their officials, agents,

employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of AR and its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on AR's behalf or under its control, in carrying out activities pursuant to this Consent Decree, including, but not limited to, any claims arising from any designation of AR as EPA's authorized representatives under Section 104(e) of CERCLA or state law.  Further, AR agrees to pay the United States and the State all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States and the State based on negligent or other wrongful acts or omissions of AR, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities relating to the Anaconda Site pursuant to this Consent Decree.  Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of AR in carrying out activities pursuant to this Consent Decree.  Neither AR nor any such contractor shall be considered an agent of the United States or the State.

           b.      The United States and the State, respectively, shall give AR notice of any third-party claim for which the United States or the State plans to seek indemnification pursuant to this Paragraph 41 (AR's Indemnification of the United States and the State), and shall consult with AR prior to settling such claim.

42.     AR waives all claims against the United States and the State for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State arising from or on account of any contract, agreement, or arrangement between AR and any

person for past performance of response activities at the Anaconda Site or performance of activities required under this Consent Decree, including, but not limited to, claims on account of construction delays.  In addition, AR shall indemnify, save, and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between AR and any person (other than the United States or the State) for performance of any activities relating to the Site under this Consent Decree, including, but not limited to, claims on account of construction delays.  AR does not waive under this Consent Decree any claims or rights it reserved under the State-AR 2008 CD.

43. **Comprehensive General Liability and Automobile Insurance**.

a. Prior to lodging of this Consent Decree, AR provided the United States and the State with information that satisfied the United States and the State as to its financial resources and ability to provide the equivalent of comprehensive general liability insurance and automobile insurance with limits of two million dollars, combined single limit, which AR shall maintain for the duration of the Work at the Anaconda Site.

b. If, prior to the first anniversary of EPA's Certification of Site-Wide Remedial Action Completion pursuant to section 5.1(h) (Certification of Site-Wide Remedial Action Completion) of the SOW, any material change occurs in the financial resources of AR such that it may no longer be able to assure its ability to provide the equivalent of comprehensive general liability insurance and automobile insurance with limits of two million dollars, combined single limit, AR shall promptly notify the United States and the State in accordance with Section XX (Notices and Submissions).  Upon receipt of such notice, EPA may, in its sole and

60

unreviewable discretion, after reasonable opportunity for review by the State, require that AR obtain that insurance.

   c. If, prior to the first anniversary of EPA's Certification of Site-Wide Remedial Action Completion pursuant to section 5.1(h) (Certification of Site-Wide Remedial Action Completion) of the SOW, the United States or the State obtains information regarding any material change in the financial resources of AR that leads the United States, in consultation with the State, to believe that AR may no longer have the financial ability to provide the equivalent of comprehensive general liability insurance and automobile insurance with limits of two million dollars, combined single limit, the United States shall so notify AR in accordance with Section XX (Notices and Submissions). AR shall have sixty (60) days after receiving any such written notice to respond and provide corrected or supplemental information or otherwise assure the United States and the State that it has the ability to provide the equivalent of comprehensive general liability insurance and automobile insurance with limits of two million dollars, combined single limit.

   d. If AR does not satisfactorily resolve the concerns of the United States, in consultation with the State, that a material change has occurred in its financial resources such that AR may no longer have the financial ability to provide the equivalent of comprehensive general liability and automobile insurance with limits of two million dollars, combined single limit, EPA, in consultation with DEQ and in its sole and unreviewable discretion, may require that AR obtain such insurance which names EPA and DEQ as additional beneficiaries and/or additional insureds.

e.      In addition, for the duration of the Consent Decree, AR shall also satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of workers' compensation insurance for all persons performing activities required of AR by this Consent Decree.  Until EPA issues its notice of Site-Wide Remedial Action Completion pursuant to section 5.1(h) (Certification of Site-Wide Remedial Action Completion) of the SOW, AR shall provide to EPA and DEQ certificates of such insurance.  AR shall resubmit such certificates each year on or before January 30th.  If AR demonstrates by evidence satisfactory to EPA and DEQ that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, AR need provide only that portion of the insurance described above which is not maintained by the contractor or subcontractor.

## XII.      FORCE MAJEURE

44.      **Definition**.  "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of AR, of any entity controlled by AR, or of AR's contractors, which delays or prevents the performance of any obligation under this Consent Decree despite AR's best efforts to fulfill the obligation.  The requirement that AR exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure event, such that the delay is minimized to the greatest extent possible.  "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.  A Force Majeure event may, however,

include a labor strike or work stoppage directly related to remedial construction activities at the Anaconda Site.

45.   **Notification**.  If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, AR shall notify orally EPA's Project Coordinator or, in his or her absence, the Director, Superfund and Emergency Management Division, EPA Region 8, and shall also notify orally DEQ's Project Coordinator, within seven (7) days of when AR first knew that the event might cause a delay. Within twelve (12) days thereafter, AR shall provide in writing to EPA and DEQ an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; AR's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of AR, such event may cause or contribute to an endangerment to public health, welfare or the environment.  AR shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure.  AR shall be deemed to know of any circumstance of which AR, any entity controlled by AR, or AR's contractors or subcontractors knew or should have known.  Failure to comply with the above requirements regarding an event shall preclude AR from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure event under Paragraph 44 (Definition) and whether AR has exercised its best efforts under Paragraph 44, EPA, in

consultation with DEQ, may excuse in writing AR's failure to submit timely or complete notices under this Paragraph.

46.     **EPA Response**.  If EPA, after a reasonable opportunity for review and comment by DEQ, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by DEQ, for such time as is necessary to complete those obligations.  If EPA, after a reasonable opportunity to review and comment by DEQ, agrees that the delay or anticipated delay is attributable to a force majeure event, EPA will notify AR in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  If EPA, after a reasonable opportunity for review and comment by DEQ, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify AR in writing of its decision.

47.     **Dispute**.  If AR elects to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding EPA's decision, it shall do so no later than fifteen (15) days after receipt of EPA's notice.  In any such proceeding, AR shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts to fulfill the obligation were exercised to avoid and mitigate the effects of the delay, and that AR complied with the

requirements of Paragraphs 44 (Definition) and 45 (Notification), above.  If AR carries this burden, the delay at issue shall be deemed not to be a violation by AR of the affected obligation of this Consent Decree identified to EPA and the Court.

48.    **EPA Timely Completion**.  The failure by EPA to timely complete any obligation under the Consent Decree or under the SOW is not a violation of the Consent Decree, provided, however, that if such failure prevents AR from meeting one or more deadlines in the SOW, AR may seek relief under this Section.

## XIII.    DISPUTE RESOLUTION

49.    **Exclusivity**.  Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes under or with respect to this Consent Decree.  The procedures set forth in this Section shall not apply to actions by the United States or the State to enforce obligations of AR that have not been disputed in accordance with this Section.  EPA's decisions under these procedures, except for EPA's final administrative decision under Paragraph 53 (Other Review), will be made in consultation with DEQ.

50.    **Informal Dispute Resolution**.  Any dispute that arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between EPA, in consultation with DEQ, and AR.  The period for informal negotiations shall not exceed twenty (20) days from the time the dispute arises, unless it is modified by written agreement of EPA and AR.  The dispute shall be considered to have arisen when one party to the dispute sends the other party to the dispute a written Notice of Dispute.

51.     **Statements of Positions**.

a.      In the event that the Parties cannot resolve a dispute by informal negotiations under Paragraph 50, then the position advanced by EPA shall be considered binding unless, within thirty (30) days after the conclusion of the informal negotiation period, AR invokes the formal dispute resolution procedures of this Section by serving on EPA and DEQ a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by AR.  The Statement of Position shall specify AR's position as to whether formal dispute resolution should proceed under Paragraph 52 (Record Review) or Paragraph 53 (Other Review).

b.      Within thirty (30) days after receipt of AR's Statement of Position, EPA, after consulting with DEQ, will serve on AR its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA.  EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under Paragraph 52 (Record Review) or Paragraph 53 (Other Review).  Not more than thirty (30) days after receipt of EPA's Statement of Position, AR may submit a further statement of position in reply.

c.      If there is disagreement between EPA and AR as to whether dispute resolution should proceed under Paragraph 52 (Record Review) or Paragraph 53 (Other Review), the Parties shall follow the procedures set forth in the Paragraph determined by EPA to be applicable.  However, if AR ultimately appeals to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in Paragraph 52 (Record Review) or Paragraph 53 (Other Review).

52.     **Record Review**.  Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph.  For purposes of this Paragraph, the adequacy of any response action includes, without limitation, (1) the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this Consent Decree; and (2) the adequacy of the performance of response actions taken pursuant to this Consent Decree.  Nothing in this Consent Decree shall be construed to allow any dispute by AR regarding the validity of the RODs' provisions except as specifically provided in Section VII (Remedy Review).

a.     An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section.  Where appropriate, EPA may allow submission of supplemental statements of position by the Parties to the dispute.

b.     The Director of the Superfund and Emergency Management Division, EPA Region 8, will issue a final administrative decision resolving the dispute based on the administrative record described in Subparagraph 52.a.  This decision shall be binding upon AR, subject only to the right to seek judicial review pursuant to Subparagraphs 52.c and 52.d.

c.     Any administrative decision made by EPA pursuant to Subparagraph 52.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by AR with the Court and served on all Parties within thirty (30) days of receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the

Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States may file a response to AR's motion within thirty (30) days of receipt of that motion.

        d.      In proceedings on any dispute governed by this Paragraph, AR shall have the burden of demonstrating that the decision of the Director of the Superfund and Emergency Management Division, EPA Region 8, is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to Subparagraph 52.a.

      53.    **Other Review**. Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

        a.      Following receipt of AR's Statement of Position submitted pursuant to Paragraph 51 (Statements of Positions), the Director of the Superfund and Emergency Management Division, EPA Region 8, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under Paragraph 51. The Director of the Superfund and Emergency Management Division's decision shall be binding on AR unless, within thirty (30) days of receipt of the decision, AR files with the Court and serves on the Parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States may file a response to AR's motion within thirty (30) days of receipt of the motion.

b.       Notwithstanding Section I (Background) of this Consent Decree, judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

54.       **No Postponement**.  The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of AR under this Consent Decree, not directly in dispute, unless EPA agrees or the Court orders otherwise or unless specifically provided in this Consent Decree.  Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute as provided in Paragraph 60 (Penalty Accrual).  Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree.  In the event that AR does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).  Stipulated penalties shall not be assessed by the United States nor paid by AR to the extent that AR prevails on the disputed issue.

## XIV.        STIPULATED PENALTIES

55.       **Stipulated Penalties**.  AR shall be liable for stipulated penalties in the amounts set forth in Paragraph 56 (Amounts and Triggering Events) to the United States and the State for failure to comply with the requirements of this Consent Decree specified below, unless excused under Section XII (Force Majeure).  AR shall be liable for stipulated penalties in the amounts set forth in Paragraph 56 (Amounts and Triggering Events) to the State only for failure to comply with the requirements of Paragraph 38.b of this Consent Decree (State Anaconda Site Future Response Costs), unless excused under Section XII (Force Majeure).  "Compliance" by AR shall

69

mean completion of the activities and obligations, including payments, required under this

Consent Decree or any work plan or other deliverable approved under this Consent Decree in

accordance with all applicable requirements of law, this Consent Decree, the SOW, and any

plans or other documents approved by EPA pursuant to this Consent Decree, and within the

specified time schedules established by and approved under this Consent Decree and the SOW.

56.    **Amounts and Triggering Events**.

a.    The following stipulated penalties shall accrue per violation per day for

any noncompliance identified in Subparagraph b:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $5,000 | 1st through 14th day |
| $6,500 | 15th through 30th day |
| $8,500 | 31st day and beyond |

b.    Failure to comply with any of the requirements in Section VI

(Performance of the Work), including sections 4 and 5 (RA except emergency response,

section 5.1(b)) of the SOW (Emergency Response and Reporting), Section VII (Remedy

Review), Section VIII (Property Requirements), Section IX (Financial Assurance), and

Section X (Payment of Response Costs).  Stipulated penalties shall not be assessed under this

Consent Decree for (1) an exceedance or other noncompliance with in-stream surface water

Performance Standards, as set forth in the SOW, or (2) a failure by AR to comply with the

requirements of this Consent Decree attributable to (i) the State's performance of or failure to

perform the State Property Remedial Commitments and/or State Lands Obligations, or (ii)

ADLC's or the Authority's performance of or failure to perform ADLC Obligations.

c.    The following stipulated penalties shall accrue per violation per day for

any noncompliance identified in Subparagraph 56.d:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $3,000 | 1st through 14th day |
| $4,500 | 15th through 30th day |
| $6,000 | 31st day and beyond |

d.      Failure to comply with any of the requirements in Sections XI (Indemnification and Insurance), XVIII (Access to Information), XIX (Retention of Records), and XX (Notices and Submissions) of this Consent Decree, and sections 5.1(b) (Emergency Response and Reporting), 7 (Reporting), and 8 (Deliverables) of the SOW.

e.      In the event that EPA assumes performance of a portion or all of the Work pursuant to Paragraph 69 (Work Takeover) of Section XV (Covenants and Reservations by United States and State), AR shall be liable for a stipulated penalty in the amount of $1,000,000; provided, however, that this stipulated penalty shall not exceed 30% of the present value of the Work to be taken over, based on EPA's cost estimates, including a net discount rate that is appropriate for the Work that is being taken over, considering the Work duration and schedule. Stipulated penalties under this Paragraph are in addition to the remedies available under Paragraph 31 (Access to Financial Assurance) and 69 (Work Takeover).

f.      All stipulated penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity; provided, however, that stipulated penalties shall not accrue: (1) with respect to a deficient submission under section 8 of the SOW (Deliverables), during the period, if any, beginning on the twenty-first (21st) day after EPA's receipt of such submission until five days after the date that EPA notifies AR of any deficiency; (2) with respect to a decision by the Director of the Superfund and Emergency Management Division, EPA Region 8, under Subparagraph 52.b or 53.a of Section XIII (Dispute

71

Resolution), during the period, if any, beginning on the 21st day after the date that AR's reply to EPA's Statement of Position is received until five days after the date that the Director issues a final decision regarding such dispute; or (3) with respect to judicial review by this Court or the Court of Appeals of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the receipt by the applicable court of the final submission regarding the dispute until five days after the date that the applicable court issues a final decision regarding such dispute.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

57.     **Notice**.  Following EPA's or DEQ's determination, in consultation with the other governmental party, that AR has failed to comply with a requirement of this Consent Decree, EPA or DEQ shall give AR written notification of the same and describe the noncompliance.  If EPA or DEQ determine that stipulated penalties are applicable to a noncompliance event, EPA or DEQ may send AR a written demand for payment of the penalties.  However, stipulated penalties shall accrue as provided in Paragraph 54 (No Postponement) and Paragraph 56 (Amounts and Triggering Events) regardless of whether EPA or DEQ has provided a written demand to AR for payment of stipulated penalties.

58.     **Payment**.  All penalties accruing under this Section shall be due and payable to the United States or the State within thirty (30) days of AR's receipt from EPA or DEQ of a demand for payment of the stipulated penalties, unless AR invokes the Dispute Resolution procedures under Section XIII (Dispute Resolution).  All payments to the United States or the State under this Section shall be made in accordance with Paragraph 38 (Payment of Anaconda Site Future Response Costs).

59.     **Obligation to Perform Work**.  The payment of stipulated penalties shall not alter in any way AR's obligation to complete the performance of the Work required under this Consent Decree.

60.     **Penalty Accrual**.  Penalties shall continue to accrue as provided in Paragraph 57 (Notice) during any dispute resolution period, but need not be paid until the following:

a.      If the dispute is resolved by agreement or by a decision of EPA that is not appealed to this Court, AR shall pay accrued stipulated penalties determined to be owing to EPA or DEQ and Interest in accordance with Paragraph 40 (Interest) within fifteen (15) days after the agreement or the receipt of EPA's decision or order;

b.      If the dispute is appealed to this Court and EPA or DEQ, as appropriate, prevails in whole or in part, AR shall pay all accrued stipulated penalties determined by the Court to be owed to EPA or DEQ and Interest in accordance with Paragraph 40 (Interest) within 60 days of receipt of the Court's decision or order, except as provided in subparagraph 60.c below; and

c.      If this Court's decision is appealed by any Party, Interest (in accordance with Paragraph 40 (Interest)) shall accrue on the stipulated penalties determined by this Court to be owing to EPA or DEQ.  Within fifteen (15) days of receipt of the final appellate court decision, AR shall pay all accrued stipulated penalties and Interest (in accordance with Paragraph 40 (Interest)) determined to be owed by AR to EPA or DEQ.

61.     **United States' and State's Collection of Stipulated Penalties**.

a.      If AR fails to pay stipulated penalties when due, the United States or the State may institute proceedings to collect the penalties, as well as Interest in accordance with

Paragraph 40 (Interest) and the cost of enforcing the requirements of this Consent Decree, including attorney's fees.  AR shall pay Interest on the unpaid balance of any stipulated penalty, which shall begin to accrue in accordance with Paragraph 40 (Interest).

b.      Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of AR's violation of this Consent Decree or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(l) of CERCLA, 42 U.S.C. § 9622(l); provided, however, that the United States shall not seek civil penalties pursuant to Section 122(l) of CERCLA, and/or to any of the RCRA and Clean Water Act provisions referenced in Paragraph 63 (Covenants to AR), for (1) any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of this Consent Decree, or (2) any violation excluded from stipulated penalties under Paragraph 56.b(1)-(2).

62.      **Stipulated Penalty Waiver**.  Notwithstanding any other provision of this Section, the United States and the State may, in their unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Consent Decree.

## XV.      COVENANTS AND RESERVATIONS BY UNITED STATES AND STATE

63.      **Covenants to AR**.

a.      **United States' Covenant to AR**.  In consideration of the actions that will be performed and the payments that will be made by AR under the terms of this Consent Decree, and except as specifically provided in Paragraphs 65 (Pre-Certification Reservations), 66 (Post-Certification Reservations) and 68 (General Reservations of Rights), the United States covenants

74

not to sue or to take administrative action against AR, any of AR's parent or affiliate

corporations providing the financial assurances required under Section IX (Financial Assurance)

of this Consent Decree, the subsidiaries of such parent or affiliate corporations, and their

respective officers, directors and employees, to the extent that the liability of such parent or

affiliate companies, subsidiaries, officers, directors, and employees arises solely from their status

as parent or affiliate companies, subsidiaries, officers, directors, and employees, pursuant to

Sections 106, 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613(f);  Sections

3004(u) and (v), 3008 and 7003 of RCRA, 42 U.S.C. §§ 6924(u) and (v), 6928 and 6973; and

Sections 309(b), 311 and 504 of the Clean Water Act, 33 U.S.C. §§ 1319(b), 1321 and 1364

relating to the ARWW&S OU, the CSOU, the OW/EADA OU, and the Anaconda Site.  Except

with respect to future liability, these covenants shall take effect upon the receipt by the United

States of the payments required by Paragraphs 35 (Payment of Anaconda Site Response Costs)

and 36 (Payment of USFS Response Costs).   With respect to future liability, these covenants

shall take effect as follows: (1) for the ARWW&S OU, upon Certification of Remedial Action

Completion for the ARWW&S OU pursuant to section 5.1(e) of the SOW; (2) for the CSOU,

upon Certification of Remedial Action Completion for the CSOU pursuant to section 5.1(e) of

the SOW; (3) for the OW/EADA OU, upon Certification of Remedial Action Completion for the

OW/EADA OU pursuant to section 5.1(e) of the SOW; and (4) for the Anaconda Site, including

all of its OUs, upon Certification of Site-Wide Remedial Action Completion pursuant to section

5.1(h) of the SOW.   These covenants are conditioned upon the satisfactory performance by AR

of its obligations under this Consent Decree.  These covenants extend only to AR, AR's parent or

affiliate corporations providing the financial assurances required under Section IX (Financial

Assurance) of this Consent Decree, the subsidiaries of such parent or affiliate corporations, and their respective officers, directors, and employees, and do not extend to any other person.

        b.   **State's Covenant to AR**. In consideration of the actions that will be performed and the payments that will be made by AR under the terms of this Consent Decree, and except as specifically provided in Paragraphs 65 (Pre-Certification Reservations), 66 (Post-Certification Reservations) and 68 (General Reservations of Rights), the State covenants not to sue or to take administrative action against AR, AR's parent or affiliate corporations providing the financial assurances required under Section IX (Financial Assurance) of this Consent Decree, the subsidiaries of such parent or affiliate corporations, and their respective officers, directors and employees, to the extent that the liability of such parent or affiliate companies, subsidiaries, officers, directors, and employees arises solely from their status as parent or affiliate companies, subsidiaries, officers, directors, and employees, pursuant to Sections 106, 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections 3004(u) and (v), 3008 and 7002 of RCRA, 42 U.S.C. §§ 6924 (u) and (v), 6928 and 6972; Sections 309(a), 311, 504 and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(a), 1321, 1364 and 1365; Sections 601, 602, 611, 613, 614 (except with respect to enforcement of an emergency order under 75-5-621), 615, 617, 631 and 635 of the Montana Water Quality Act, MCA §§ 75-5-601, 602, 611, 613, 614 (except with respect to enforcement of an emergency order under MCA § 75-5-621), 615, 617, 631 and 635; Section 415 of the Montana Hazardous Waste Act, MCA § 75-10-415; and Sections 711, 715, 722 and 726 of CECRA, MCA §§ 75-10-711, 712, 722 and 726 relating to the ARWW&S OU, the CSOU, the OW/EADA OU, and the Anaconda Site. Except with respect to future liability, these covenants shall take effect upon the Effective Date. With respect to future liability, these

covenants shall take effect as follows: (1) for the ARWW&S OU, upon Certification of Remedial Action Completion for the ARWW&S OU pursuant to section 5.1(e) of the SOW; (2) for the CSOU, upon Certification of Remedial Action Completion for the CSOU pursuant to section 5.1(e) of the SOW; (3) for the OW/EADA OU, upon Certification of Remedial Action Completion for the OW/EADA OU pursuant to section 5.1(e) of the SOW; and (4) for the Anaconda Site, including all of its OUs, upon Certification of Site-Wide Remedial Action Completion pursuant to section 5.1(h) of the SOW.  These covenants are conditioned upon the satisfactory performance by AR of its obligations under this Consent Decree.  These covenants, as described in this Subparagraph, extend only to AR, AR's parent or affiliate corporations providing the financial assurances required under Section IX (Financial Assurance) of this Consent Decree, the subsidiaries of such parent or affiliate corporations, their respective officers, directors, and employees, and do not extend to any other person.

  64. **EPA Covenant to Settling Federal Agencies**.  Except as provided in Paragraphs 65 (Pre-Certification Reservations), 66 (Post-Certification Reservations) and 68 (General Reservations of Rights), EPA covenants not to take administrative action against Settling Federal Agencies pursuant to Sections 106, 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections 3004(u) and (v), 3008 and 7003 of RCRA, 42 U.S.C. §§ 6924(u) and (v), 6928 and 6973; Sections 309(b), 311 and 504 of the Clean Water Act, 33 U.S.C. §§ 1319(b), 1321 and 1364 relating to the ARWW&S OU, the CSOU, the OW/EADA OU, and the Anaconda Site.  Except with respect to future liability, EPA's covenant shall take effect upon the Effective Date.  With respect to future liability, EPA's covenant shall take effect as follows: (1) for the ARWW&S OU, upon Certification of Remedial Action Completion for the ARWW&S

OU pursuant to section 5.1(e) of the SOW; (2) for the CSOU, upon Certification of Remedial

Action Completion for the CSOU pursuant to section 5.1(e) of the SOW; (3) for the OW/EADA

OU, upon Certification of Remedial Action Completion for the OW/EADA OU pursuant to

section 5.1(e) of the SOW; and (4) for the Anaconda Site, including all of its OUs, upon

Certification of Site-Wide Remedial Action Completion pursuant to section 5.1(h) of the SOW.

EPA's covenant extends only to Settling Federal Agencies and does not extend to any other

person.

     65.    **Pre-Certification Reservations**.

     a.    **United States' Pre-Certification Reservations**.  Notwithstanding any

other provision of this Consent Decree, except for the United States' reservation of rights under

Paragraph 68.a(6), the United States reserves, and this Consent Decree is without prejudice to,

the right to institute proceedings in this action pursuant to this Consent Decree, or in a new

action, or to issue an administrative order seeking to compel AR, and EPA reserves the right to

issue an administrative order to compel Settling Federal Agencies:

     (1)    To perform further response actions relating to the Anaconda

Site; and/or

     (2)    To reimburse the United States for additional costs of response

relating to the Anaconda Site

     if, prior to Certification of Site-Wide Remedial Action Completion:

     A.    Conditions at the Anaconda Site, previously unknown to

EPA, are discovered, or

B.       Information, previously unknown to EPA, is received, in

whole or in part,

and EPA determines that these previously unknown conditions or information together with any

other relevant information indicates that the Remedial Action is not protective of human health

or the environment.

b.       **State's Pre-Certification Reservations**.  Notwithstanding any other

provision of this Consent Decree, except for the State's reservation of rights under Paragraph

68.a(6), the State reserves, and this Consent Decree is without prejudice to, the right to institute

proceedings in this action pursuant to this Consent Decree, in a new action against AR, or in an

administrative order seeking to compel AR:

(1)       To perform further response actions relating to the Anaconda

Site; and/or

(2)       To reimburse the State for additional costs of response relating to

the Anaconda Site

if, prior to Certification of Site-Wide Remedial Action Completion:

A.       Conditions at the Anaconda Site, previously unknown to

the State, are discovered, or

B.       Information, previously unknown to the State, is received,

in whole or in part,

and the State determines that these previously unknown conditions or information together with any other relevant information indicates that the Remedial Action is not protective of human health or the environment.

66.     **Post-Certification Reservations**.

a.      **United States' Post-Certification Reservations**.  Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action pursuant to this Consent Decree, or in a new action, or to issue an administrative order seeking to compel AR, and EPA reserves the right to issue an administrative order to the Settling Federal Agencies:

(1)     To perform further response actions relating to the Anaconda Site; and/or

(2)     To reimburse the United States for additional costs of response relating to the Anaconda Site

if, subsequent to Certification of Site-Wide Remedial Action Completion:

A.      Conditions at the Anaconda Site, previously unknown to EPA, are discovered, or

B.      Information, previously unknown to EPA, is received, in whole or in part,

and EPA determines that these previously unknown conditions or information together with any other relevant information indicate that the Remedial Action is not protective of human health or the environment.

80

b.      **State's Post-Certification Reservations**.  Notwithstanding any other provision of this Consent Decree, the State reserves, and this Consent Decree is without prejudice to, the right to institute proceedings in this action as pursuant to this Consent Decree, in a new action against AR, or in an administrative order seeking to compel AR:

(1)      To perform further response actions relating to the Anaconda Site; and/or

(2)      To reimburse the State for additional costs of response relating to the Anaconda Site

if, subsequent to Certification of Site-Wide Remedial Action Completion:

A.      Conditions at the Anaconda Site, previously unknown to the State, are discovered, or

B.      Information, previously unknown to the State, is received, in whole or in part,

and the State determines that these previously unknown conditions or information together with any other relevant information indicate that the Remedial Action is not protective of human health or the environment.

67.      **Information and Conditions Known**.

a.      **Information and Conditions Known to the United States**.  For purposes of Subparagraph 65.a (United States' Pre-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of lodging of this Consent Decree that are described or contained in: (1) the RODs; (2) all administrative records supporting the RODs; and (3) the EPA Site Record as of the date of

81

lodging of the Consent Decree, except for risk assessment information related to lead and arsenic received or discovered by EPA after June 12, 2020.  For purposes of Subparagraph 66.a (United States' Post-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the Certification of Site-Wide Remedial Action Completion and described or contained in: (1) the RODs; (2) the administrative records supporting the RODs; (3) the EPA Site Record as of the date of the Certification of Site-Wide Remedial Action Completion for the Anaconda Site; and (4) any other information received or discovered by EPA pursuant to the requirements of this Consent Decree as of the date of Certification of Site-Wide Remedial Action Completion for the Anaconda Site. Information and conditions known to the United States does not include risk assessment information related to lead and arsenic received or discovered by EPA after June 12, 2020.  Any modification after the Effective Date of the lead and/or arsenic action levels set forth in the RODs may only be lawfully required under a ROD amendment.

      b.    **Information and Conditions Known to the State**.  For purposes of Subparagraph 65.b (State's Pre-Certification Reservations), the information and the conditions known to the State shall include only that information and those conditions known to the State as of the date of lodging of this Consent Decree that are described or contained in: (1) the RODs; (2) the administrative records supporting the RODs; (3) the State Site Record as of the date of lodging of the Consent Decree, except for risk assessment information related to lead and arsenic received or discovered by the State or EPA after June 12, 2020; and (4) the files or records related to the State Action.  For purposes of Subparagraph 66.b (State's Post-Certification Reservations), the information and the conditions known to the State shall include only that

information and those conditions known to the State as of the Certification of Site-Wide Remedial Action Completion as described or contained in: (1) the RODs; (2) the administrative records supporting the RODs; (3) the State Site Record as of the date of Certification of Site-Wide Remedial Action Completion for the Anaconda Site; (4) the files and records related to the State action; and (5) any other information received or discovered by the State pursuant to the requirements of this Consent Decree as of the date of Certification of Site-Wide Remedial Action Completion for the Anaconda Site.  Information and conditions known to the State does not include risk assessment information related to lead and arsenic received or discovered by the State or EPA after June 12, 2020.  Any modification after the Effective Date of the lead and/or arsenic action levels set forth in the RODs may only be lawfully required under a ROD amendment.

68.     **General Reservations of Rights**.

a.     **United States' General Reservations of Rights**.  The covenants set forth in Paragraph 63 (Covenants to AR) and Paragraph 64 (EPA Covenants to Settling Federal Agencies) do not pertain to any matters other than those expressly specified in those Paragraphs. With respect to all other matters, including but not limited to Paragraph 77 (Contribution Protection), the United States reserves, and this Consent Decree is without prejudice to, all rights against AR, and EPA reserves the right to issue an administrative order seeking to compel the Settling Federal Agencies, to take action in certain circumstances, including, but not limited to, the following:

(1)     Claims or actions to enforce this Consent Decree based on a failure by AR or Settling Federal Agencies to meet a requirement of this Consent Decree;

83

(2)      Liability for response costs and injunctive relief under CERCLA

Sections 106, 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613(f);

and Sections 3004(u) and (v), 3008 and 7003 of RCRA, 42 U.S.C. §§ 6924(u) and (v),

6928 and 6973; and Sections 309(b), 311 and 504 of the Clean Water Act, 33 U.S.C. §§

1319(b), 1321 and 1364 arising from the past, present, or future disposal, release, or

threat of release of Waste Materials outside of the Anaconda Site, other than as provided

in the RODs or the Work.  For purposes of this Reservation, the downstream movement

of hazardous substances from the areas where AR is performing the surface water

remediation as part of the Remedial Action for the ARWW&S OU is not a disposal or "a

release of Waste Materials outside of the Anaconda Site" as long as AR is in compliance

with its obligations under this Consent Decree and any other lawful cleanup requirements

under administrative orders associated with the Site;

(3)      Liability for response costs and injunctive relief under CERCLA

Sections 106, 107(a), and 113(f) of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613(f);

and Sections 3004(u) and (v), 3008 and 7003 of RCRA, 42 U.S.C. §§ 6924(u) and (v),

6928, and 6973; and Sections 309(b), 311 and 504 of the Clean Water Act, 33 U.S.C. §§

1319(b), 1321 and 1364 for future acts of disposal of Waste Material at the Anaconda

Site by AR or Settling Federal Agencies, other than as provided in the RODs, the Work,

or response actions otherwise ordered by EPA, and specifically excluding any claims for

violations of existing or future permits under such statutes;

(4)      Criminal liability;

84

(5)      Liability for violations of federal or state law by AR or any

Settling Federal Agency which occur during or after implementation of the Work;

(6)      Liability, prior to Certification of Remedial Action Completion

for either the ARWW&S OU, the CSOU, or the OW/EADA OU, for additional response

actions within any of these respective operable units that EPA determines are necessary

to achieve and maintain Performance Standards, or to carry out and maintain the

effectiveness of the Remedial Action, but that cannot be required pursuant to Paragraph

13 (Modification of SOW or Related Deliverables) because they are outside the Scope of

the Remedy as defined in section 3 of the SOW.  The rights reserved under this

Subparagraph shall be exercised only in a separate judicial proceeding in the Federal

Action (but not under this Consent Decree) or a new action, or under a new and/or

existing administrative order; and

(7)      Liability for damages for injury to, destruction of, or loss of,

natural resources and for the costs of assessing and litigating any claims for natural

resource damages relating to the Anaconda Site against AR, but only to the extent such

claims are reserved in Paragraph 114 of the Clark Fork Operable Unit Consent Decree or

the Paragraph 77 of the Streamside Tailings Consent Decree.

b.      **State's General Reservation of Rights**.  The covenants set forth in

Paragraph 63 (Covenants to AR) do not pertain to any matters other than those expressly

specified in that Paragraph.  With respect to all other matters, including but not limited to

Paragraph 77 (Contribution Protection), the State reserves, and this Consent Decree is without

prejudice to all rights against AR, including but not limited to the following:

(1)      Claims or actions to enforce this Consent Decree based on a failure by AR to meet a requirement of this Consent Decree;

(2)      Liability for response costs and injunctive relief under CERCLA Sections 106, 107, and 9613(f), 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections 3004(u) and (v), 3008 and 7002 of RCRA, 42 U.S.C. §§ 6924 (u) and (v), 6928 and 6972; Sections 309(a), 311, 504 and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(a), 1321, 1364 and 1365; Sections 601, 602, 611, 613, 614, 615, 617, 631 and 635 of the Montana Water Quality Act, MCA §§ 75-5-601, 602, 611, 613, 614, 615, 617, 631 and 635; Section 415 of the Montana Hazardous Waste Act, MCA § 75-10-415; and Sections 711, 715, 722 and 726 of CECRA, MCA §§ 75-10-711, 715, 722 and 726 arising from the past, present, or future disposal, release, or threat of release of Waste Materials outside of the Anaconda Site, other than as provided in the RODs or the Work.  For purposes of this Reservation, the downstream movement of hazardous substances from the areas where AR is performing the surface water remediation as part of the Remedial Action for the ARWW&S OU is not a disposal or "a release of Waste Materials outside of the Anaconda Site" as long as AR is in compliance with its obligations under this Consent Decree and any other lawful cleanup requirements under administrative orders associated with the Site;

(3)      Liability for response costs and injunctive relief under CERCLA Sections 106, 107, and 9613(f), 42 U.S.C. §§ 9606, 9607(a) and 9613(f); Sections 3004(u) and (v), 3008 and 7002 of RCRA, 42 U.S.C. §§ 6924 (u) and (v), 6928 and 6972; Sections 309(a), 311, 504 and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(a), 1321,

86

1364 and 1365; Sections 601, 602, 611, 613, 614, 615, 617, 631 and 635 of the Montana

Water Quality Act, MCA §§ 75-5-601, 602, 611, 613, 614, 615, 617, 631 and 635;

Section 415 of the Montana Hazardous Waste Act, MCA § 75-10-415; and Sections 711,

715, 722 and 726 of CECRA, MCA §§ 75-10-711, 715, 722 and 726 for future acts of

disposal of Waste Material at the Anaconda Site by AR, other than as provided in the

RODs, the Work, or otherwise ordered by EPA, and specifically excluding any claims for

violations of existing or future permits under such statutes;

(4)     Criminal liability;

(5)     Liability for violations of federal or state law by AR which occur

during or after implementation of the Work;

(6)     Liability, prior to Certification of Remedial Action Completion

for either the ARWW&S OU, the CSOU, or the OW/EADA OU, for additional response

actions within any of these respective operable units that the State determines are

necessary to achieve Performance Standards, or to carry out and maintain the

effectiveness of the Remedial Action, but that cannot be required pursuant to Paragraph

13 (Modification of SOW or Related Deliverables) because they are outside the Scope of

the Remedy as defined in section 3 of the SOW.  The rights reserved under this

Subparagraph shall be exercised only in a separate judicial proceeding in the Federal

Action (but not under this Consent Decree) or a new action, or under a new and/or

existing administrative order; and

(7)     Liability for damages for injury to, destruction of, or loss of,

natural resources and for the costs of assessing and litigating any claims for natural

resource damages and other liability relating to the Anaconda Site against AR, but only to the extent such claims are reserved in consent decrees previously entered in the State Action.

69.     **Work Takeover**.

a.     In the event EPA, in consultation with DEQ, determines that AR has (i) ceased implementation of any portion of the Work, (ii) is seriously or repeatedly deficient or late in its performance of the Work, or (iii) is implementing the Work in a manner which may cause an endangerment to human health or the environment, EPA may issue a "Work Takeover Notice" to AR.  Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide AR a period of thirty (30) days within which to remedy the circumstances giving rise to EPA's issuance of such notice.  EPA may extend the thirty (30) day period for good cause.

b.     If, after expiration of the  notice period specified in Subparagraph 69.a, AR has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portions of the Work as EPA deems necessary ("Work Takeover").  EPA shall notify AR in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this Subparagraph 69.a.

c.     AR may invoke the procedures set forth in Paragraph 52 (Record Review) of Section XIII (Dispute Resolution), to dispute EPA's implementation of a Work Takeover under Subparagraph 69.b.  However, notwithstanding AR's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA, in consultation with DEQ, may

88

in its sole discretion commence and continue a Work Takeover under Subparagraph 69.b until the earlier of (i) the date that AR remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (ii) the date that a final decision is rendered in accordance with Section XIII (Dispute Resolution), Paragraph 52 (Record Review), requiring EPA to terminate such Work Takeover.

       d.      After commencement and for the duration of any Work Takeover, EPA shall have immediate access to and benefit of any financial assurance mechanism provided pursuant to Section IX (Financial Assurance), pursuant to the terms of said form of performance guarantee and pursuant to Paragraph 31 (Access to Financial Assurance) of that Section.  Any unreimbursed costs incurred by EPA in performing Work under the Work Takeover shall be considered Federal Anaconda Site Future Response Costs that AR shall pay pursuant to Section X (Payment of Response Costs).

      70.    **Reservation of Response Authority**.  Notwithstanding any other provision of this Consent Decree, the United States and the State retain all authority and reserve all rights to take any and all response actions authorized by law.

## XVI.     COVENANTS AND RESERVATIONS BY AR AND SETTLING FEDERAL AGENCIES

      71.    **AR's Covenants**.

      a.      **AR's Covenants not to Sue the United States**.  Subject to the reservations in Paragraph 73 (AR's Reservation of Rights), AR hereby covenants not to sue and agrees not to assert any past, present, or future claims or causes of action against the United States, its agencies, instrumentalities, officials, employees, agents, and contractors relating to the Anaconda Site, as defined herein, including:

(1)     Any direct or indirect claim related to the Anaconda Site for reimbursement from the Hazardous Substance Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507) through CERCLA Sections 106(b)(2), 107, 111, 112, 113 or any other provision of law;

(2)     Any claims under CERCLA Sections 107 or 113, 42 U.S.C. §§ 9607 and 9613; under RCRA Sections 3004(u) and (v), 3008 and 7002, 42 U.S.C. §§ 6924(u) and (v), 6928 and 6972; under Sections 311, 504 and 505 of the Clean Water Act, 33 U.S.C. §§ 1321, 1364 and 1365; or under CECRA, including Sections 711, 715, 719, 722, 724 and 726, MCA §§ 75-10-711, 75-10-715, 75-10-719, 75-10-722, 75-10-724, 75-10-726 and any other theory of recovery or provision of law relating to the Anaconda Site; or

(3)     Any claims arising out of response activities at the Anaconda Site, including claims based on EPA's selection of response actions, oversight of response activities, or approval of plans for such activities, including any claim under the United States Constitution, the State of Montana Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

b.     **AR's Covenant Not to Sue the State**.  Subject to the reservations in Paragraph 73 (AR's Reservation of Rights), AR hereby covenants not to sue and agrees not to assert any past, present, or future claims or causes of action against the State, its agencies, instrumentalities, officials, employees, agents, and contractors relating to the Anaconda Site, as defined herein, including:

90

(1)      Any direct or indirect claim for reimbursement or funding under

State law, including any direct or indirect claim related to the Anaconda Site for

reimbursement from the Environmental Quality Protection Fund (established pursuant to

MCA 75-10-704), the Orphan Share Account (established pursuant to MCA 75-10-743),

or any other provision of law;

(2)      Any claims under CERCLA Sections 107 or 113, 42 U.S.C.

Sections 9607 and 9613; under RCRA Sections 3004(u) and (v), 3008 and 7002, 42

U.S.C. §§ 6924(u) and (v), 6928 and 6972; under Sections 311, 504 and 505 of the Clean

Water Act, 33 U.S.C. §§ 1321, 1364 and 1365; or under CECRA, including Sections 711,

715, 719, 722, 724 and 726, MCA §§ 75-10-711, 75-10-715, 75-10-719, 75-10-722,

75-10-724, 75-10-726 and any other theory of recovery or provision of law relating to the

Anaconda Site; or

(3)      Any claims arising out of response activities at the Anaconda

Site, including claims based on selection of response actions, oversight of response

activities, or approval of plans for such activities including any claim under the United

States Constitution, the State of Montana Constitution, the Tucker Act, 28 U.S.C. § 1491,

the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

72.      **Covenant by Settling Federal Agencies to EPA**.  Settling Federal Agencies

except for EPA agree not to assert any direct or indirect claim for reimbursement from the EPA

Hazardous Substance Superfund through CERCLA Sections 106(b)(2), 107, 111, 112 or 113 or

any other provision of law with respect to the Anaconda Site and this Consent Decree.  This

covenant does not preclude demand for reimbursement from the Superfund of costs incurred by a

Settling Federal Agency in the performance of its duties (other than pursuant to this Consent

Decree) as lead or support agency under the NCP.

73.     **AR's Reservation of Rights**.  AR reserves, and this Consent Decree is without

prejudice to:

a.     Claims against the United States, subject to the provisions of Chapter 171

of Title 28 of the United States Code, and claims against the State under Chapter 9 of Title 2 of

Montana Code Annotated for money damages for injury or loss of property or personal injury or

death caused by the negligent or wrongful act or omission of any employee of the United States

or the State while acting within the scope of his office or employment under circumstances

where the United States or the State, if a private person, would be liable to the claimant in

accordance with the law of the place where the act or omission occurred.  However, any such

claim shall not include a claim for any damages caused, in whole or in part, by the act or

omission of any person, including any contractor, who is not a federal employee as that term is

defined in 28 U.S.C. § 2671, or an employee, as that term is defined in 2-9-101, MCA; nor shall

any such claim include a claim based on EPA's selection of response actions that may be

required under this Consent Decree or the oversight or approval of AR's plans or activities.  The

foregoing applies only to claims which are brought pursuant to any Federal or State statute other

than CERCLA or CECRA and for which the waiver of sovereign immunity is found in a statute

other than CERCLA or CECRA.

b.     In the event the United States or the State initiates a new claim, new

action, or administrative order seeking to compel AR to perform and/or pay for further response

actions pursuant to the reservations of the United States and the State under Paragraph 65 (Pre-

92

Certification Reservations), Paragraph 66 (Post-Certification Reservations), or Paragraph 68

(General Reservations of Rights), excluding Subparagraphs 68.a(1) and 68.b(1) (claims for

failure to meet a requirement of the Consent Decree), 68.a(4) and 68.b(4) (criminal liability), and

68.a(5) and 68.b(5) (violations of federal/state law during or after implementation of the Work),

then AR reserves the defenses, contribution claims, counterclaims, and other claims that AR

reserved in Paragraph 20 of the Past Costs Consent Decree and did not otherwise waive or settle

under the Past Costs Consent Decree (including, but not limited to, contribution claims against

any person or entity not a party to the Past Costs Consent Decree), but only for defenses,

contribution claims, counterclaims, and other claims arising from the same matters, transactions,

or occurrences that are raised in or directly related to the United States' or the State's new

claims, actions, or orders against AR;

      c.    Any claim, defense, or counterclaim by AR against the State which is

expressly reserved in a consent decree previously entered in the State Action; and

      d.    Any defenses to any claim by the United States or the State for civil

penalties under Section 109 or 122(l) of CERCLA, 42 U.S.C. §§ 9609 or 9622(l), but only for

defenses arising from the same matters, transactions, or occurrences that are raised in or directly

related to the United States' claims or the State's claims against AR in such an action.

74.    **Preauthorization**.  Nothing in this Consent Decree shall be deemed to constitute

approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42

U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

75.    **Waiver of Claims**.  AR agrees not to assert any claims and to waive all

CERCLA, CECRA, and RCRA claims or causes of action that it may have for all matters

relating to the Anaconda Site, including for contribution, against any person where the person's liability to AR with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material contributed by such person to the Site containing hazardous substances did not exceed 110 gallons of liquid materials or 200 pounds of solid materials.  This waiver shall not apply to any claim or cause of action against any person meeting the above criteria if: (i) EPA has determined that the materials contributed to the Site by such person contributed or could contribute significantly to the costs of response at the Site; (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927; or (iii) such person has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site.  This waiver shall also be void to the extent that the United States or the State institutes a new claim in the Federal Action (but not under this Consent Decree) or a new action, or issues a new administrative order to AR, pursuant to Subparagraph 68.a(6) or 68.b(6) (General Reservations of Rights) of this Consent Decree.  In addition, this waiver also shall not apply with respect to any defense, claim, or cause of action that AR may have against any person if such person asserts a claim or cause of action relating to the Site against AR.

## XVII.    EFFECT OF SETTLEMENT; CONTRIBUTION

76.    **Effect on Nonparties**.  Except as provided in Paragraphs 63 (Covenants to AR) and 75 (Waiver of Claims), nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.  The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this Consent Decree may have under applicable law.  Except as provided in Paragraph 75 (Waiver of Claims), each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the matters addressed in this Consent Decree against any person not a Party hereto.  Nothing in this Consent Decree diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2) and (3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

77.    **Contribution Protection**.  The Parties agree, and by entering this Consent Decree this Court finds, that this Consent Decree constitutes a judicially-approved settlement pursuant to which AR and the Settling Federal Agencies have, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2) and/or Section 719(1) of CECRA, 75-10-719(1), and are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA and/or Section 719(1) of CECRA, or as may be otherwise provided by law, for the "matters addressed" in this Consent Decree.  For purposes of this Paragraph, the "matters

95

addressed" in this Consent Decree include: Anaconda Site Response Costs, Anaconda Site Future Response Costs, USFS Response Costs, as well as all response actions taken and to be taken, at or in connection with the Anaconda Site, by the United States or any other person; provided, however, that if the United States exercises rights under the reservations in Paragraph 65.a, 66.a, and 68.a(1)-(3), (5)-(6), the "matters addressed" in this Consent Decree will no longer include those response costs or response actions that are within the scope of the exercised reservation.  The contribution protection set forth in this Paragraph is intended to provide the broadest protection afforded by CERCLA and CECRA for matters addressed in this Consent Decree.

78.     The Parties further agree, and by entering this Consent Decree this Court finds, that the complaints filed by the United States and the State in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to which AR and the Settling Federal Agencies have, as of the Effective Date, resolved liability to the United States and the State within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

79.     **Notification**.  AR agrees that with respect to any suit or claim for contribution brought by it for matters related to this Consent Decree, it will notify the United States and the State in writing no later than sixty (60) days prior to the initiation of such suit or claim. AR agrees that with respect to any suit or claim brought against it for matters related to this Consent Decree, it will notify the United States and the State in writing within ten (10) days after being served with the complaint.  In addition, AR shall notify the United States and the State within ten

(10) days of service or receipt of any motion for summary judgment and within ten (10) days of

receipt of any order from a court setting a case for trial.

       80.    **Waiver of Claim-Splitting Defenses**.

         a.    In any subsequent administrative or judicial proceeding initiated by (1) the

United States or the State for injunctive relief, recovery of response costs, or other appropriate

relief relating to the Anaconda Site or any of the operable units within the Clark Fork NPL sites,

or (2) the United States or the State for other claims reserved in Paragraphs 65 (Pre-Certification

Reservations), 66 (Post-Certification Reservations), and 68 (General Reservation of Rights), AR

shall not assert, and may not maintain, any defense or claim based upon the principles of waiver,

res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon

any contention that the claims raised in the subsequent proceeding by the United States or the

State were or should have been brought in the Federal Action or in the State Action; provided,

however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set

forth in Section XV (Covenants and Reservations by United States and State).

         b.    In any subsequent administrative or judicial proceeding initiated by the

United States or the State, for injunctive relief, recovery of response costs, or other appropriate

relief relating to the Anaconda Site, neither the United States nor the State shall use any

provision of this Consent Decree to assert and maintain any defense or claim based upon the

principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other

defenses based upon any contention that the claims raised by AR in the subsequent proceeding

were or should have been brought in the Federal Action or in the State Action; provided,

however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set

forth in Section XVI (Covenants and Reservations by AR and Settling Federal Agencies).

## XVIII.    ACCESS TO INFORMATION

81.    **Obligation to Provide Documents**.  Subject to the assertion of privilege claims

in accordance with Paragraph 82 (Claims of Privilege), AR shall provide to EPA and DEQ, upon

request, copies of all documents and information within its possession or control or that of its

contractors or agents relating to the Anaconda Site or to the implementation of this Consent

Decree, including, but not limited to, sampling, analysis, chain of custody records, manifests,

trucking logs, receipts, reports, sample traffic routing, and correspondence.  In response to

reasonable requests by EPA, in consultation with DEQ, AR shall cooperate in making available

to EPA and DEQ, for purposes of investigation, information gathering, or testimony, its

employees, agents, or representatives with knowledge of relevant facts concerning the

performance of the Work, subject to their right to counsel or any other right under State and

Federal law.

82.    **Claims of Privilege**.

a.    AR may assert business confidentiality claims covering part or all of the

documents or information submitted to the United States, EPA, or DEQ under this Consent

Decree to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA,

42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b).  Documents or information determined to be

confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B.  If

no claim of confidentiality accompanies documents or information when they are submitted to

the United States, EPA, or DEQ, and if EPA has notified AR that the documents or information

are not confidential under the standards of Section 104(e)(7) of CERCLA, the public may be given access to such documents or information without further notice to AR.

       b.    AR may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by state or federal law.  If AR asserts such a privilege in lieu of providing documents over which it asserts a privilege, and if AR has not previously provided a privilege log to the United States for the documents subject to the request, AR shall provide the United States and/or EPA, and DEQ, with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the contents of the document, record, or information: and (6) the privilege asserted by AR.  However, no documents, reports, or other information that AR is required to create or generate by this Consent Decree shall be withheld on the grounds that they are privileged.

      83.    **Previously Provided Documents**.  Nothing in this Section shall require AR to produce any documents, records, or other information that it has previously produced to the United States or the State, although AR shall cooperate with the United States to identify the approximate date(s) of such previous production or other information to assist the United States in locating previously produced documents.

      84.    **Admissibility**.  If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this Consent Decree.

85.   **No Data Claim**.  No claim of confidentiality shall be made by any Party with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other non-privileged documents or information evidencing conditions relating to the Site.

86.   **Plaintiffs' Retention of Rights**.  Notwithstanding any provision of this Consent Decree, the United States and the State retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIX.   RETENTION OF RECORDS

87.   **Preservation of Records**.  Until 5 years after Certification of Work Completion pursuant to section 5.1(j) of the SOW, AR shall preserve and retain all records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate to the Anaconda Site Work or liability of any person for response actions conducted and to be conducted at the Site, regardless of any corporate retention policy to the contrary.  AR shall also instruct its contractors and agents to preserve all documents and records relating to the performance of the Work at the Site.

88.   **Notification**.  At the conclusion of this document retention period, AR shall notify EPA and DEQ at least ninety (90) days prior to the destruction of any such records or documents.  AR may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by state or federal law.  If AR asserts such a privilege, it shall provide EPA and DEQ with the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the

name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by AR.  However, no final documents, reports or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on the grounds that they are privileged.

89.   **Certification**.  The Anaconda Smelter Hill Complex was demolished between 1980 and 1987.  With the exception of records, documents, and other information that may have been impacted by such demolition, AR hereby certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information relating to its potential liability regarding the Anaconda Site since the notification of potential liability by the United State or the State, and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

90.   **Settling Federal Agency Acknowledgement**.  The United States acknowledges that each Settling Federal Agency (a) is subject to all applicable federal record retention laws, regulations, and policies; and (b) has certified that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XX.     NOTICES AND SUBMISSIONS

91.     **Individuals and Addresses**.  All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this Consent Decree must be in writing unless otherwise specified. Whenever, under this Consent Decree, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the Consent Decree regarding such Party.

As to the United States:

EES Case Management Unit, U.S. Department of Justice
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ# 90-11-2-430

and

Chief, Environmental Defense Section
U.S. Department of Justice
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-11-6-19677

As to EPA:

Site Remedial Project Coordinator
U.S. Environmental Protection Agency
Region 8 Montana Office
10 West 15th Street, Suite 3200
Helena, Montana  59624

Site Attorney
U.S. Environmental Protection Agency
Region 8
1595 Wynkoop Street
Denver, CO 80209

Regional Financial Management Officer
U.S. Environmental Protection Agency
Region 8
1595 Wynkoop Street
Denver, CO 80202-1129

As to EPA Cincinnati Finance Center:

EPA Cincinnati Finance Center
26 W. Martin Luther King Drive
Cincinnati, Ohio 45268
cinwd_acctsreceivable@epa.gov

As to the State or DEQ:

Gordon Levin
State Project Officer
Anaconda CERCLA Site
Department of Environmental Quality
Remediation Division
P.O. Box 200901
Helena, Montana  59620-0901

Jonathan Morgan
DEQ Legal Counsel
Montana Department of Environmental Quality
P.O. Box 200901
Helena, Montana  59620-0901

As to AR:

Shannon Dunlap
Project Coordinator
Atlantic Richfield Company
317 Anaconda Road
Butte, Montana  59701

Luke Pokorny
Project Coordinator
Atlantic Richfield Company
317 Anaconda Road
Butte, MT 59701

Jean A. Martin, Senior Counsel
Atlantic Richfield Company
501 Westlake Park Boulevard
Houston, Texas  77079

## XXI.     RETENTION OF JURISDICTION

92.     This Court retains jurisdiction over both the subject matter of this Consent Decree

and AR for the duration of the performance of the terms and provisions of this Consent Decree

for the purpose of enabling any of the Parties to apply to the Court at any time for such further

order, direction, and relief as may be necessary or appropriate for the construction or

modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to

resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXII.     APPENDICES

93.     The following appendices are attached to and incorporated into this Consent

Decree:

Appendix A – Statement of Work

Appendix B – Map of the Anaconda Site

Appendix C – ARWW&S OU ROD and ROD Amendments

Appendix D – CSOU ROD, ROD Amendment, and ESDs

Appendix E – OW/EADA OU ROD and ESDs

## XXIII.    EFFECTIVE DATE

94.     The Effective Date of this Consent Decree shall be sixty (60) days from the date

that this District Court enters the Consent Decree, unless an appeal of the entry and judgment is

filed during the 60-day period; if an appeal is taken, the Effective Date means the date on which

the District Court's judgment is affirmed.

## XXIV.    MODIFICATION

95.     Except as provided in Paragraph 13 (Modification of SOW or Related

Deliverables), material modifications to this Consent Decree, including the SOW, shall be in

writing, signed by the Parties, and shall be effective upon approval by the Court.  Except as

provided in Paragraph 13, non-material modifications to this Consent Decree, including the

SOW, shall be in writing and shall be effective when signed by duly authorized representatives

of the Parties.  A modification to the SOW shall be considered material if it: (i) changes or

further waives an ARAR; (ii) modifies section 3 of the SOW (Scope of the Remedy); or (iii)

implements a ROD amendment or an ESD that alters the basic features of the selected remedy

within the meaning of 40 C.F.R. § 300.435(c)(2)(i), except as provided in Paragraph 13 and

Section VII (Remedy Review).  Before providing its approval to any modification of the SOW,

the United States will provide DEQ with a reasonable opportunity to review and comment on the

proposed modification.

96.     Nothing in this Consent Decree shall be deemed to alter the Court's power to

enforce, supervise, or approve modifications to this Consent Decree.

## XXV.     LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

97.     This Consent Decree shall be lodged with the Court for at least thirty (30) days

for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C.

§ 9622(d)(2), and 28 C.F.R. § 50.7.  The United States and the State reserve the right to

withdraw or withhold their consent if the comments regarding this Consent Decree disclose facts

or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

AR consents to the entry of this Consent Decree without further notice.

98.     If for any reason the Court should decline to approve this Consent Decree in the

form presented, this agreement is voidable at the sole discretion of any Party and the terms of the

agreement may not be used as evidence in any litigation between the Parties.

## XXVI.     MISCELLANEOUS PROVISIONS

99.     **Partial Consent Decree Obligations**.  As of the Effective Date, AR's obligations

under the Partial Consent Decree shall be replaced and superseded by the requirements of this

Consent Decree.

100.     **Termination of Administrative Orders**.  As of the Effective Date, AR's

obligations under the Administrative Orders shall terminate and be replaced and superseded by

the requirements of this Consent Decree.

101.     **Opportunity to Comment on CERCLA Section 122(e)(6) Requests**.  AR will

be provided with an opportunity to submit written comments to EPA in the event that a

potentially responsible party seeks or is required to seek authorization pursuant to Section

122(e)(6) of CERCLA for remedial action at the Site.

## XXVII.   SIGNATORIES/SERVICE

102.    The undersigned representatives of Atlantic Richfield Company, the Environment and Natural Resources Division of the United States Department of Justice, the United States Environmental Protection Agency, and the Montana Department of Environmental Quality each certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

103.    Each Party agrees not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States or the State has notified AR in writing that it no longer supports entry of this Consent Decree.

104.    AR shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on its behalf with respect to all matters arising under or relating to this Consent Decree.  AR agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons.

## XXVIII.  FINAL JUDGMENT

105.    This Consent Decree, its appendices, and enforceable documents referenced thereto constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the Consent Decree.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

106.     Upon the Court's approval of this Consent Decree, the Decree shall be entered as a final judgment under Fed. R. Civ. P. 54 and 58, and shall serve to satisfy the settlement negotiation requirements contained in paragraph 31(e) of the Streamside Tailings Consent Decree with respect to the Anaconda Site.  The Court expressly determines that there is no just reason for delay in entering this judgment.

SO ORDERED THIS 16TH DAY OF DECEMBER, 2022

<br>

Sam E. Haddon
United States District Judge

108

FOR THE UNITED STATES OF AMERICA:

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
Washington, D.C.  20530


*/s/John Sither*
JOHN SITHER
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044


*/s/Jesse Laslovich*
JESSE LASLOVICH
United States Attorney
District of Montana
316 N. 26th Street, #5018
Billings, Montana  59101


*/s/Mark S. Smith*
MARK S. SMITH
Chief, Civil Division
District of Montana
316 N. 26th Street, #5018
Billings, Montana  59101

109

*/s/Betsy Smidinger*
BETSY SMIDINGER
Director, Superfund and Emergency Management Division
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado  80202

*/s/Kenneth C. Schefski*
KENNETH C. SCHEFSKI
Regional Counsel
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado  80202

*/s/Andrew Lensink*
ANDREW LENSINK
Senior Enforcement Attorney
U.S. Environmental Protection Agency
Region 8
1595 Wynkoop Street
Denver, CO 80202

FOR THE STATE OF MONTANA:


_/s/Greg Gianforte_____
GREG GIANFORTE
Governor of the State of Montana



_/s/Austin Knudsen_____
AUSTIN KNUDSEN
Montana Attorney General



_/s/Chris Dorrington_____
CHRIS DORRINGTON
Director
Montana Department of Environmental Quality



_/s/Jonathan Morgan_____
JONATHAN MORGAN
Legal Counsel
Montana Department of Environmental Quality

FOR THE ATLANTIC RICHFIELD COMPANY:


*/s/Patricia Gallery*
PATRICIA GALLERY
President



*/s/Adam S. Cohen*
ADAM S. COHEN
(authorized to accept service of process by mail on behalf of AR as noted in Paragraph 104)
Davis Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver, Colorado  80202



*/s/Jean A. Martin*
JEAN A. MARTIN
Senior Counsel
Atlantic Richfield Company
501 Westlake Park Blvd.
Houston, Texas 77079